# SAMUEL B. COOK v. GLOBE PRINTING COM-PANY OF ST. LOUIS, Appellant.

### In Banc, April 26, 1910.

1. **JURISDICTION: Libel: Accrues in What County?** A cause of of action accrues in any county in which the newspaper containing all the libel circulates, and under the statute permitting a suit against corporations to be brought "in the county where the cause of action accrued" a libel suit against a corporation may be brought in any county in which the newspaper containing the libel was sold and circulated.

2. ——: ——: ——: **Appearance: Waiver.** An application for a change of venue, made and granted before any plea to the jurisdiction is filed, is an appearance, and a waiver of any objection to the court's jurisdiction over the person of defendant.

3. ——: ——: ——: **Federal Question.** The circuit court has jurisdiction over the subject-matter of a libel suit, and where the jurisdiction of the court over the person of defendant may be made to rest upon other grounds than the constitutionality of the statute permitting the case to be brought in any county in which the cause of action accrued (in total disregard of the residence of plaintiff and defendant), such, for instance, as the voluntary appearance of the defendant and a consequent waiver, the constitutionality of the statute will not be considered.

4. **LIBEL: Pleading: Different Causes in One Count: Perjury: False Affidavit.** A petition setting forth in one count that a certain publication charged plaintiff with perjury and with making a false, voluntary affidavit, does not improperly join two separate and distinct causes of action. There being only one article there is a single tort, and a single tort gives rise to one cause of action only, and need not be split up and placed in separate counts unless the charges are repugnant, inconsistent and self-destructive; and imputations of perjury, making a false affidavit and lying in one publication are not inconsistent, and the damages are not divisible—whether the words used, in law, amount to a charge of a felony (perjury) or of a misdemeanor (voluntarily making a false affidavit).

5. ——: ——: **Waiver.** By answering over and thereby tendering the issue of libel or no libel, defendant waived its motion to elect.

6. ———: **Charge of Perjury: Intention.** The effect and tendency of the language used, not its form, is the criterion by which to determine the actionable quality of the words used in the publication. If on the whole they are defamatory and were so intended and understood, they are libelous. And it is the province of the jury, under the instructions of the court, to construe the publication, and to draw the inference therefrom that defendant imputed to plaintiff the crime of perjury. And an article in which it is assumed that plaintiff, who was the chairman of the State Committee of his party, made and filed a report, with an affidavit attached, in which it was stated that $2500 contributed to the committee's campaign funds by another, had been contributed by plaintiff, when in fact said report had been made and sworn to by the treasurer, and in which article it is said that plaintiff "is the man that swore to what wasn't so," that plaintiff swore that "he contributed $2500 to a campaign fund that was contributed by another man, whose name he wanted to conceal," that the people were "demanding a law that will send them all to the penitentiary," that, "give them a question that goes down to the bottom of their common nature, and they will answer it with almost one voice, and that voice will be an echo of one that came down from Mount Sinai a-sayin' 'Thou shalt not steal,' " that "I reckon they still think, even after what's happened to more'n one chairman of a State committee in Missouri, since that law was passed, that a man can swear to a lie and not be caught at it," and "that the ·people of Missouri is a God-fearing people, and the man who'll do what" plaintiff "done to serve his party or hisself instead of the Lord, and will take the name of the Lord in vain, in swearing to an untruth, will never meet their approval," contains language that warranted a finding that it charged perjury, and also insinuations and innuendoes from which that charge might by reasonable inference have been drawn.

7. ———: **Perjury: Instruction: Amended to Embrace False Affidavit.** A charge that plaintiff voluntarily made a false affidavit is libelous *per se.* Therefore, the court did not err in amending defendant's instruction which told the jury that "unless it appears from the facts and circumstances proven in evidence that the portions of the publication complained of did in fact charge that plaintiff had been guilty of the abominable crime of perjury," by adding immediately thereafter, "or of making a voluntary false affidavit"—the publication as a whole having been submitted to the jury and plaintiff having alleged that it charged him both with perjury and with having voluntarily made a false affidavit, and the evidence showing that he made no affidavit whatever.

8. ————: Justification: Not Pleaded: Participation in Wrongful Act: Mitigation. The defendant cannot under the general issue prove the truth of the defamatory words. Their falsity is presumed, and plaintiff need give no evidence to show them false, but the burden is on defendant to rebut the presumption by giving evidence in support of the plea of justification; and where the truth of the charge is pleaded, it must, to constitute a complete defense, be as broad as the charge. Hence, where defendant in its answer denied the allegations of the petition charging that the publication was false and malicious, but did not plead the truth of the charges, a demurrer to the evidence cannot be sustained upon a showing by other witnesses (there being no such admission by plaintiff) that he, as chairman of the committee, knowingly participated in concealing the fact in the treasurer's report that the $2100 was contributed by another and not by himself, as the treasurer's report showed, and therefore he cannot be held to have been legally guilty of making a voluntary false affidavit or perjury. The truth of slanderous words cannot be shown under the general issue, either as a defense or in mitigation of damages.

9. ————: ————: Privilege. While the Constitution guarantees to the press to freely publish whatever it may desire, it does not protect any publisher from an abuse of the privilege; it does not shield him from responsibility for publications that are so blasphemous, obscene or scandalous in their character that they may become an offense against the public, or by their malice and falsehood injuriously affect the character, reputation and pecuniary interests of individuals. And where defendant in its answer sets forth at length a former deposition of plaintiff's and avers that the publication complained of relates wholly to the acts of plaintiff as shown by that deposition, and were therefore privileged, and the falsity and malice of the publication were submitted to the jury, under favorable instructions, the issue was for the jury to settle, and defendant is not entitled to have the court declare as a matter of law that the libelous charges were true.

10. ————: Antidote. The libelous publication in this case was not accompanied with such a specification of facts as demonstrated there was no such crime as perjury committed or a false affidavit made. On the contrary the charge of false swearing was leveled at the plaintiff, and there is no word in the publication that on its face tends to show that this charge was palpably unfounded.

11. ————: Perjury Issue: Submission to Jury. Where the publication is reasonably susceptible of the interpretation that it charged plaintiff with perjury, the instruction may submit to the

jury the issue of perjury or no perjury. And to be libelous it is not necessary that the charge constitute technical legal perjury; for, if it had a tendency to 'provoke the plaintiff to wrath, and expose him to public hatred and contempt, and deprive him of public confidence and social intercourse, plaintiff has a clear right to recover.

12. ———: **Evidence of Prior Knowledge.** Testimony of plaintiff, that prior to the publication complained of, in which he is charged with having made a false affidavit to a report, he had made known to the editorial manager of defendant's newspaper, that he had not made any report or any affidavit at all, and other testimony tending to show that such editorial manager had actual knowledge that said affidavit was not made by plaintiff, is competent and pertinent on the issue of malice and punitive damages.

13. ———: **Damages: Question for Jury.** Under the provision of the Constitution, which says, "In all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact," the jury's right to judge the law, as well as the fact, is confined to the sole question of whether the question was in fact libelous. On all other questions, including the amount of the verdict, the jury are as much bound by the instructions of the court in a libel suit as in any other case. The constitutional provision does not deprive the court, as such, of their power to grant a new trial in a libel suit on the ground that the verdict is excessive.

14. ———: ———: **Excessive: Passion and Prejudice: Things to be Considered.** The verdict in the opinion of the court may be excessive and large, but it does not follow that it is necessarily the result of passion or prejudice. In considering whether it indicates passion or prejudice on the part of the jury, the nature of the libel, the character and wealth of the newspaper, and the extent of its circulation, the motive and malice of the publication, the mental anguish and suffering naturally and necessarily caused by it, and the defense interposed, together with the mitigating circumstances, should all be taken into account. Indeed, so many considerations enter into the awarding of damages in a libel suit, that the court should approach the excessiveness of the verdict with great reluctance.

*Held*, by GRAVES, J., dissenting, that where, notwithstanding there was at the trial no error in the instructions, no error in the admission of evidence and nothing to indicate misconduct on the part of the jury, the court is of the opinion plaintiff is entitled to damages, yet that the verdict is too large and excessive, the result shows passion and prejudice

on the part of the jury, and the verdict cannot be reasonably explained on any other hypothesis, and the court should not undertake, by compelling the filing of a *remittitur* as a condition of affirmance, to substitute its own estimate as to what would be a reasonable award, but should remand the cause for a new trial.

15. ———: **Proof of Actual Damages: Feelings: Good Name.** It is not necessary, in order to recover general damages, for words which are actionable in themselves, that the plaintiff should have suffered an actual or constructive pecuniary loss. In such case he is entitled to recover for the injury to his feelings which the libel has caused and the mental anguish and suffering which he has endured in consequence thereof. And a charge of perjury and false swearing are words actionable of themselves; in fact, they import the most heinous of offenses, for reputation and honor are no less dear to good men than life itself.

16. ———: **Mitigation: Withdrawal.** An apology or retraction should be a manly and honest and candid withdrawal of the infamous charge. If it says, "I tried to let him down easy," instead of being a fair retraction it is an indirect repetition of the charge.

17. ———: **Excessive Verdict: $150,000.** Plaintiff had been prominent in public affairs, and the article itself stated he was "once the most popular man in Missouri." In a long article, written in a style calculated to inflame prejudice and arouse contempt, and published in 160,000 copies of its newspaper, which circulated in every State of the Union and foreign countries, defendant charged that plaintiff "had sworn to a lie," that he had "perjured hisself," that he had "ruined hisself," that he had "made a false affidavit," that he had, as chairman of the State committee of his party, received $2500 from the representative of a corporation and concealed the fact by entering on his report that the money had been given by himself, and sworn to the report, and filed it with the recorder of deeds, and that the people would "be afraid of the vengeance of God falling upon them" if they were "to elect such a man" to office. Plaintiff had made no such affidavit, or report, but he had knowledge that the treasurer of his committee had received a written order from the donor of the money directing him to credit the money upon his books and in his report to someone else. Defendant did not plead the truth of the charges, and the evidence of the writer of the article and of its managing editor shows that they knew the charges were not true. *Held*, that, a verdict of $75,-000 actual damages and $75,000 punitive damages does not show passion or prejudice on the part of the jury, but is excessive, and

will be affirmed only on condition that plaintiff remit one hundred thousand dollars.

*Held*, by WOODSON, J., concurring, that the libel in this case charges three felonies punishable by imprisonment in the penitentiary, namely (1) the embezzlement of $2500 contributed to the State committee by another, (2) bribing legislators, by the charge that plaintiff, as chairman of said committee, sold legislation to corporations in advance in consideration of the large contributions made by them to the committee, and (3) perjury, in so many words, and one misdemeanor, false swearing, in making an affidavit to a statement showing he had contributed the $2500, when in fact another had done so; and there being no attempt to show the charges were true, but their falsity being admitted, and the case having been well tried and free from error, the verdict is not the result of passion or prejudice, but the verdict being too large, this court has the power and right, following its uniform rule, to compel as a condition of affirmance, that so much of the verdict be remitted as will bring it within a reasonable sum; but the wrong done was almost incalculable, and never-ending, and hence, under the constitutional provision making the jury judges of both the law and the fact in libel cases, the court should be very hesitant to interfere, and the judgment should be for a larger sum than that approved.

*Held*, by LAMM, J., dissenting, with whom GRAVES, J., concurs, that, though there were no reversible errors in the rulings of the trial court on testimony, instructions, jurisdiction or the motion to elect, yet the verdict was so enormous and out of proportion to all other verdicts in all other libel cases in every other civilized country, and so out of proportion to the injury done, and took so little heed of the matters of mitigation established in the case, it bore on its face the stamp of passion, prejudice, favor and a wild caprice abhorrent to a refined and exalted sense of justice, and it cannot stand for any sum; that the evidence shows that plaintiff knowingly and accommodatingly furnished and arranged the data upon which the treasurer of the committee of which he was chairman, made a misleading sworn public statement, and thereby he undertook to bring about a concealment of the very wrong which the publication charged him with doing, and these things having been specially pleaded in mitigation, should be so considered (but not in justification), and when so considered the verdict, even after two-thirds of it has been whittled away by judicial fiat, is capricious and shocking to judicial sense; and the action of the court in reducing a judgment for $150,000 to $50,000 of itself shows that the verdict is the product of passion and prejudice.

*Held,* by GRAVES, J., dissenting, that though the case was well tried and free from error, the excessive verdict shows passion and prejudice on the part of the jury and cannot be otherwise explained, and the court in all cases should remand the cause for a new trial where it is so large as to show it is the result of passion or prejudice on the part of the jury, and it has authority to remand the cause for a new trial whenever the verdict is excessive, whether or not it was the result of passion or prejudice.

Appeal from Chariton Circuit Court.—*Hon. Jno. P. Butler,* Judge.

AFFIRMED (*conditionally*).

*Ashley C. Clover* and *E. C. Crow* for appellant.

(1) The gist of the complaint of the plaintiff is that defendant published that plaintiff had made a false affidavit under the Corrupt Practices Act, and thereby charged the plaintiff with the crimes of perjury and of making a false affidavit. The petition alleged in one count that defendant in the publication pleaded had charged plaintiff with the two independent and separate crimes of perjury and of making a false affidavit. It is apparent from the instructions that the issue of whether or not the portions of the publication complained of did in fact charge the plaintiff with having committed the crimes of perjury or of making a voluntary false affidavit, was submitted to the jury, thereby making the charge of perjury or of making a false affidavit an issue in the case. It is proper, therefore, to consider, first, what, under our law, constitutes the two offenses; second, did the publication complained of, constitute a legal charge that plaintiff committed either or both offenses. Statutory definition of per-

jury: R. S. 1899, sec. 2033. Statutory definition of making false affidavit: R. S. 1899, sec. 2036. (2) To publish of a man "he is perjured" or that he committed perjury, is libelous, for these words being the legal term for the crime shall be intended to mean that he was forsworn in a judicial proceeding. Newell on Slander and Libel (2 Ed.), sec. 55, p. 123, and sec. 6, p. 68. The publication complained of does not in literal legal terms charge that plaintiff committed perjury. The plaintiff in his petition, claims that the charge of perjury was made by inference only. The question then is, was the publication reasonably susceptible of the construction that it charged plaintiff with perjury? (3) If the publication is not reasonably capable of the defamatory meaning alleged to attach to it, then it is not libelous. McGinnis v. Knapp & Co., 109 Mo. 131. (4) For the purpose of its construction, language is to be regarded not merely in reference to the words employed, but according to the sense or meaning which, all the circumstances of its publication considered, the language may be fairly presumed to have conveyed to those to whom it was published. Townshend on Slander and Libel, sec. 133; McGinnis v. Knapp, 109 Mo. 140. The act alleged to be libelous must be construed as a whole and not separated into parts and construed separately. Von Vachter v. Walkup, 46 Cal. 124. The liability of the defendant should be determined by all he has published in the same pamphlet or paper. Morehead v. Jones, 2 B. Mon. (41 Ky.) 210. In determining the construction to be put upon the language of any part of a publication, the court will construe it with reference to the entire writing. Townshend on Slander and Libel, p. 175; Newell on Slander and Libel, sec. 4, pp. 290-291; McGinnis v. Knapp, 109 Mo. 131; Walford v. Herald Co., 133 Ind. 372. And still another rule applied in determining whether a publication is reasonably susceptible of a libelous meaning is that if

the language complained of amounts of itself to a charge of a crime, yet is accompanied with a specification of acts upon which the charge is based which shows that no such crime was committed, the person mentioned has no cause of action. As, if the words relate to the taking of property not a subject of larceny, they will not be actionable. Trimble v. Foster, 89 Mo. 52; Johnson v. Post-Dispatch, 2 Mo. App. 565; Hall v. Adkins, 59 Mo. 144; Pasley v. Kemp, 22 Mo. 409; Israel v. Israel, 109 Mo. App. 376; Grimes v. Thorp, 113 Mo. 652; Carpenter v. Hamilton, 185 Mo. 603; Alderson v. Auerswald, 80 Mo. App. 370. To publish that a man lied or swore falsely, or took a false oath does not alone charge him with perjury. Such a published statement will not sustain an action for libel grounded on the charge of perjury. Mahan v. Berry, 5 Mo. 21; Newell on Slander and Libel, secs. 50 to 58; Harris v. Woody, 9 Mo. 113; Persley v. Bacon, 20 Mo. 330; McManus v. Jackson, 28 Mo. 56; Shaffer v. Kintze, 1 Binn. (Pa.) 537; Van Rensler v. Dole, 1 Johns. Cas. 279; Shecut v. McDowell, 1 Com. (S. C.) 35; Thompson v. Bernard, 1 Camp. 48; Parker v. Spangler, 2 Binn. (Pa.) 60; Stafford v. Greene, 1 Johns. Cas. 505; Ward v. Clark, 2 Johns. 10; Green v. Long, 2 Cains 901; Clifton v. Kahle, 3 Watts (Pa.) 94; McClurg v. Ross, 5 Binn. (Pa.) 320. In the absence of a statute, to charge a person with having sworn falsely is not a charge of perjury, unless it refers to some swearing in a judicial proceeding. Newell on Slander and Libel, sec. 52; Crookshank v. Gray, 20 Johns. 324; Stafford v. Green, 1 Johns. 505. In the absence of statutory enactments, it is impossible that any person by falsely taking an oath can be guilty of legal perjury unless the oath is taken in a judicial proceeding. Newell on Slander and Libel, sec. 50. A charge that plaintiff swore falsely in an affidavit to a report of campaign contributions would not be a charge

that plaintiff committed perjury. State v. Hamilton, 7 Mo. 300; Shaffer v. Kintze, 1 Binn. (Pa.) 537. The innuendo alleging that defendant charged the plaintiff with perjury is inconsistent with the publication. The whole article complained of relates to the making of an extra-judicial affidavit under the Corrupt Practices Act. Shaffer v. Kintze, 1 Binn. (Pa.) 537. If the publication related to a particular transaction which shows that the crime of perjury could not have been committed, then the innuendo cannot make the charge one of perjury. Shaffer v. Kintze, 1 Binn. (Pa.) 537; Van Rensler v. Dole, 1 Johns. Cas. 279; Shoont v. McDowell, 1 Com. (S. C.) 35; Thompson v. Bernard, 1 Camp. 48; Tipton v. Kahle, 3 Watts (Pa.) 93; Ward v. Clark, 2 Johns. 10. The publication here complained of did refer specifically to a particular transaction, i. e., the making of a false, sworn affidavit to campaign contributions, and the particular acts stated and transaction in itself shows that the crime of perjury could not have been committed by plaintiff in making a false affidavit to a report as to campaign contributions under the circumstances, because the plaintiff was not required to take any oath as chairman of the State Committee, and had he made an affidavit it would have been an extra-judicial one. For these reasons the innuendo of perjury is inconsistent with and contradictory to the publication and the language of the publication. If the colloquium as laid and proved is to an extra-judicial affidavit or one not provided for or required by the Constitution or any law or ordinance of the State, then it is not a charge of perjury to publish of one that he swore falsely in such affidavit. State v. Hamilton, 7 Mo. 300; Shaffer v. Kintze, 1 Binn. (Pa.) 537. The offenses of perjury and making a voluntary false affidavit are two distinct and separate offenses under our law, perjury being a felony, and making a voluntary false oath a misdemeanor. State v. Boland, 12 Mo. App. 75. (5) Then the petition was bad for

misjoinder, because it contained averments in the same count of the two crimes of perjury and of making a false affidavit, and it is improper to join in the same. count averments imputing distinct crimes.   Christal v. Craig, 80 Mo. 367.   (6) As the alleged publication is not reasonably susceptible of the interpretation that it charges the plaintiff with perjury, the trial court .committed reversible error when it submitted the issue to the jury as to whether the portions of the publication complained of did in fact charge the plaintiff with perjury.   It is unjust to allow damages in part or in whole for a portion of a publication not actionable as a charge of perjury, and therefore the court was wrong in leaving it to the jury to determine whether the charge of perjury laid by innuendo in the petition was proved.   No innuendo though found by the jury would render the defendant liable for words not in themselves actionable.   Shaffer v. Kintze, 1 Binn. (Pa.) 537; Parker v. Spangler, 2 Binn. (Pa.) 60; Tipton v. Kahle, 3 Watts (Pa.) 93.   As no perjury was charged in the publication it was error to allow the charge of perjury to be considered by the jury as an issue in the case, as it prejudicially affected the question of damages. Tipton v. Kahle, 3 Watts (Pa.) 93.   If the publication does not charge perjury neither the innuendo nor the verdict aid.   McClurg v. Roon, 5 Binn. (Pa.) 220; Andrew v. Kopperlaufe, 3 Sarg. & Rawle 257; Shaffer v. Kintze, 1 Binn. (Pa.) 357.   (7) If the plaintiff contends the libel consisted of charging him with making a false affidavit under the Corrupt Practices Act (sec. 7195, R. S. 1899), then according.to his own testimony he was legally guilty of making a voluntary false affidavit under section 2036, because that section makes the act a misdemeanor, and the plaintiff admits he counseled and advised Ziebig to make the false affidavit and that he took part in getting it made.   In this. State any person taking part in a misdemeanor is a principal

and not an accessory. State v. Wayther, 75 Mo. 108; State v. McLain, 92 Mo. App. 456; State v. Frederick, 85 Mo. 150; State v. Orwisk, 106 Mo. 119; State v. Edgreen, 181 Mo. 590. (8) The facts in evidence in this case do not justify any other conclusion but that the jury were moved by passion and prejudice and that their passion and prejudice resulted in the excessive verdict. We understand the rule to be that the verdict which the jury may award in such a case will not ordinarily be interfered with unless it appear that the damages awarded by them are so grossly in excess of, or inadequate to, the actual injury done, or what the facts in the case would justify, as to clearly indicate that they were influenced by bias, prejudice or some other improper motive, in which case it will be set aside. Joyce on Damages, sec. 386; Mangett v. O'Neill, 51 Mo. App. 35; Newell on Slander & Libel (2 Ed.), pp. 910-920; Logan v. Weltner, 180 Mo. 322. Although there is no fixed measure of damages applicable to suits for libel or slander, since they must vary according to the circumstances of each, yet the damages awarded ought to be reasonably proportionate to the injury done, and hence a verdict is open to inspection and revision by the court for the purpose of determining whether the jury were guided by a sound discretion in fixing damages. 25 Cyc. 539; 48 Mo. 152; 12 Mo. 499. The court permitted the issue of the charge of perjury by defendant against the plaintiff to remain in the case. The facts show, as proven by the plaintiff, that the acts of the plaintiff set out in the publication, did not, and could not, constitute perjury. The facts proven by the plaintiff's own admission in his testimony at the trial show that plaintiff was legally guilty of the offense of making a false affidavit, because he procured and aided Ziebig to make the one to the report. The facts do disclose that the plaintiff was not guilty of perjury; but the publication, construed as a whole and with reference to the events to which it

Cook v. Globe Printing Co.

referred, shows conclusively that no legal charge of perjury was contained in the publication. On what, then, can the enormous verdict of one hundred and seventy-five thousand dollars rest? At most it can only be held that the publication charged the plaintiff with making a false affidavit to a report under the Corrupt Practices Act. If the publication did so charge, the plaintiff has pleaded guilty to it. We can conceive of no possible legal evidence before the jury upon which a large amount of damages can be based in this case. There was no personal malice or ill will shown. The publication itself commended the plaintiff and expressly stated that his official record was clean and honest. The case, in our judgment, lacks every element necessary to justify a large amount of damages.

*Reed, Atwood, Yates, Mastin & Harvey, Edwin Silver* and *J. A. Collet* for respondent.

(1) The objection to the petition, that plaintiff improperly joined in one count two separate and distinct causes of action (meaning that he improperly charged that defendant imputed to him in the same count the offenses of perjury and of making a false affidavit), is not well taken, and the motion to require plaintiff to elect was rightly overruled. The English and American authorities are to the effect that the pleader can unite in one count all words written or spoken at one time. Hughes v. Rees, 4 M. & W. 204; Sweeney v. Baker, 13 W. Va. 158; Cracraft v. Cochran, 16 Ia. 301; Swinney v. Nave, 22 Ind. 178; Holmes v. Jones, 50 Hun (N. Y.) 345; Railroad v. Sheftall, 118 Ga. 865; Secor v. Sturgis, 16 N. Y. 548. A single tort gives rise to only one cause of action, and cannot be split into separate suits; the damages resulting therefrom must be assessed in the same suit. Bank v. Tracy, 141 Mo. 252; Darby v. Railroad, 156 Mo. 391. The various forms or subjects of injury sustained from a single wrongful act do not multiply the causes of action. Stickford v. St.

Louis, 75 Mo. 309. The appellant seemingly relies in support of its contention on the case of Christal v. Craig, 80 Mo. 367. It will be observed, however, that the case was one of oral slander, and is really inconsistent with the subsequent case of Lewis v. McDaniel, 82 Mo. 578. The case here presented is not unlike one in which different acts of negligence may be set forth in one count and as constituting one cause of action, and in such case a motion to elect will not be sustained, unless the acts of negligence are inconsistent—self-destructive. Jordan v. Railroad, 202 Mo. 418; White v. Railroad, 209 Mo. 539. (2) Whether the publication imputed perjury was a question for the jury. The term "perjury" is expressly used in the publication. "A defendant is liable for what is insinuated, as well as for what is stated explicitly." Merrill v. Post Pub. Co., 197 Mass. 185; Haynes v. Printing Co., 169 Mass. 512; Adams v. Lawson, 17 Gratt. (Va.) 250. Words calculated to induce suspicion that one has committed a crime are libelous. 18 Am. and Eng. Ency. Law (2 Ed.), p. 970. A false and malicious writing containing an insinuation that plaintiff has been guilty of perjury is libelous. Hilhouse v. Dunning, 6 Conn. 391; Hopkins v. Beedle, 1 Caines (N. Y.) 347; Newell on Slander and Libel (2 Ed.), p. 124. "To print and publish of another that he has sworn falsely, or is a perjured scoundrel, is libelous without a colloquium." Haws v. Stanford, 4 Sneed (Tenn.) 520; Darling v. Clement, 69 Vt. 296. It is only when the judge is satisfied that the publication cannot be a libel, and that if it is found by the jury to be such, their verdict will be set aside, that he is justified in withdrawing the case from their cognizance. 13 Am. and Eng. Ency. Law (1 Ed.), pp. 381-2-3, 5-6; McCloskey v. Pulitzer Pub. Co., 152 Mo. 837; Julian v. Star Pub. Co., 209 Mo. 35; Caruth v. Richeson, 96 Mo. 186; Julian v. Star Co., 209 Mo. 76; Post Pub. Co. v. Hallam, 59 Fed. 530. Where the words complained of as libelous are susceptible of two

meanings, one harmless and the other defamatory, it is for the jurors to say in what sense they may have been understood by the readers. McGinniss v. Knapp & Co., 109 Mo. 131. An instruction to the jury that an article is not libelous, is proper only in case the language is incapable of a construction injurious to plaintiff. Sanderson v. Caldwell, 45 N. Y. 401; Warner v. Southall, 165 N. Y. 496; Cox v. Lee, 4 Excheq. (L. R.) 284. (3) Nor ought the question of the publication containing an imputation of perjury to have been withheld from the jury for the alleged reason that it contains a specification of facts showing or indicating (as contended by appellant) that no perjury had been committed, that the imputation related to a misdemeanor under the Corrupt Practices Act (R. S. 1899, secs. 7193-7195); in other words, that it is a case of "carrying the antidote with the poison." That the defendant may be within the foregoing rule, the publication must show on its face that the charge is palpably unfounded, so that "he who runs" may so read the publication. Deford v. Miller, 3 Penn. & Watts (Pa.) 103; Brown v. Knapp Pub. Co., 213 Mo. 655; Persilly v. Bacon, 20 Mo. 331; Fowle v. Robbins, 12 Mass. 514; Newell, Libel and Slander (2 Ed.), pp. 112-33, sec. 33; Stewart v. Howe, 17 Ill. 71; Bricker v. Potts, 12 Pa. St. 200; Cooley on Torts (2 Ed.), p. 233, note. (4) Appellant is estopped to complain that matter of perjury was submitted to the jury. It will be observed that the matter of perjury is not referred to or mentioned in any of the instructions given at plaintiff's instance, and that the perjury matter was introduced into the instructions by the defendant—that is, in the instructions asked by it. Brown v. Knapp, 213 Mo. 655; Bain v. Myrick, 88 Ind. 137; Thompson v. Pub. Co., 91 Me. 207. The fact, however, that the instruction, which was given at defendant's instance, was too favorable to it, is not a matter of which defendant can complain. Smith v. St. Joseph, 122 Mo. 643; State v. Stewart, 90

Mo. 507; Summers v. Ins. Co., 90 Mo. App. 691; Manigold v. Railroad, 24 Mo. App. 52; Alexander v. Clark, 83 Mo. 482; State v. Porter, 170 Mo. 422. (5) Defendant contends in its brief that the publication complained of is non-libelous as a matter of law, *i. e.,* is incapable of a defamatory construction as regards plaintiff, and that defendant's instruction, in the nature of a demurrer to the evidence, ought to have been given by the trial court. Defendant's contention on this branch of the case is untenable for a number of reasons: It will be observed that the publication taken in its entirety charges plaintiff *inter alia* with being a defaulter, a card player, with lying, false-swearing, false affidavit making and perjury. It is sufficient to make a written or printed publication libelous and actionable *per se,* that it is false and tends to expose one to public hatred, contempt and ridicule, to provoke him to wrath or to deprive him of the benefits of public confidence and social intercourse. It is not necessary that the publication should charge a crime or indictable offense. The distinction between oral slander and written slander or libel in the foregoing respect is well recognized in this State. R. S. 1899, sec. 2259; Nelson v. Musgrove, 10 Mo. 648; Price v. Whitely, 50 Mo. 439; McGinniss v. Knapp & Co., 107 Mo. 131; Ukman v. Daily Record Co., 189 Mo. 378; Manget v. O'Neill, 51 Mo. App. 26; State v. Kountz, 12 Mo. App. 511; Anderson's Dictionary, "Defaulter." So oral words, imputing to another want of veracity, or charging that he told a falsehood, are not actionable *per se,* but it is otherwise where such charge is made in writing. Written words imputing want of veracity are actionable without proof of special damage and a written charge that another is untruthful may be made the basis of a criminal libel. 18 Am. and Eng. Ency. Law (2 Ed.), p. 921; Paxton v. Woodward, 78 Pac. (Mont.) 217; Meriwether v. Lewis, 120 Mo. App. 354; Byrne v. Fink, 38 Wash. 511; Steele v. Southwick, 9 Johns. 214; Cranfill v.

Hayden, 97 Tex. 689; Graybill v. De Young, 140 Cal. 323. But, however, the various charges and imputations made against plaintiff in the publication complained of, being actionable *per se,* plaintiff had a perfect right to abandon them and to fall back on the libelous character of the publication complained of as the basis of his recovery. Julian v. Star Co., 209 Mo. 90; Calahan v. Ingram, 122 Mo. 355; Hudson v. Garner, 22 Mo. 424; Railroad v. Sheftall, 118 Ga. 865. Where an article is libelous *per se,* the case should be submitted to the jury, though plaintiff has by innuendo put a meaning on the alleged libelous publication, which is not supported by the language or the proof. Morrison v. Smith, 177 N. Y. 366; Haynes v. Printing Co., 169 Mass. 512; Wallace v. Vo, 117 Ia. 363; Prewitt v. Wilson, 128 Ia. 203. (6) The trial court did not err in its ruling on the instructions asked by plaintiff; it correctly defined the meaning of a libel, leaving it to the jury to determine whether the publication fell within the definition so given, and to determine whether the plaintiff should recover on the publication as being a libelous and defamatory one. The innuendoes were mere surplusage, and plaintiff could properly ignore them in framing his instructions. This course has received the express sanction of this court. Julian v. Star Pub. Co., 209 Mo. 90; McCloskey v. Pulitzer Pub. Co., 152 Mo. 340; 13 Am. and Eng. Ency. Law (1 Ed.), pp. 381-2; 2 Greenleaf, Evidence (10 Ed.), sec. 411; Cox v. Lee, 4 Excheq. (L. R.) 290; Hotchkiss v. Oliphant, 2 Hill (N. Y.) 510. The instructions given for plaintiff on punitive damages are in accord with the prior decisions of this court. Buckley v. Knapp, 48 Mo. 152; Ingraham v. Callahan, 122 Mo. 355; Jones v. Murray, 165 Mo. 67; Brown v. Knapp, 213 Mo. 655. Mere non-direction in a libel case, as in other cases, does not constitute error. Minter v. Bradstreet Co., 174 Mo. 444. (7) So many considerations enter into the awarding of damages by a jury in a libel case, that

the courts approach the question of the excessiveness of a verdict in such case with great reluctance. The question of damages for a tort, especially in a case of libel or slander, is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with their injustice, and to thereby induce the court to believe that the jury were actuated by prejudice, partiality or corruption, it rarely interferes with the verdict. Brown v. Knapp, 213 Mo. 655. The assessment of damages is peculiarly the province of the jury in an action for libel. Gambil v. Schooley, 93 Md. 65. The extent of the injuries to the person libeled, as well as the malice, need not be specially proved, but may be inferred from the wrongful charges. Price v. Whitely, 50 Mo. 439; McCloskey v. Pub. Co., 152 Mo. 339. Reputation and honor are no less to good men than bodily safety and protection. In some cases they are dearer than life itself. Goldsborough v. Orem, 103 Md. 671. Shame and mortification may constitute grievous mental suffering, and are elements of actual damages. Graybill v. DeYoung, 140 Cal. 323; Baldwin v. Boulware, 76 Mo. App. 5. Injury to the feelings, as a matter of common experience, is one of the keenest results of a libelous article, and may be taken into consideration by the jurors, simply from their general knowledge. Butler v. Barrett, 130 Fed. 909. Damages for injury to feelings, shame, mortification, mental anxiety, insulted honor and indignation are regarded as actual in contradistinction from exemplary damages. Long v. Printing Co., 106 Mich. 216. The evidence of the defendant's wealth was a proper matter for the consideration of the jury. Buckley v. Knapp, 48 Mo. 162. The rank, condition in life and social standing of plaintiff are, as a general rule, held to be admissible in evidence, either in mitigation or aggravation of damages. 25 Am. and Eng. Ency. Law, p. 508. In an action for libel, where the defendant does not contend that the article is true, and

it is sensational in character and manner of publication, the jury may properly find it was a gross libel, though defendant was innocent of any malicious intent, and that plaintiff has been greatly injured in his feelings. Bishop v. Newspaper Co., 47 N. E. (Mass.) 119.

GANTT, J.—This is an action for libel. The defendant is a corporation and the owner and proprietor of the well known metropolitan newspaper, the St. Louis *Globe-Democrat*, printed in the city of St. Louis. His action is founded on an alleged libelous and defamatory article, which appeared in that paper, and in its issue of February 12, 1905.

This suit was instituted in Randolph county at Huntsville, Missouri, the petition alleging, among other things, that copies of the paper containing the article complained of were circulated in that county. The defendant at the return term of the writ of summons, which was served on the defendant in the city of St. Louis pursuant to section 997, Revised Statutes 1899, first filed its application for a change of venue from the Randolph Circuit Court, on the ground that both the judge of that court and the inhabitants of that county were prejudiced against the defendant. A change of venue was duly awarded to the circuit court of Chariton county, sitting at Salisbury. At the next ensuing term after the change of venue, to-wit, at the September term, 1905, the defendant filed a plea to the jurisdiction of the court, to-wit, that the issue of the *Globe-Democrat* containing the article complained of was printed, and first given to the public, in the city of St. Louis, thereby creating a cause of action, if any, in St. Louis city, and that a cause of action did not accrue to the plaintiff in Randolph county because of the subsequent sale and circulation of the paper in the latter county.

The court overruled this plea to the jurisdiction, and thereupon the cause, by stipulation of parties, was

transferred to the circuit court of Chariton county sitting at Keytesville, where the objections to the jurisdiction of the court were renewed in defendant's answer filed at Keytesville, and the same were overruled as they had been at Salisbury.

The petition consists of one count based on the alleged libel article which appeared in the *Globe-Democrat* of February 12, 1905, being the Sunday edition of that paper. This article is set out at length in the defendant's answer and occupies between seven and eight pages of the abstract. This article was purported to be written by "The Old Politician," who had furnished matter for the columns of that paper for several years, and the evidence established that he was one Donald C. Fitzmaurice. The petition alleged and the testimony established that plaintiff is, and was at all the times therein mentioned, a citizen of this State and a resident of the City of Jefferson, and was at the time of the printing and publishing of the said article the president of the Central Missouri Trust Company, a financial institution in the City of Jefferson. That the defendant is, and was at the time of the publication of said article, a corporation under the laws of this State under the corporate name of the Globe Printing Company with a capital stock of $500,000. That said company had and has its principal business office in the city of St. Louis; that it was and is the owner of a certain newspaper known as the "St. Louis *Globe-Democrat*," Republican in politics, and had a wide circulation throughout Missouri and adjoining States and the country at large, and its daily edition amounted to 100,000 copies, and the Sunday edition averaged from 153,000 to 160,000 copies. Plaintiff was the chairman of the Democratic State Central Committee of Missouri during the year 1896, the said committee being a political committee composed of a chairman and thirty-two members, having a secretary and treasurer, the business and purpose of said com-

mittee then and there being, among other things, to raise, collect and disburse money for election purposes to secure the election, at the general November election in 1896, of the regular Democratic State nominees for State offices at said election, and to secure the success of the Democratic nominees generally.

During the said campaign, and at the time of the said general election in 1896, there was in force in this State a statute relating to corrupt practices in elections, which, among other things, provided that every political committee shall appoint and constantly maintain a treasurer, to receive, keep and disburse all sums of money which should be collected or received or disbursed by such committee, or by any of its members for any of the purposes mentioned in section 17 of the said act, for which such committee exists or acts; and, unless such treasurer is first appointed and thereafter maintained it shall be unlawful and a violation of this act for a political committee or any of its members to collect, receive or disburse money for any purpose. It was further provided: All money collected, received or disbursed by said committee, or any member thereof, for the purposes mentioned in said act should be paid over and passed through the hands of the treasurer and be disbursed by him. And it was made unlawful for the committee or any member thereof to disburse or expend money for any of the objects and purposes for which said committee acted until the said money had passed through the hands of the treasurer. It was provided that the treasurer or any person who should at any time act as treasurer, should, whenever he received or disbursed money as such treasurer on account of any of the objects or purposes mentioned in the act, immediately enter and copy in a proper book or books, to be provided and preserved by him, a full, true and detailed statement and amount of each and every sum of money received and disbursed, and the date when, and the person from whom received, or

to him paid, as the case might be, and the object and purpose for which it was received or disbursed. It was further provided that every treasurer of a political committee, as defined in said act, and every person who should act as treasurer thereof, should within thirty days, after each and every election, whether State, city, municipal, township or district election, in or concerning or in connection with which he shall have received or disbursed any money for any of the objects or purposes mentioned in said act, prepare and file in the office of the recorder of deeds of the county in which such treasurer resides, a full, true and complete account and statement, subscribed and sworn to by him before an officer authorized to administer oaths, setting forth each and every sum of money received or disbursed by him for any of the objects or purposes mentioned in said act within the period beginning ninety days before such election and ending on the day on which such statement is filed, the date of each receipt and each disbursement, the name of the person from whom received or to whom paid, the object or purpose for which the same was received, and the object or purpose for which it was disbursed. And said statement is also required to set forth the unpaid debts and obligations, if any, of such committee, with the nature and amount of each and to whom owing, and if there are no unpaid debts or obligations, the statement shall state such fact.

The petition alleged that the defendant well knowing the facts aforesaid, wickedly, designedly and maliciously contriving and intending to injure said plaintiff in his good name and credit and to bring him into public scandal, contempt, infamy and disgrace with and among all good and worthy people and with the public generally, and wickedly, designedly and maliciously contriving and intending to charge and make it appear that it was the legal and solemn duty of plaintiff, within thirty days after the general Missouri State election of

November, 1896, to prepare and file in the office of the recorder of deeds in the county in which plaintiff at that time resided, a full, true and detailed account and statement subscribed and sworn to by him before an officer authorized to administer oaths, setting forth each and every sum of money received and disbursed by him for any of the objects or purposes mentioned in the said statute law aforesaid, within the period beginning ninety days before such election and ending on the day on which such statement should be filed, the date of each receipt and each disbursement, the name of the person from whom received or to whom paid, and the object or purpose for which the same was received and for which disbursed, and wickedly, designedly and maliciously contriving and intending to charge and make it appear that in the discharge of said pretended duty to so make and verify under oath the statement above referred to and provided for in said act above mentioned, charged that plaintiff did willfully, corruptly and falsely before an officer authorized to administer oaths, under his oath, voluntarily make, within the State of Missouri, a false affidavit, and that said plaintiff had, in the execution of said pretended duty, falsely, by swearing, taken oath prescribed by law of this State, to-wit, the statute law aforesaid, the said oath having been legally administered by an officer authorized to administer oaths and the said oath having been taken in this State by plaintiff in a material matter, to-wit, the preparing and filing the detailed account and statement provided for in the said statute aforesaid, had then and there and thereby been guilty of the abominable crime of perjury, in its said newspaper on the 12th day of February, 1905, to-wit, the Sunday edition of the said St. Louis *Globe-Democrat* bearing date the 12th day of February, 1905, having reference to and concerning the making of said alleged affidavit, statement and account, did wrongfully, wickedly, designedly with malice and with malicious

intent towards plaintiff print and publish of and con-
cerning plaintiff the following false, libelous, malicious
scandalous and defamatory words, article and matter,
to-wit:

### OLD POLITICIAN ON PARTY FUNDS.
### FIGHT OF THE PEOPLE.
### WRECKS THROUGH COVERING UP AND FRAUD IN CAMPAIGN CONTRIBUTIONS.

### THE PRESENT INVESTIGATION.
The Thursday Conference, Why it Was Called, and What May Grow
Out of It.
Special Correspondence of the Globe-Democrat.

Jefferson City, Mo., February 11.

*    *    *

*    *    *

It was thirty years ago we crossed the Arkansas an' left the
desert behind us.  An' no sooner did we think we'd got rid of the
quicksand than we commenced a drivin' like the devil.  We didn't
notice none of the signs along the road.  We was comin' so fast that
we only hit the trail on the high spots.  We didn't know and some
of us don't care where we was a-going to.  But the first thing we
all knowed we brought up at Independence.

Court was a-goin' on there an' Sam Cook was called as a wit-
ness.  Sam had been our boss wagonmaster along the whole trail
this side of the Arkansas.  Most o' the men that brought us through
the desert was dead.  It was Sam that brought us to Independence.
He'd been playing cards every inch o' the way this side o' Pawnee
ford.  An' when they got him in court he didn't make no bones
about telling o' the kind o' cards he'd been a-holdin'.

Bill Phelps had give him $2500, he said, for the Democratic fund
in the campaign of 1896, when Sam was chairman of the Democratic
Committee.  He had talked with some other Democrats about it,
an' whether it'd be a wise thing to put it in as an item in his sworn
statement of receipts, to be published after the election.

(Meaning the sworn statement required by law to
be made of the receipts and disbursements of the said
Democratic State Committee for the campaign of 1896,
and that plaintiff had been required by law as a duty
devolving upon him personally to make and file under
oath, legally administered to him, the statement re-
ferred to.)

I don't know what Sam thought about it hisself. He didn't say at Independence. I reckon he must ha' thought it'd be dangerous to let the party and the people know that a corporation agent had been helpin' the party along, or he wouldn't have called the little conference to talk it over.

But never mind what he thought. Bill Stone was in the conference, an' says he, it would never do to let it get out that Bill Phelps had contributed so much money to help the Democrats o' Missouri. It'd look, says Bill, like the Democrats an' the corporations was a-workin' together. That's what they was doin' an' Bill knowed it, but he didn't want the people to know it. So Ed Orear was sent round to see Bill Phelps and ask if he'd have any objection to his contribution bein' credited to Sam Cook. If Bill had any objections, he didn't say so, an' his money was put down to the credit of Sam Cook, who was then a-puttin' up his fences for Secretary of State, an' might ha' thought that a big reputation for loosenin' up wouldn't hurt him none, an' it didn't.

Sam told about how the St. Louis Transit Company had contributed $2500, to the Democratic campaign fund in 1898, when Sam was chairman again. It was Seibert who collected that money from the street railroads, an' Sam had credited it collections by Seibert in his report, but when they went after Seibert to get him on a subpoena to go into court at Independence, somebody that had been contributin' to these Democratic funds contributed again, an' got up enough more money to put an end to the proceedin's.

### FOLLOWING THE TRAIL.

That's the end of the road to Independence. But the trail runs further than that, an' followerin' it up is one of the most interestin' things I ever undertook. I made a bet when Sam struck the end o' the trail at Independence that that was the end of him politically. Come along the trail with me now an' see how that's come out. It was after the election of Dockery, in 1900, that the depositions at Independence was took. In 1902, after the depositions was made, the Democrats lost about 12,000 votes, but still they had enough to carry the legislature on joint ballot, an' elect Bill Stone to the Senate, the man who'd told Sam to credit hisself with payin' Bill Phelps' contribution to the fund.

When I met Stone a-comin' back here from Washington, and sees Sam a-goin' down the street that'll keep him from passin' the State house, I think o' the time that Jim Frisbie, who used to run a saw-mill in Gasconade county, licked one of his boys and let the other go. Both of 'em had broke in the closet and got nearly all the Sunday dinner that was bein' saved for company. They hadn't had it long till the old man found 'em with it. Bob, the oldest one of 'em, seen there wasn't much time to get anything if it was wasted in talkin', so he lets Ed, the younger one, do the talkin', a-tryin' to square things, while he tackles the grub. The way that Ed squared

things was that the old man took·him by the ear and led him to the the wood shed, an' commenced usin' his horsewhip for all it was worth. As Ed danced around that shed, as a boy will at such times, he happened to think of Bob settin' out there an' layin' in a full supply, an' "It's Bob done the eatin,'" says he, a-tryin' to rub a red stripe off of his hind quarters. "But it's you that's done the lyin'," says Jim, a-givin' him enough more stripes to make a flag, "an' I can't a-bear lyin'."

Most everybody's that way. The only thing that explains the difference made between Cook an' Stone is that Cook is the man that swore to what wasn't so.

(Meaning that plaintiff had been required by law to make the affidavit, statement and account under oath as aforesaid, and that in the performance of said duty said plaintiff had willfully sworn falsely before an officer authorized to administer oaths to material matters therein.)

The people of Missouri'll never stand for that, my boy, or anything like it. The people of Missouri are all very much alike, an' every man that knows 'em knows it. There's been a whole generation since the war, when the whole country thought, an' a great many Missourians thought, that this here State was only made by God Almighty for armies to fight over, or parties to quarrel over, with so much hatred toward one another that it was almost as bad as war all the time. People'd think the way we've carried on that Missouri was divided into two camps, in which the people in one camp was teetotally different from them in the other, natural born enemies by nature as well as by politics.

Tain't so, son, we're all alike. The average Missourian stands for honest government. If one party can't give it to him he will try the other. An' the big thing that made him try the other was when the machine tried to gag him, an' force a lie down his throat after Sam Cook had sworn that he contributed $2500 to a campaign fund that was contributed by another man whose name Sam wanted to conceal.

(Meaning that plaintiff had been required by law to file a statement, under oath, showing the amount of moneys received by the Democratic State Committee in the campaign of 1896, and from whom received, and that plaintiff had willfully, corruptly and falsely in said statement set forth that he contributed to said Demo-

cratic State fund the sum of $2500, whereas in truth and in fact said $2500 had been contributed by another person, and that said statement was material and was with regard to a material matter under the law, and that plaintiff had willfully, corruptly and falsely, by swearing, taken oath prescribed by the laws of this State and that said oath had been legally administered, and that under said oath, plaintiff had wickedly, corruptly and falsely sworn that he had contributed the said $2500 when in truth and in fact it had been contributed by another person and that by reason of the making of said false oath the plaintiff had been guilty of willful and corrupt perjury and had committed a felony and was liable to imprisonment in the penitentiary for a term not exceeding seven years; and meaning further to charge that plaintiff had willfully, corruptly and falsely, before an officer authorized to administer oaths, upon his oath voluntarily made a false affidavit within the State of Missouri, in which said affidavit he had willfully and falsely stated that he had contributed $2500 to the Democratic State campaign fund in the campaign of 1896, and that in fact plaintiff had not contributed said sum of $2500 but the same had been contributed by another person, and that plaintiff had willfully and corruptly for the purpose of concealing the facts, made a false affidavit as aforesaid, falsely setting forth that the sum of $2500 had been contributed by himself and that said statement in said affidavit was a material statement under the law, and that plaintiff had taken such oath voluntarily and that he had thereby been guilty of a crime under the law of the State of Missouri, and was liable to be punished by imprisonment or fine therefor.)

That's when your Missourian gagged, an' bucked, an' kicked till he kicked the dashboard out an' run away with the whole darned outfit. He'd stood Stone. He made a bad face over him but swallowed him, alum and all. That'll show you that he could stand any thing but Cook.

227 Sup—32

Now, Cook ain't the issue as a public officer, mind you. Sam was a good sheriff of Warren county. He made a good Secretary of State, an' administered that office and closed up its accounts without the loss of a dollar to the State. Nothing was ever proved against him but what he proved hisself in that Independence story, but, say, if you don't think that was enough, ask Sam. Here he comes; once the most popular man in Missouri, away back yonder behind the next lowest man on his ticket, an' so far back of him that you've got to get a spy-glass to see the dust he's a-raisin'. Say, we were all against him. Republicans, Democrats, an' all of us. There's no such thing as party lines when it comes to dealing with that there question. I tell you, Missourians is all alike. Give 'em a question that goes down to the bottom of their common nature an' they'll answer it with almost one voice, an' that voice'll be an echo of the one that come down from Mount Sinai a'sayin' "Thou shalt not bear false witness."

(Meaning and charging that plaintiff had made the alleged false affidavit and committed the alleged perjuries aforesaid, and that by reason thereof he had been defeated by the people of the State of Missouri in an election in which he was a candidate, and meaning and charging that plaintiff had borne false witness, that is, that plaintiff had sworn falsely, and that his conduct was revolting to the nature and moral ideas of the people of the State of Missouri, and that the people of the State of Missouri had with one voice when plaintiff was a candidate for office denounced him as one who gave false testimony and as a perjurer and an untruthful man.)

Right there's where party lines goes glimmerin'. I ain't talkin politics to you now. I'm talkin' morals and common-sense, an' I'm a-talkin' somethin' that the politicians ought to know without tellin', since the experience Sam Cook had, an' about which they all know as much as I do. They ought to know more'n Sam did. Since he went along the road to Independence there's been sign posts put up to tell where he ought to have stopped, but didn't. A whole lot of 'em don't seem to have as much sense as Sandy Bowlin had when he tore off the sign posts an' took 'em with him so he'd have 'em on hand if he found he was on the wrong road an' had to take the backtrack. You often have to take a backtrack. I've done it myself, an' I'm an old woodsman, because it was the only way of getting out of the woods. If there's any place you don't want to go, the sign

posts'll tell you how to keep away from it, an' if you can't recollect 'em you'd better tear 'em off, like Sandy Bowlin did, an' take 'em with you. It isn't everybody that knows how to read a sign post, but some do.

### GUM-SHOE TRACKS IN THE ROAD.

The people do. But there's a lot of politicians, or fellows that calls themselves politicians, that don't. You can hear 'em a-growlin' around in both parties about this investigatin' committee that's wantin' to break into other people's business. I reckon they still think even after what's happened to more'n one chairman of a State Committee in Missouri since that law was past

(Meaning the aforesaid statute set out at length in the petition.)

That a man can swear to a lie and not be caught.

(Meaning that plaintiff had sworn to a lie and had willfully committed perjury and willfully made a false affidavit concerning a material matter of which he was required by law to make affidavit and that he had been detected and caught in the making of said false oaths and perjuries.)

I wonder if they think Sam Cook'd run a bit better before the people o' Missouri to-day than he did three months ago. If they do, I can tell 'em their ears is longer than I thought they was. The people of Missouri is a God-fearin' people, an' the man who'll do what Sam done, to serve his party and hisself instead of the Lord, an' will take the name of the Lord in vain, in swearin' to an untruth, will never meet their approval. They'd be afraid to elect such a man. They'd be afraid of the vengeance of God fallin' upon them, for their sin and iniquity in the sight o' the Lord. That's the kind o' people they are, Republicans, Democrats, or Populists, That's the kind they all are. I know 'em.

(Meaning to charge and charging that plaintiff in order to serve his party and disregarding his duty to the Lord had voluntarily made a false oath and had willfully, maliciously and corruptly sworn falsely to a material matter with reference to which he was required by law to make oath, and that he had willfully and corruptly sworn to a material matter which was not true, and that the people of the State of Missouri were

afraid to re-elect him to office because he was so utterly wicked and depraved by reason of such false oaths and perjuries that they feared that the vengeance of Almighty God would be visited upon them for the great sin and iniquity they would commit in the sight of the Lord by voting for and electing to office a man so utterly corrupt, immoral and criminal.)

It is then averred with particularity that the said article meant and the defendant intended it to mean, and intended that its readers should understand it to mean, and the readers thereof did understand it to mean, that it was the legal duty of the plaintiff to have paid over to him and to have pass through his hands all moneys received for the purposes aforesaid and to disburse all moneys paid out on behalf of said Democratic State Committee, and that it was his legal duty whenever he received or disbursed any money for or on account of any of the objects or purposes aforesaid, to immediately enter and copy in a proper book or books of account, the object and purpose for which said sum was received or disbursed, and was legally bound, within thirty days after said election of November, 1896, to prepare and file in the office of the recorder of deeds of the county in which he resided, a true and detailed account and statement subscribed and sworn to by him before an officer authorized to administer oaths, and particularly that said committee did receive and there did pass through plaintiff's hands various large sums of money on behalf of said committee and among others that plaintiff received in the manner and for the purpose aforesaid from one William H. Phelps $2500, and plaintiff in making said statement falsely entered said item so contributed by the said Phelps as having been contributed by him, the plaintiff, and well knowing the fact aforesaid, had willfully, corruptly and falsely, by swearing, by taking oath prescribed by the laws of this State, and the said oath had been legally administered to the effect, purport, intent and

meaning that said statement, false in the material matter above set forth, was true, had willfully, corruptly and falsely taken an oath in relation to material matter and thereby had been guilty of the abominable crime of perjury and was liable therefor to be imprisoned in the penitentiary of this State. And that plaintiff was a man wholly without honor or truth and was a common perjurer and liar, and this was well and widely known throughout the State of Missouri, and that his character and reputation in the matters aforesaid were utterly irretrievable, ruined and destroyed, and that he was no longer esteemed or respected in the State of Missouri.

It was alleged that at the time said published statement was made, the defendant knew that all the charges above set out were absolutely untrue, and that the same was published with malice and express intent of defaming and injuring plaintiff, of destroying his good name and reputation and with a wicked design and purpose to bring him into public scandal, contempt, infamy and disgrace; that defendant well knew that plaintiff had never made an affidavit of the kind charged in said article; that defendant well knew that plaintiff had never made an affidavit setting forth or purporting to set forth the raising, collection or disbursement of income or expenses of said Democratic State Central Committee of the year 1896, and that defendant's said article was printed and published and circulated after plaintiff had personally notified the defendant that he had never made an affidavit of the character referred to in said article.

It was then alleged that at the time of the publication of the said article, plaintiff had a large and extensive acquaintance throughout the United States of America, and particularly throughout the State of Missouri, and especially had many personal friends and acquaintances in the county of Randolph in said State, and that he was generally esteemed, until the publica-

tion of said article, as a truthful man. That a large number of said newspapers containing said article were published and circulated by defendant in the county of Randolph and State of Missouri aforesaid, and were read by divers persons in said county and State and elsewhere, and plaintiff was greatly injured thereby in said county in the loss of the good name and reputation he had previously borne, and a cause of action is accrued to him thereby in said county.

It was then stated that said defendant had no business office in Randolph county and that the president or other chief officer of that corporation could not be found therein. It was then alleged that plaintiff had suffered great humiliation and shame by reason of said publication; that he has been brought into contempt and disgrace thereby, and has suffered great mental pain and anguish and has been greatly damaged and injured, and that all the acts of the defendant in publishing and procuring the publication of said libelous article were knowingly, intentionally and maliciously done for the purpose of injuring the plaintiff.

He laid his actual damages at $100,000, and asked for $150,000 exemplary and punitive damages.

The summons was served upon the president of defendant company in the city of St. Louis. As already said the defendant prayed for a change of venue from Randolph county and from the judge of the said court on account of the prejudice of both the judge and the inhabitants of said county against the defendant. Thereupon a change of venue was awarded to Chariton county, Missouri. The plea in abatement was filed and overruled at the September term, 1905, and the defendant filed its exceptions. After the change of venue to Keytesville, the defendant filed its answer.

In the first paragraph of the defendant's answer it pleads the want of jurisdiction of the Chariton Circuit Court. In its second defense, it admits its incorpora-

tion and that it prints and publishes the *Globe-Democrat*; denies that it circulates or publishes the same in Randolph county; denies that in its article complained of it ever intended or was understood to accuse plaintiff of the crime of perjury or of any other crime whatever; denies especially that it ever entertained any malice, spite or illwill to the plaintiff and denies that the matters and things referred to in plaintiff's petition were so understood; denies all injury to plaintiff's good name, reputation or in the esteem of others by said publication, or that plaintiff has suffered any humiliation caused thereby, or that he has been brought into contempt, infamy or disgrace, or has in any way suffered pain or anguish by reason of said publication.

In the third paragraph of its answer, defendant purports to set forth the occasion and circumstances giving rise to the publication of the article complained of substantially as follows:

"That the Republicans had a majority of members of the General Assembly elected at the general election in this State in November, 1904; that one Thomas K. Niedringhaus, who had been and was at the time chairman of the Republican State Committee, was the choice of the Republican caucus for nominee for United States Senator; that his nomination was opposed by the stubborn opposition of a portion of the Republican members of the General Assembly; that soon after the caucus nomination of said Niedringhaus, the Senate and House of Representatives appointed committees to investigate his action and conduct as chairman of the Republican State Committee, and to inquire into his receipts and expenditures as said chairman in connection with the election of the Republican candidates at the preceding November election. That said committee sometime early in the month of February made reports of their proceedings under their power and appointment, in which *certain alleged irregularities in the*

*management and accounting* for and reporting of certain funds by said Niedringhaus were alleged to have been discovered. That said investigation of Niedringhaus was a live public issue, and was a subject of general interest to the public and attended with much public comment and discussion by individuals and the public press of the State. That the opposition to the election of Niedringhaus as Senator became so determined and persistent and his election became so uncertain that it was given out that a representative of the Federal administration at Washington was visiting Jefferson City to bring about harmony in the Republican party and the election of a Republican United States Senator, and that a move was on foot, on or about Thursday preceding the twelfth day of February, 1905, looking to the calling of a new caucus to nominate another candidate instead of Niedringhaus.''

The answer then proceeds to state that in November, 1896 (more than eight years prior to the transactions referred to above) plaintiff was chairman of the Democratic State Committee and Fred G. Zeibig was its treasurer. That one W. H. Phelps had contributed to said State Committee at one time $100, and at another time had given plaintiff for said committee the sum of $2000, and that plaintiff obtained permission from said Phelps that said contribution should, in the treasurer's report of the campaign receipts and disbursements, be credited to plaintiff; that is, appear as having been contributed by plaintiff instead of by Phelps. That sometime prior to November 27, 1901, one William Cardwell had instituted an action in the circuit court of Jackson county against George Knapp, publisher of the St. Louis *Republic,* a metropolitan daily newspaper of wide circulation in Missouri and elsewhere, for an alleged libel appearing in said paper and charged to have been written by the plaintiff; that on said November 27th, 1901, plaintiff herein gave his deposition at Independence, Missouri, in said suit last

referred to.  Defendant's answer then sets forth parts
of plaintiff's said deposition, the purport and substance
of which was that plaintiff was then, when his deposition was taken, Secretary of State of Missouri; that
he was chairman of the Democratic State Committee,
which elected the members of the Legislature of 1897
and 1899; that in the campaign of 1896 he received
from Colonel Phelps first the sum of one hundred dollars, and after the election was over and the campaign was closed, the further sum of $2000, and received an order from Phelps to Zeibig, the treasurer, to
credit said contribution in plaintiff's name, and turned
the order over to Zeibig, who, when he made up his
report, did so credit it as directed to do by Phelps.
Also that during the campaign of 1896, plaintiff received a contribution of $1000 from Col. John Carroll
and some other money from Mr. Seibert, which had
been paid to the latter by Mr. Priest of St. Louis, and
plaintiff paid it into the committee in his own name.
That one Edward T. Orear testified by deposition at
Independence in the Cardwell case and stated that he
was at a conference following the closing up of the
business of the Democratic State Committee for the
1896 campaign, said conference being after the election; that the committee was about $2000 short, needed
that much to pay unpaid bills; that plaintiff informed
Orear that Col. Phelps had contributed $2000 to the
committee to liquidate said unpaid bills, this being done
after the election; that objection was made to the contribution appearing in Phelps's name because he was
a corporation attorney, and that he, Orear, suggested
that he could see no impropriety in its being credited to
some one else, provided that Phelps made no objection
to it; that this led to plaintiff seeing Phelps, and to the
latter giving him his order to Mr. Zeibig, the treasurer
of the committee, to credit the Phelps contribution in
his report to plaintiff. That the newspapers of the State
discussed generally the foregoing matters referred to

in said depositions, and that the Cardwell suit was soon thereafter dismissed for a valuable consideration, reported in the newspapers to have been paid by one E. O. Brown of Carthage, Missouri. That at the general election in the year 1902 the Democratic majority in Missouri was sensibly reduced. That the article published by the defendant was received from a regular contributor; that he was a respectable gentleman and a trustworthy writer, and it appeared in defendant's newspaper on the 12th day of February, 1905, in the columns of defendant's paper, more or less known as the "Old Politician's" columns.

The answer then set forth said entire article, which purports to have been written at Jefferson City, Missouri, and occupies between seven and eight pages of closely printed matter in small type of appellant's abstract. Defendant's answer then alleges and sets up that said article relates solely to the acts and conduct of plaintiff as shown in his testimony in the Cardwell case, and in that of Orear in the same case, and that said article does not attempt in any way to charge the plaintiff with the crime of perjury or any other crime, or in any way to defame him, and that said article is not libelous, and plaintiff has no right to complain of the same.

Defendant, in paragraph 4 of its answer, sets up that the matters and things contained in the article and complained of by plaintiff related to public issues that were then alive and being discussed and involved the public interests and the regularity and purity of party organizations, and that defendant's comments in its said publication were within the bounds of legitimate newspaper criticism and were not libelous, and that plaintiff therefore has no right to complain of said article.

Defendant, in paragraph 5, sets up that plaintiff, in his position as chairman of the Democratic State Committee in 1896 and 1898, was a *quasi* public func-

tionary, and that his actions as such were proper and legitimate subjects of newspaper comments and criticism, and that the article complained of does not exceed the bounds of just and reasonable criticism, and that said article, with all its comments and criticisms made on plaintiff therein, is privileged, and plaintiff had no right to complain thereof.

The remainder of defendant's defenses set up in its answer are merely in mitigation of damages.

Defendant, in paragraph 6, says that it published said article complained of in good faith, believing the comments and criticisms made therein were proper and legitimate inferences from plaintiff's testimony in the Cardwell case; that said matters had been published and republished in the newspapers of the State, and that defendant did not believe that its article published on February 12, 1905, could or would injure plaintiff or in any manner defame him, and that "this defendant had nothing to gain by assailing the plaintiff personally and had no such wish or desire."

Defendant, in paragraph 7 of its answer, avers and says that by the publication complained of by plaintiff it did not mean or imply that plaintiff had been in any way guilty of perjury or making a false affidavit, nor was it so understood by any one reading the same, and in this connection defendant sets out at length an article published by it in its newspaper on Sunday, February 26, 1905. Said article last referred to defendant pleads as an apology or retraction, and thus concludes paragraph 7: "And so defendant pleads said publication in further mitigation of damages, if plaintiff be in any wise damaged, which is denied."

The following excerpts from said so-called "apology" or "retraction" will be noted:

"Here not long ago tellin' you 'uns what it was knocked the old machine out an' made Sam Cook the most popular man in Missouri run behind his ticket.

was the making of a false affidavit to a statement of receipts of campaign funds.

"So far as Sam Cook was concerned, I tried to let him down easy, as my remarks showed.

"Some of Sam's friends, an' I hear Sam hisself says I accused him of perjury. Not on your life."

Defendant then sets up in mitigation of damages that the depositions of plaintiff and of Orear in the Cardwell case set up in the second defense of the answer, and its publication in the press of the State, had so fixed public opinion in the State adversely to plaintiff that the article sued on did not in any wise injure plaintiff.

Defendant in the last one of its answers, pleads by way of mitigation of damages that the article, in its paper of Sunday, February 12, 1905 (the one sued on), was received from a regular contributor, who for some years had been furnishing political articles for the Sunday edition of defendant's paper; that said contributor, one Donald C. Fitzmaurice, is a man of experience and of respectable standing in newspaper circles, and that defendant in its former relations with him had found him careful and diligent, and in a series of years had never had any trouble by reason of his communications,"and that beyond the receipt of said article, this defendant, or its management, did not in any way encourage, promote, instigate or suggest to said Fitzmaurice any of the matter, criticism, comments, characterizations or epithets appearing in said article," and that "defendant and its management never in any manner authorized said Fitzmaurice in any manner to libel or defame or injure plaintiff, and that defendant, or its management, did not intend so to do by said publication."

Defendant further says that it published, as hereinbefore stated, on the twenty-sixth of February, 1905, the article and matter hereinbefore set out as an explanation, apology and correction of any alleged con-

struction of said article which might in any way reflect upon plaintiff.

"And so this defendant pleads these facts herein in this defense set forth in mitigation of any damages, if any, that it may be found plaintiff has sustained in any manner by reason of said publication. And this for an eighth defense."

The plaintiff in reply joined issue with defendant on the new matter set up in his answer.

The case was tried at the November term, 1905, and resulted in a verdict for the plaintiff in the sum of $75,000 punitive damages, and $75,000 actual damages, and judgment was rendered accordingly. Before proceeding to trial, the defendant moved the court to require plaintiff to elect whether he would proceed to trial on the averments that the publication complained of charge plaintiff with having made a false affidavit or on the claim that it charged plaintiff with having falsely taken an oath in preparing and filing a detailed statement under the Corrupt Practice Act. This motion was overruled by the court. On the trial of the plea to the jurisdiction, the plaintiff introduced Mr. W. H. Harrington, who testified he was the circulation manager of the St. Louis *Globe-Democrat* on February 12, 1905; that the circulation of the paper at that time on Sunday was about 160,000; that he sent copies of the said paper both by mail and by express to the newsdealers in Randolph county; they had a newsdealer in Moberly by the name of H. S. Williams, and that they usually sent him about two hundred copies of the Sunday papers, sometimes more and sometimes less; that the *Globe-Democrat* circulates in every State in the Union, and there was hardly any country where somebody from St. Louis or somewhere did not take the *Globe-Democrat*. The papers go to London, Paris and South America. Plaintiff also, in resistance of said plea to the jurisdiction, read in evidence the transcript of the case showing the proceedings had in

the cause when same was pending in Huntsville, in Randolph county, among other things that defendant applied for and obtained its change of venue from Randolph Circuit Court without raising or suggesting any objection to the jurisdiction of that court; that this was first raised in the case after the cause had reached Salisbury, and that a motion to dismiss the case for want of jurisdiction was filed by the defendant in the court at Salisbury and was overruled.

On the trial proper, to sustain the issues, the plaintiff introduced the evidence of Mr. Harrington already introduced, and Mr. Thomas M. Hollingshead, the business manager of the defendant, who testified that he did not know "Old Politician," and did not know who he was; that the circulation of the *Globe-Democrat* for February 12, 1905, was in the neighborhood of 158,000 to 160,000 copies; that its office building was on Sixth and Pine streets in the city of St. Louis; that defendant's capital stock was $500,000; that the value of defendant's property was from $2,000,000 to $2,500,00; that it owned real estate worth from $300,000 to $400,000.

Charles M. Harvey testified that he was not positive who "Old Politician" was, he knew that he (Harvey) was not the writer of the said article; that Capt. King would know; that Mr. Houser would not know.

Plaintiff then read in evidence the entire article as published by the defendant in its paper February 12, 1905, containing the extracts set forth in plaintiff's petition, and being the same article set out in full in the defendant's answer.

Frederick Zeibig testified that he was the treasurer of the Democratic State Committee in 1896; that Samuel Cook was the chairman of the committee; that prior to the election in 1896 he received one hundred dollars directly from W. H. Phelps, was paid by check; that subsequently Mr. Cook gave witness $2000, and also on the same day told him it was from Phelps; that

Cook told witness that Ed Orear had objected to the contribution appearing in his report in Colonel Phelps's name; that witness made a report according to his understanding of the statute within thirty days after the election; that he credited the one hundred dollars to Mr. Cook, did so on the written order of Mr. Phelps, and that he also credited the $2000 to Mr. Cook. That Mr. Cook brought witness a written order signed by Col. Phelps authorizing him to credit the money in the name of Mr. Cook, which witness did. "That Mr. Cook was thoroughly indifferent in the matter, he did not care anything about it personally; the way I understand it, it seemed to please Mr. Orear more than any one else." Witness made out his report with the help of a stenographer in his office. That the report was not made up for two or three weeks after the election, and that Mr. Cook had no part in it. "Q. Did you submit it to Mr. Cook? A. I do not think I did. I have no recollection of having done so. After the campaign the headquarters were closed up and Mr. Cook went home. I prepared my report at my office when I had the time with my stenographer, a young man that I had there. He prepared it; I think the report itself will show that I paid him for his services." That he did not think Mr. Cook saw the report in the rough, but it was copied by the stenographer; that witness was crowded to get it filed in time, and completed it only four or five days before that time elapsed; that he was living in St. Louis county and filed it at Clayton; that he, witness, did not remember of ever having shown a copy of the report to Mr. Cook. Did not know that Cook ever saw a copy of it. "Have no recollection of it."

On cross-examination Mr. Zeibig testified that he lived in St. Louis county and the law requires the report to be filed there; also required the treasurer of the committee to file the report; that Cook was chairman of the State Committee; was not the treasurer in

any sense; did not sign the report, made no affidavit to it and did not see it that witness knew of; that Mr. Cook was not then Secretary of State and held no State or other office.

Samuel B. Cook, the plaintiff, testified that he lived in Jefferson City; had lived there since January, 1901; that he was born in Virginia and had lived in this State for nearly fifty years, since he was seven years of age; that he has been sheriff of Warren county, Missouri, elected in 1878 and 1880; was secretary of Democratic Committee in the Stone campaign, being a member of the committee; was elected chairman of the State Committee the latter part of 1895 or the early part of 1896; was elected chairman by the State Convention of 1896 and re-elected in 1898; that witness received money from different sources during the campaign of 1896 and always turned it over to Mr. Zeibig, the treasurer; that Col. Phelps sent him a check for one hundred dollars; that on the morning after the election the committee owed $2100, or something like that sum; some of the candidates having failed to pay their assessments, the committee was short about that amount; that witness left the committee to see if he could raise some money and when he returned found that in his absence Col. Phelps had left $2000 for the committee; that witness got the check cashed and turned the money over to Mr. Zeibig, the treasurer; that this occurred on Thursday following the election of 1896; that he did not see Zeibig's report prior to the time it was filed; that he had no conversation with Mr. Zeibig with reference to what it should contain; that witness at that time lived at Mexico, Missouri, and went to his home there on Friday following the election; that witness returned to St. Louis about three weeks later; was asked to come up to Governor Stone's room at the Planter's Hotel; that he found there Governor Stone, Mr. Orear and Maj. Salmon; that Mr. Orear told witness that Gov. Stone was worked up over the contribu-

tion of Col. Phelps; that he thought it ought not to have been made and that Governor Stephens ought to have paid it himself; that Orear asked witness to see Col. Phelps and ask the latter to put his contribution in the name of some one else; that the result was witness saw Phelps and the latter told him to tell Zeibig to put his contribution in the name of some one else; that he so reported to Zeibig; that Zeibig said he would not credit the contribution to any one else except on Phelps's written order; that witness saw Phelps again and told what Zeibig said, and Phelps wrote out a written order and handed it to witness, who gave it to Zeibig; that witness's name was not mentioned when Phelps gave him the order. Plaintiff further testified that he went to the *Globe-Democrat* office on January 5, 1899, and called on Captain King, the editorial manager of the *Globe-Democrat*; that the occasion of the visit was that he had noticed an editorial in the *Globe-Democrat* charging him with not having accounted for the $2100 that had been paid; that he visited Captain King in company with Maj. Salmon and Mr. Zeibig and called Captain King's attention to the editorial referred to, remarking to the latter that the editorial charged him (plaintiff) with embezzlement; that he told Captain King that he had brought with him Mr. Zeibig, the treasurer, and a copy of the report, showing that witness had paid the $2100 to the committee; that Zeibig produced the report and showed it to King; that Zeibig also produced Col. Phelps's written order above referred to and showed it to King and the latter replied: "Well, that fellow (Phelps) sat right in that chair and told me that you had never accounted for that money." That the next day the *Globe-Democrat* stated that plaintiff had accounted for all the money that came into his hands; that witness, at King's request, explained to the latter the circumstances under which the $2100 was credited to plaintiff in Zeibig's

227 Sup—33

report; that Captain King examined the report and saw that Zeibig swore to it and that it was signed by Zeibig and by no other person; that the conversation referred to was on January 6, 1899, and the Cardwell suit was in 1901.

On cross-examination plaintiff testified that he is now and has been since January 10, 1905, president of the Missouri Trust Company at Jefferson City, Missouri, and in reference to his deposition in the Cardwell case said it was poorly taken and was poorly reported. "I stated (referring to his deposition in that case) that the treasurer did make the report, and I remember that part of it. Q. That you were with him when he made the report? A. Yes, sir. I do not know whether the answer was just that way, but it was explained there just as I explained it here; that I was in that room the day he was consulting in regard to making his report; I was not there in the sense of helping him make it, but I was there."

Defendant on its part introduced in evidence the House and Senate resolution of the Forty-third General Assembly of Missouri calling for the investigation of the report of Thomas K. Niedringhaus, treasurer of the Republican State Committee for the year 1904 on campaign contribution and expenses, in support of its defense that said article and its criticism and comments were proper to illustrate the effect and results of certain actions by political committees, among others the Niedringhaus Committee, and to arouse the public to understand the meaning of such actions.

Defendant next introduced in evidence the record of the proceedings of the circuit court of Jackson county in the case of William O. Cardwell against George Knapp & Company, for an alleged libel of said Cardwell, appearing in the St. Louis *Republic*, the said libel having been alleged to have been written by the plaintiff, and the deposition of the plaintiff taken in that cause on the 27th of November, 1901, in which the

plaintiff testified to the receipt from William H. Phelps of the $2000 heretofore alluded to in plaintiff's evidence in this case, and to the disposition of the same as therein stated.

Defendant next introduced in evidence the report of Frederick G. Zeibig, as treasurer of the Democratic State Committee in the campaign of 1896, signed and sworn to by Frederick G. Zeibig, treasurer, and certified to by the Recorder of Deeds of St. Louis county, wherein, on November 5, 1896, the plaintiff was credited with having contributed $2100 to said campaign expenses.  Defendant also introduced in evidence the report of James E. Hereford as treasurer of the Democratic State Central Committee of campaign receipts and expenditures for 1898, filed in St. Louis county and certified by the Recorder of Deeds.  Defendant next  introduced in evidence a certified copy of the total vote cast for the various State officers at the general State election held in November, 1900, showing plaintiff's plurality for the office of Secretary of State to have been 38,875, and his majority over all 21,616. Defendant also offered in evidence a certified copy of the tabulated returns of the election of 1904, whereby it appeared that John E. Swanger, the Republican candidate for Secretary of State, received a plurality of 23,980 over plaintiff, Samuel B. Cook, for the office of Secretary of State.

Defendant then offered and read in evidence the testimony of Edward T. Orear wherein he testified that in 1896 he was an intimate friend of Governor Lon. Stephens and was regarded as the personal representative of Governor Stephens in that campaign; that shortly after the election said Orear was notified by the plaintiff, Mr. Cook, to come to St. Louis in regard to the closing up of the work of the committee; that upon his arrival he met the plaintiff, Mr. Cook, and was informed by him that the bills of the campaign had been paid, but that in closing up the work they were

$2000 short; that Col. Phelps had contributed the money and discharged the indebtedness, and they were now ready to make their report under the provisions of the Corrupt Practices Act; that Governor Stone suggested that the contribution of $2000 by Mr. Phelps ought not to appear as coming from him, because he was the attorney of a corporation; that he, Orear, suggested that he could see no impropriety in Phelps' contribution being credited to some one else, provided Phelps made no objection. It was agreed that Mr. Cook should go and see Phelps to get his consent to crediting his contribution to some one else; that plaintiff went to see Phelps twice; that nothing was said as to whom the contribution was to be credited, but witness was informed that night, either by Mr. Cook or Zeibig, the treasurer, that Phelps had given an order to Zeibig to credit his contribution in Cook's name. That Mr. Cook secured the order from Mr. Phelps authorizing the contribution to be credited to Cook.

Defendant also read the depositions of the plaintiff and Edward T. Orear given in the Cardwell case. Defendant also read in evidence the deposition of John H. Carroll, who testified that in 1898 he gave S. B. Cook, as chairman of the Democratic State Committee, $1000; that this was his personal contribution; that he gave it to help the Democratic State ticket; that the *Globe-Democrat* was a Republican party newspaper and the plaintiff, at that time, was not Secretary of State, or holding any public office.

The defendant then offered the deposition of William H. Phelps, who testified that he was a *farmer,* a lawyer and assistant general solicitor of the Missouri Pacific Railway Company, and had his office in the Missouri Pacific Building in St. Louis. That on October 7, 1896, he contributed by check to F. G. Zeibig one hundred dollars and took his receipt for that sum as treasurer of the Democratic State Committee; that on November 6, 1896, about the third day after the elec-

tion, he gave S. B. Cook a check for $2000, and the latter afterwards gave him a receipt of Mr. Zeibig for that sum; that afterwards Mr. Cook came to the office of witness and stated that some of the leaders of the party thought it was not best for his contribution to appear in the name of witness and wanted to know if it could appear in the name of some other person and he answered he had no objection and gave the order to credit the contribution to Mr. Cook. The order was in the following words: "St. Louis, 11:30. F. G. Zeibig, Esq. Dear Sir:—You can transfer my contribution of $2100 to Mr. Cook. W. H. Phelps." On cross-examination, he stated he was a Democrat at that time. The *Globe-Democrat* was a Republican party organ published in the city of St. Louis and had been for many years.

Henry King testified that he was the editor of the *Globe-Democrat* and had been for about eight years; that he knew the plaintiff; that he remembered that plaintiff, H. W. Salmon and F. G. Zeibig called at the office of the witness after the campaign of 1896; that witness had made a statement in the *Globe-Democrat* that a certain contribution made to the Democratic campaign fund credited to Mr. Cook had been given by somebody else; that Mr. Cook called to see witness about that statement and explained to him the facts in the matter; said that he had done so with the assent of the person who had given the money; that he did not think the question of affidavit was mentioned; that Mr. Cook wanted it understood that he had not credited himself with somebody else's money; did not think he ever had any other conversation with Mr. Cook; that so far as witness knew the defendant never received any information from Mr. Cook that he had not made an affidavit as chairman of the Democratic State Committee in regard to the raising of campaign money; that witness knew Donald C. Fitzmaurice; had known him for fifteen years, that he bears, so far as

witness knows, a good reputation as being a careful and reliable correspondent in the newspaper fraternity; that Fitzmaurice's reputation for honesty and integrity was good; that witness recollected the taking of the depositions in the Cardwell case at Independence; that the *Globe-Democrat* published in its columns the testimony of S. B. Cook taken at Independence; that the same was also published in the Kansas City and St. Joseph papers. Witness, on cross-examination, stated that he was born in Ohio, formerly lived at Topeka, Kansas, and succeeded Mr. McCullough on the *Globe-Democrat* on the latter's death; that it is possible the conversation with Mr. Cook on the occasion of his visit to the office was in regard to the publication in the *Globe-Democrat* of January 5, 1899, of an editorial headed *"Democratic Campaign Mysteries,"* which reads:

"Strange reports, and well-verified reports at that, multiply concerning the disappearance of contributions to the Democratic campaign fund in this State. Col W. H. Phelps says he holds a receipt for $2100, given by him to the Democratic campaign fund of Missouri two years ago. No report of the receipt or expenditure of this money has ever been made by the Democratic State Committee. The law requires a sworn statement of such receipts to be filed. Why has it not been done in this case? And what became of Col. Phelps's $2100? Chairman and others concerned would do well to furnish an explanation. This is no vague rumor, but a perfectly definite statement from the contributor himself, and the receipt is in his hands. He has a right to know how the money is spent, and so has every citizen of Missouri. A secret and select Democratic fund seems to be well established in this State, in defiance of the statute and in total disregard of the right of the contributors to know that their money is not privately misapplied. The police force in this city, which is under Democratic control, is heavily and regularly assessed for the campaign fund, but no intelligible showing is ever made of where the money goes to. They are compelled to pay monthly, and that is all they know about it. To growl is dangerous, and to resist it is to lose a job. To this day no one apparently knows how Judge Bland's $1000 was expended after it found its way into the hands of Chairman Cook during the season of Populist withdrawals, which is just before the election. Col. Phelps' $2100 cannot be called an unconsidered trifle. It is gone and left no sign. Governor Stephens

fortified himself against any personal occurrence of this kind last fall. He made no campaign contributions. Nor was he much to blame, considering his facilities for inside observation. His course, however, has not stopped the remarkable leak in the case of others less favored."

Witness continuing testified that it is possible that the editorial was the occasion of Mr. Cook's visit, but that their conversation was in regard to Phelps's contribution; that witness did not write the foregoing editorial, but had it written and was responsible for it. The examination of the witness at this point proceeded as follows:

"Q. You know, as a matter of fact, as editor of the *Globe-Democrat,* that the treasurer makes those reports under the laws and not the chairman? A. Yes, sir.

"Q. You say that you published in the *Globe-Democrat* an abstract or the substance of the testimony given in the Cardwell case in the depositions at Independence? A. Yes, sir.

"Q. Don't you recollect that in the course of his testimony in that case Mr. Cook stated that the treasurer of the committee made the report, the sworn report, and the chairman did not? A. Yes, sir, I remember that."

Witness further testified: Donald C. Fitzmaurice lives in St. Louis; that he furnished his letters to the *Globe-Democrat* under the *nom de plume* of "Old Politician;" had been doing so for three years; that they generally appeared in the Sunday edition of the *Globe-Democrat*; that he, Fitzmaurice, was a contributor to the paper and was paid for the work he contributed; that he, Fitzmaurice, in politics was a Democrat.

Defendant also offered Donald Fitzmaurice as a witness. He testified that he was the author of the article which is the subject of the suit for libel in this case, under the alias of "Old Politician." He gave as his motive for writing the article that Mr. T. K. Niedringhaus, who was chairman and acting

treasurer of the Republican State Committee in the 1904 campaign, had "received campaign funds and concealed them in his official report;" that Mr. Niedringhaus had, in his sworn statement filed in St. Louis, credited himself with about $24,000 as paid by himself, whereas the money was contributed by Mr. Busch and others; that notwithstanding the foregoing developments, Mr. Niedringhaus was the Republican nominee for United States Senator; that the prospective election of Mr. Niedringhaus as United States Senator by the Republican party, because of the aforesaid disclosures, greatly disturbed Fitzmaurice and the other "two Democrats" with whom he was colaboring; that this result would be out of harmony with some reform work the trio had been attempting to do through the columns of the *Globe-Democrat,* the Republican party organ, so that he went back to this matter of Mr. Cook and this was done on his own motion just simply carrying out the policy those three had agreed upon. He testified further that in handling the article "I became confused with the fact or circumstance that Mr. Niedringhaus was both chairman and treasurer of his committee, and that he himself swore to his accounts, and that fact is the one that 'confounded' me into forgetting that Mr. Cook was not, at the time the affidavit was made, also the treasurer of his committee." He testified that for five or six years he had been writing articles over the name of "Old Politician" in the *Globe-Democrat.*

Defendant next read in evidence an article headed "Old Politician on Nature's Laws," and which was published in the *Globe-Democrat* February 26, 1905. This article is set forth at length in defendant's answer, and was treated in the defendant's instruction number six as an "apology" to plaintiff.

Henry F. Woodward in rebuttal for the plaintiff testified that he was connected with the Democratic State Committee 1896; that he was present at the head-

quarters of the Committee when Col. Phelps brought in the check for the $2000 for the committee; that Mr. Cook was absent at the time and Col. Phelps gave the check to Mr. Seibert.

The court instructed the jury, and the instructions will be noticed in the course of the opinion.

I.   The overruling of the plea to the jurisdiction of the circuit court of Chariton county presents the first alleged error in the case.   In the consideration of this point, it should be borne in mind that this action was brought in Randolph county, and the writ served in the city of St. Louis, where the defendant had its chief place of business, and where its president was.   The evidence established beyond all question that the paper containing the libelous matter was sold and circulated in Randolph county on the day of its issue.   The defendant appeared to the writ in Randolph county and prayed for and obtained a change of venue from said county to Chariton county without having raised any objection to the jurisdiction of that court in any manner whatever.   In Julian v. Kansas City Star Company, 209 Mo. 35, it was ruled by this court that section 997, Revised Statutes 1899, authorized a person libeled by a corporate defendant to commence his action in any county where said publication is made or in which the newspaper containing the libelous article is circulated.   It was also held in that case that when the defendant filed its application for a change of venue, it entered its general appearance in the cause, and even though the process might not have been sufficient to give jurisdiction over the person up to that point in the case by making the application for the change of venue it waived the jurisdiction of the circuit court in which the action was brought over its person, and could not afterwards avail itself of its objection to the jurisdiction of the court over its person.   [Feedler v. Schroeder, 59 Mo. 364; Baisley v. Baisley, 113 Mo.

l. c. 551; Rodney v. Gibbs, 184 Mo. l. c. 18; Meriwether v. Knapp, 211 Mo. 199.]

In the Julian case a plea to the jurisdiction was filed before the defendant took a change of venue, but in this case the defendant appeared to the action without reservation and filed its application for a change of venue, which was granted to it to another county and the jurisdictional objection was not made until the case reached the Chariton Circuit Court. Under the previous rulings of this court, we think there can be no doubt that the circuit court of Randolph county obtained jurisdiction over the defendant and the circuit court of Chariton county derived jurisdiction by the change of venue thereto. The Act of 1909, Laws 1909, page 347, passed after this judgment had been rendered and while the appeal was pending in this court, does not affect the case.

Defendant urges that section 997, Revised Statutes 1899, which provides that "suits against corporations shall be commenced either in the county where the cause of action accrued, or in any county where such corporations shall have or usually keep an office or agent for the transaction of their usual and customary business," is void and unconstitutional because in conflict with the Fourteenth Amendment to the Constitution of the United States, in that it denies to the defendant corporation the equal protection of the law. That the circuit court of Randolph county and Chariton county have jurisdiction under the laws of this State, of actions of libel, there can be no doubt whatever; that is to say, they have jurisdiction of the subject matter of this action. Equally well settled is the law that where a court has jurisdiction of a class of cases, any defendant, whether a natural or an artificial person, may confer jurisdiction over his or its person by entering his or its general appearance in a cause of that class, and that when this is done he or it cannot thereafter raise the insufficiency of the service of the process by

which he or it is notified of the commencement of the action. This was ruled in Julian v. Kansas City Star Company, 209 Mo. l. c. 94, 97, upon the strength of the prior decisions of this court therein cited and approved. It was also held in that case that the appearance of the defendant in that case by filing a petition for a change of venue, was a general appearance and gave the court jurisdiction over its person, notwithstanding it had filed a plea in abatement to the jurisdiction of the court over it. As already noted, in this case, the defendant appeared in the Randolph Circuit Court and filed its application for a change of venue and obtained a change of venue thereon, without having made any objection to the jurisdiction of the court and without any plea to the jurisdiction, and not until after the cause had reached the Chariton court did the defendant object to the jurisdiction of the court. Having filed its plea to the jurisdiction to the circuit court of Chariton county that court overruled it. This it must be presumed it did upon the general principles of law and without any reference to the Federal question injected into the case in said plea. When the Julian case reached the Supreme Court of the United States, that court dismissed the writ of error for want of jurisdiction in that court to hear the same, on two grounds, one was that the attention of this court was not called to any Federal question until in the motion for rehearing, and that was too late, and the other was, that the judgment rested on non-Federal grounds broad enough to sustain it, as was held in the opinion of this court in that case. [Railroad v. Snell, 193 U. S. 30; Hammond v. Arkansas, 212 U. S. 322.] As we understand it the Supreme Court of the United States holds that the Federal question must be directly involved so that the State court could not have given judgment without deciding it and its decision must have been against the right claimed. [Sayward v. Denny, 158 U. S. 180.] Surely

in the face of this record it cannot be said that the circuit court of Chariton county could not have overruled the plea to the jurisdiction without deciding defendant's claim that section 997 was unconstitutional. On the contrary, it is obvious that it could have and properly did, retain jurisdiction over defendant, because defendant's general appearance waived any question of the illegality or irregularity of the notice by which it was brought into court. In view of this condition of the record, we must decline to enter upon a discussion of the constitutionality of section 997, Revised Statutes 1899, however much we may be satisfied of its constitutionality.

II.  In logical sequence, we find the next alleged error was the overruling of defendant's motion to elect.  This contention is bottomed upon the construction placed on the petition by defendant's counsel that the plaintiff had improperly joined in one count two separate and distinct libels, to-wit, one charging that of perjury, and the other charging him with making a false, voluntary affidavit.  Obviously, we think this point is not well taken.

In Hughes v. Rees, 4 Meeson and Welsby 204, Lord ABINGER said: "You may put into one count all words spoken or written at one time; but I am not aware that you may put into one count matters published at different times."

The rule is that a single tort gives rise to one cause of action only and cannot be split up into separate suits and the damages resulting therefrom must be assessed in the same suit.  [Bank v. Tracey, 141 Mo. 252.]  The action here was based upon one publication only and the injury flowed from this one act.  Thus the case presented is not unlike one in which different acts of negligence may be set forth in one count and all constitute one cause of action unless they are inconsistent and self-destructive.  In the publication

set forth in the petition the imputations of perjury, making a false affidavit and lying, are all charged and are not inconsistent, as the defendant could and did impute all of said different matters to the plaintiff, and we think the damages are not divisible.

Nothing said in the case of Flowers v. Smith, 214 Mo. 98, is in conflict with this conclusion. In that case there were various newspaper publications made on different dates and in different issues of the paper and were united in one count and were clearly distinct and separate causes of action, as was held by this court.

We think there was no merit in the claim of misjoinder, but by answering over and thereby tendering the issue of libel or no libel, the defendant, under the long established rule of this State, waived its motion to elect. [Hof v. Transit Co., 213 Mo. l. c. 465; White v. Railroad, 202 Mo. 539; Paddock v. Somes, 102 Mo. 235.]

III.   These questions of jurisdiction having been disposed of, we are brought to those contentions of the defendant which go to the very merits of the case.

At the close of the plaintiff's evidence and again after all the evidence on both sides had been introduced, the defendant requested an instruction in the nature of a demurrer to the evidence, which the court overruled, and this is now assigned as a vital error in the case.

By statute in this State "a libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, or any malicious defamation made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives or friends." [Sec. 2259, R. S. 1899.]

This contention is treated in different aspects. It is insisted, first, that the publication was not libelous and that the publication was not reasonably susceptible of the interpretation that it charged the plaintiff with perjury; that no perjury was charged therein and the court should have excluded that issue from the jury. And that the innuendo alleging that the defendant charged the plaintiff with perjury is inconsistent with the publication; that nothing more than the making of a false affidavit under the Corrupt Practices Act, can be made out of the publication.

That this publication was clearly libelous, we are all agreed, whether we look to our statute defining a libel or to the common law. "To print and publish of another that he has sworn falsely, or is a perjured scoundrel, is libelous without a colloquium, averring that a judicial proceeding was or had been pending in which legal perjury had been committed, because any publication about a person which tends to excite a sense or feeling of ridicule, contempt, infamy or disgrace is libelous, and if the innuendo gives the language used in the publication a more enlarged signification than the facts in the case justify, it may be rejected as surplusage. See 1 Chitty, 384-385, and authorities there cited, where it is said: 'But where the new matter stated in an innuendo is not necessary to support the action, it may be rejected as surplusage.' " [Haws v. Stanford, 4 Sneed (Tenn.) l. c. 526 and 527.] The term perjury is expressly used in the publication, thus: "Bill didn't pretend that he can prove anything like it was proved in Sam's case, but he says so and so; says this and that, an' this and that, says so and so, and winds up by denouncin' in thunder tones every man who would commit a perjury by making a false oath in such case, an' demandin' a law that 'll send them *all to the penitentiary*. I guess every Democrat in Missouri 'ill get that speech—*all but Sam Cook*." This plainly insinuates and implies that the

plaintiff had committed perjury.  In Merrill v. Post Pub. Co., 197 Mass. 193, it is said: ''A defendant is liable for what is insinuated as well as for what is stated explicitly.''

''The effect and tendency of the language used, not its form, are the criterion by which to determine the actionable quality of the words.  It is immaterial that the words used concerning the plaintiff are indefinite and uncertain in their meaning if on the whole they are defamatory and were so intended and understood, for, as has been justly remarked, calumny may be as effectually conveyed in artful allusions to collateral matter and oblique insinuations as by the most explicit assertions; and it is well settled that in actions of libel and slander it is permissible to aver and prove that words which have a covert meaning were intended to defame and were understood in a defamatory sense by those who heard or read them.  Although the words do not contain a direct affirmative charge that a crime has been committed, yet if they are calculated to induce the hearers to suspect that the person spoken of has committed a crime, they are actionable, and it would seem that the same rule applies not only to imputations of crime but also to imputations of other acts or circumstances to charge which directly is actionable.''  [18 Am. and Eng. Ency. Law (2 Ed.), pp. 969, 970, and cases therein cited.]

Under the Constitution of this State, it was the province of the jury, under the instructions of the court, to construe the publication and to draw the inference therefrom that the defendant imputed to plaintiff the crime of perjury.  The plain language of the publication, we think, warranted such a finding, irrespective of the innuendoes, which were disregarded by the court in its instruction to the jury.  Among other charges in the publication were these:  ''Most everybody's that way.  The only thing that explains the difference made between Cook an' Stone is that Cook is

*the man that swore to what wasn't so.* The people o'
Missouri 'll never stand for that, my boy, or anything
like it.'' ''The average Missourian stands for honest
government. If one party can't give it to him, he'll try
the other, and the big thing that made him try the
other was when the machine tried to gag him, an' force
a lie down his throat *after Sam Cook had sworn that
he contributed $2500 to a campaign fund that was con-
tributed by another man,* whose name Sam wanted to
conceal.'' ''Give 'em a question that goes down to the
bottom of their common nature an' they'll answer it
with almost one voice, an' that voice'll be an echo of one
that come down from Mount Sinai a-sayin' 'Thou shalt
not bear false witness,' '' ''I reckon they still think, even
after 'what's happened to more'n one chairman of a
state committee in Missouri since that law was passed,
*that a man can swear to a lie an' not be caught at it.''*
''The people of Missouri is a God-fearin' people,
an' the man who'll do what Sam done, to serve
his party or hisself instead of the Lord, an'
will take the name of the Lord in vain, *in swearin'
to an untruth,* will never meet their approval.''
It's just the other way, Sam Cook and Bill
Stone know by this time what that *kind of lies* cost a
man an' a party, but they don't want the whole load of
bricks to fall on them.'' Accepting the test that the
publication must be read altogether as one statement,
which is unquestionably correct, it is obvious that no
court can say that it was incapable of a construction
charging and imputing that plaintiff had been guilty
of perjury.

In Brown v. Publishers, 213 Mo. 655, Division
No. Two of this court had occasion to consider this
proposition and adopted the view announced in 18
Amer. & Eng. Ency. of Law, 989, that: ''To render
words actionable it is not necessary that they should de-
scribe the offense with that precision with which it is
necessary to set forth an offense in an indictment, and it

is well settled that if the words used to express the charge are such, in the sense in which they would naturally be understood, as to convey to the minds of those to whom they are addressed, or to the readers of the words, the impression that the plaintiff has committed a crime, the words are actionable.''

The plaintiff was not bound to establish that the article charged him technically with the crime of perjury. To sustain the substance of his petition it was only necessary that the jury should find that the said publication was maliciously published and had a tendency to provoke him to wrath, or to expose him to public hatred, contempt or ridicule, or to deprive him of the benefit of public confidence and social intercourse, and so the circuit court correctly instructed the jury. Plaintiff did not request the court, by any instruction, to limit or define the issues to perjury, or a false voluntary affidavit, but submitted to the jury the publication as a whole and the jury under the instructions of the court, as was their constitutional right, responded by finding that the article was libelous, as it clearly was. ·

But at the request of defendant, the court went further, and in the 14th instruction asked by the defendant advised the jury that the plaintiff complained of the portions of said article set out in instruction number one, because he said they charged him with being guilty: 1, of voluntarily making a false affidavit; 2, of falsely, by swearing, taking an oath prescribed by the law of this State; and 3, by so doing plaintiff had then and there been guilty of the abominable crime, of perjury, and the jury were therefore instructed that unless it appeared from the facts and circumstances proven in evidence that the portions of the publication complained of did in fact charge that plaintiff had been and was guilty of the abominable crime of perjury, or of making a voluntary false affidavit, plaintiff could

not recover in any event. The instruction, it is true, as requested, omitted the words ''or of making a voluntary false affidavit.'' Thus it will be seen that the defendant by its instruction invited the jury to pass upon the question whether the publication charged plaintiff with perjury. Obviously the court committed no error in adding the words ''or making a voluntary false affidavit,'' as the defendant was not entitled to go acquit of the libel even if the jury did not find it charged plaintiff with perjury, because the publication was libelous *per se* in charging the making of a voluntary false affidavit.

Recurring now to the proofs, it was established beyond peradventure that not only did plaintiff not make a false affidavit but that he made no affidavit whatever to the receipts and expenditures of the funds by the Democratic State Committee, either in 1896 or in 1898; that the affidavits required by the Corrupt Practices Act were made by the treasurers of said committees for those years, and for this reason the demurrers to the evidence were properly overruled. But notwithstanding the testimony showed that plaintiff did not make any affidavit as charged, it is insisted by defendant that the plaintiff's own admissions on the stand and in his deposition at Independence demonstrated that he knowingly participated in concealing the contribution of Col. Phelps to the campaign expenses in 1896, and therefore was legally guilty of making a voluntary affidavit or perjury as the court might construe the publication; in a word, the contention is that defendant was justified in making and publishing said charges. By section 636, Revised Statutes 1899, it is provided that in actions for libel and slander ''the defendant may, in his answer, allege both the truth of the matter charged as defamatory and any mitigating circumstances admissible in evidence to reduce the amount of damages.'' In this case the defendant denied the allegations of the petition charging that said

publication was false and malicious, but it nowhere pleaded the truth of said charges. That defendant cannot avail itself of a claim that the charges against plaintiff were true would seem too clear for discussion. The defendant can not prove under the plea of the general issue at common law, the truth of the defamatory words, either in bar of the action or in mitigation of damages, no more can he do so under the unequivocal language of section 636, Revised Statutes 1899, above quoted. The falsity of all defamatory words is presumed in the plaintiff's favor and he need give no evidence to show them false. The burden is on defendant to rebut this presumption by giving evidence in support of the plea of justification. [Newell on Libel and Slander (2 Ed.), p. 651; Odgers on Libel and Slander, 170.] In 13 Ency. Pl. & Pr., p. 75, it is said: ''The truth of the words spoken or published is not admissible under the general issue in mitigation of damages. No principle is better established than that the truth of slanderous words cannot be given in evidence under the general issue, either as a defense or in mitigation of damages.'' [Shepard v. Merrill, 13 Johns. (N. Y.) 475.] And such is the doctrine of this court. [Minter v. Bradstreet, 174 Mo. 444; McCloskey v. Pub. Co., 152 Mo. 339.] Moreover, where the truth is pleaded it must, to constitute a complete defense, be as broad as the charge; proof of a part of the charge will not amount to a complete defense. [Meriwether v. Knapp & Co., 120 Mo. App. l. c. 385.] In this record there is no plea of the truth of the charge, and there was no admission of the truth thereof in the testimony of plaintiff, so that this contention of defendant affords no reason for sustaining the demurrer to the evidence.

In the third paragraph of its answer, defendant sets forth at length the testimony of plaintiff given in the deposition given by plaintiff in the Cardwell suit against the Republic, and avers that the publication of which plaintiff complains in this suit as libelous,

with its comments, criticisims and characterizations and especially the extracts therefrom set out in plaintiff's petition herein, in so far as they relate to and mention plaintiff, refer solely and only to the acts and conduct of plaintiff and his committee as shown and set forth in the testimony of plaintiff, and to nothing else whatever, and has no reference whatever to any other acts of the plaintiff, than those mentioned in the testimony aforesaid, and thus were privileged. While at common law defendant in a libel suit might make his defense of privilege under the general issue, it was not available on demurrer. In this case it sought to avail itself of this matter as privileged in a special defense and had the full benefit thereof in the admission of that evidence and in instructions given at its request, numbered 3, 11, and 12, which are as follows: "3. The jury are instructed that the actions of the plaintiff as chairman of the Democratic State Committee in 1896, and the policy and action of the Democratic Committee of that year, are matters of history, and as such, are legitimate subjects for comment, criticism, denunciation and approval by any citizen and by any newspaper in the State, and that the rights of such criticisms, characterizations and denunciations are guaranteed to every citizen and to every newspaper, and that every citizen and newspaper have a right to use such facts of history to show the impolicy and unwisdom of the threatened action on the part of political committees and parties, and to illustrate the probable and possible results, effects and consequences of such action, and the plaintiff cannot complain of such use, however severe may be the strictures, comments and characterizations unless they are made maliciously for the purpose of injuring him.

"11. The jury are instructed that it is the privilege of the defendant, as of every other citizen, to comment in its paper upon all public matters that affect the public welfare and are at the time agitating the

public mind, and the defendant, as every other citizen, may characterize the action of the public officials or *quasi*-public officials, such as chairmen of state political committees, and can denounce such action in the severest terms and illustrate the pernicious effects and results of such actions and in such terms as may seem just and reasonable to it under the circumstances, and so long as the comment relates to the acts, conduct and policy of such officials and committees, in their official capacities, such publication if fairly made in good faith, and for an honest purpose, is privileged, and the defendant is in no wise liable therefor without the party alleging the injury shall charge and prove malice and special damages resulting to him therefrom. Wherefore, if upon a consideration of the publication offered in evidence, the jury believe that the same is a comment and characterization of and upon the conduct of the plaintiff as chairman of the Democratic State Committee and upon the policy and action of that committee, if fairly made in good faith and for an honest purpose, then it is not liable and plaintiff cannot recover in this action.

"12. In passing upon the question whether the publication offered in evidence is privileged the jury should take into consideration all the facts and circumstances as they existed at the date of the publication as shown in the evidence and therefrom, together with the article itself, determine whether the same is a proper and legitimate comment upon the action of plaintiff as chairman of the committee and upon the policy and action of the committee; and the jury are instructed that in commenting upon the action of Niedringhaus and the Republican committee in relation to the campaign funds, the defendant in its newspaper had a right to illustrate the effect and result of said action by commenting upon and calling to mind the actions and conduct of the plaintiff and the Democratic State Committee in 1896, and to characterize such con-

duct in the most vivid manner, and in the severest terms, so as to arrest the public attention, and to make manifest to the public and the Legislature the inevitable effects of similar conduct in the matters then pending before the people and the Legislature; and the fact that such comment may have been unpleasant and humiliating to the plaintiff and his associates cannot in the least make the defendant liable to the plaintiff, provided it was done without malice, fairly and in good faith, and before defendant can become liable for such comment and characterization and criticism of his conduct in that regard, plaintiff must show to the satisfaction of the jury, by a fair preponderance of the evidence, that said publication, with its comments, criticisms and strictures, was maliciously done for the purpose of injuring plaintiff.''

The petition alleged said publication was false and malicious, and whether it was so was a question for the jury under said instructions, which were as favorable as defendant could have required. The circuit court could not have properly taken the case from the jury on this defense. [Tiepke v. Times Co., 20 R. I. 200.] Officers and persons occupying public positions are subject to just criticism, but the constitutional liberty of speech and of the press simply guarantees the right to freely utter and publish whatever the citizen may desire and to be protected in so doing, provided always such publications are not blasphemous, obscene and scandalous in their character so that they may become an offense against the public, and by their malice and falsehood injuriously affect the character, reputation or pecuniary interests of individuals. The constitutional protection shields no one from responsibility for abuse of this right. To hold that it did would be a cruel libel upon the Bill of Rights itself. The defendant tendered this issue of privilege and the court heard its evidence and gave full and liberal instructions in its behalf, and the jury found that issue against it. It did

not allege that said libelous charges were true and submit their truth to the jury and abide the failure of establishing it, but seeks to have this court usurp the right of the jury and say they were true, without attempting in the circuit court to justify by alleging their truth. This cannot be tolerated. A defendant cannot thus evade the law which requires him, if he intends to insist the libel is true, to plead the truth as a justification and submit that issue to the jury, and then ask an appellate court to pass upon the truth or falsity of the charge as a matter of law. It follows that upon this ground also the demurrer to the evidence was correctly overruled.

IV. There is still another view pressed by the defendant to which we must respond in deference to counsel for the defendant, and that is their insistence that even if the publication is reasonably susceptible of a libelous meaning, yet it was accompanied with such a specification of facts as to demonstrate there was in fact no such crime committed, hence plaintiff had no cause of action. More specifically it is argued that readers of the article would gather merely that it referred to corporation contributions to political committees for campaign purposes and that in violation of the Corrupt Practices Act the sworn reports of the political committee fraudulently concealed the source of these contributions; that the plaintiff, as chairman of the Democratic State Committee, had received $2100 from a corporation representative as a campaign contribution, and sought to conceal the name of the donor, and that the sworn report required of the committee was incorrect, in that it reported the contribution as coming from plaintiff instead of the real donor, and this sworn false report was a violation of the Corrupt Practices Act. That no other transactions in so far as plaintiff was concerned was referred to or meant to be referred to.

· In support of this contention counsel rely upon
various decisions of this court, notably Hall v. Adkins,
59 Mo. 144, in which the action for slander was based
upon a charge of stealing corn, and in defense to which
the defendant offered evidence that the plaintiff was
his tenant and by written agreement the corn was to
be penned on the leased premises and remain a lien for
the rent, and that the defendant discovered plaintiff
was hauling off the corn and at the time of such dis-
covery accused the plaintiff with stealing the same, and
made the same accusation against the plaintiff in the
presence of other persons, giving the circumstances and
referring to the same transaction, and believing that
plaintiff was guilty of larceny and that he had a right
to speak such words. After holding that the corn be-
longed to the plaintiff and was in his possession and
he could not be guilty of larceny in stealing his own
property, the court considered the refusal of the ninth
instruction, which told the jury that if the defendant
spoke the words under the circumstances set forth above
in his evidence, the plaintiff was not entitled to recover
unless they believed that the defendant spoke the said
words with malice and with intent to injure and defame
the plaintiff, and not with an honest purpose believing
the words spoken were true, and held that the refusal
was error, saying: "If the defendant honestly believ-
ed that the facts and circumstances attending the tak-
ing of the corn constituted larceny, and so believing,
and without malice, uttered the words charged only
to those to whom he communicated the facts in his opin-
ion constituting the crime charged, and upon which he
based the same, thus sending the antidote along with
the poison and showing a mistaken view of the law
rather than a malicious purpose, the plaintiff cannot
recover." The defendant is in no attitude to invoke the
doctrine of that and similar cases. In the first place
the assumption of counsel that this publication merely
referred to the sworn report required by the Corrupt·

Practices Act of the committee was incorrect, and that this was all that the article meant, is without any foundation in our opinion. On the contrary the charge is leveled at the plaintiff, and he alone is charged with having falsely sworn to what he knew was not true. Whereas the plaintiff had made no affidavit at all, and had never sworn at any time to the receipts and expenditures of the said committee, and in the whole article there was not a word or a line which showed or attempted to show that this charge of false swearing was palpably unfounded on the face of it. In Brown v. Publishers: Knapp & Co., 213 Mo. 655, the claim was advanced that the statement of the facts showed that the charge was baseless. It was said: "In like manner, they who read the publication in the case before us may not have known whether the oath in which perjury is alleged to have been committed constituted perjury in law, or not; nor could they be expected to incur the trouble and expense of an inquiry into the fact, granting them competent to determine it on a view of the record. 'Words which impute a crime are actionable, not more because they expose the party charged to the danger of being convicted than of being prosecuted, which, even to the innocent, is a grievance; and in every instance where the meaning of what would otherwise have been an unambiguous accusation has been controlled by circumstances which showed it to be groundless, and thus rendered it harmless, the controlling circumstances were so mingled with the accusation by the accuser himself as to make the poison carry its antidote along with it.' This view of the law was expressly adopted by this court in Perselly v. Bacon, 20 Mo. 333." In a word, one may search throughout this publication and find no antidote for the poison; besides, the case was submitted to the jury upon instructions, which gave the defendant the full benefit of the principle which it invokes.

V. It is assigned as error that the court erred in submitting to the jury by its instruction the issue as to whether or not the portion of the publication complained of did in fact charge the plaintiff with perjury. As already said the publication is reasonably susceptible of the interpretation that it charged the plaintiff with perjury. It was not necessary to make the article libelous that it should charge technical legal perjury; moreover, the defendant asked the court to instruct the jury that unless the article sued on charged legal perjury, plaintiff could not recover. This instruction was modified only to the extent of including the making of a false affidavit. As requested it was more than the defendant was entitled to, because, regardless of whether the article charged legal perjury or not, the plaintiff had a clear right to recover, if it had a tendency to provoke the plaintiff to wrath and expose him to public hatred and contempt and deprive him of the benefit of public confidence and social intercourse. It is said that instruction number three given for the plaintiff was contradictory of instruction number 13 given by the court after amending defendant's instruction number 13 by inserting the words "or making a false affidavit." The defendant having invited and obtained the error in this very instruction number 13, it is in no position to complain. It could only have operated to the disadvantage of the plaintiff. Moreover, the jury had already been instructed at the defendant's request on the subject of what constituted legal perjury and there was no necessity for the giving of instruction number 13. Certainly there is no reversible error in this point.

VI. Again the defendant assigns as error the refusal of instruction number five in these words: "The jury are instructed that all the testimony of Captain King and of the plaintiff relating to a conversation said to have occurred on or about the 6th of December, 1899, is hereby withdrawn from the consideration of

the jury, and the jury are instructed to wholly exclude it from their deliberations."

In the first place, the testimony of the plaintiff tending to show that King saw the Zeibig report and that it was not signed by the plaintiff, but by Zeibig and by him alone, was admitted without any objection on the part of the defendant; but for a much better reason a distinct part of the libelous charge was the imputation that the plaintiff had made the affidavit of receipts and expenditures by the Democratic State Committee in 1896 as required by section 7193, Revised Statutes 1899, and this evidence tended to show that prior to the publication complained of herein the defendant, through Captain King, its general editorial manager, had actual knowledge that said affidavit was not made by the plaintiff, but by Zeibig, and if Captain King had such knowledge it was pertinent for the consideration of the jurors on the question of malice and punitive damages. The plaintiff especially testified that Captain King saw the report and saw that Zeibig had sworn to it, on the 5th of January, 1899, long before the publication complained of in this case was made in the *Globe-Democrat*. We think that this evidence was clearly competent and the court committed no error in refusing the instruction excluding it from the jury.

As to the alleged errors above considered and discussed we are all practically agreed that there was no reversible error committed in the circuit court.

VII. We are finally brought to the last contention of the defendant that the verdict is so excessive that it was clearly the result of passion or prejudice or both. The jury returned a verdict assessing plaintiff's damages at $75,000 actual, and $75,000 punitive, damages.

Questions of grave import arise in the consideration of this ground for new trial. Thus it has been urged that, under section 14 of our Bill of Rights, which provides, "In all suits and prosecutions for libel, the

truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact," neither the circuit court nor this court on appeal has any right to interfere with the amount of the verdict.

Section 14 of article 2 of the Constitution of Missouri, as was pointed out in State v. Armstrong, 106 Mo. l. c. 418, 421, had its origin in what is known as Fox's Libel Act, enacted by the British Parliament in 1792 (32 Geo. III), and is but a rescript of that act. Prior to the enactment of the Fox Act it was the rule in England for the judge to direct the jury to find the defendant guilty on proof of the publication, and the other necessary averments, but that act provided that on the trial of an indictment or information for libel the jury might give a general verdict of guilty or not guilty upon the whole matter put in issue before them. It was upon this act the English judges in libel cases directed the jury that whether a publication was a libel was a question of law and fact intrusted to the jury alone. That this power had been given to the jury for the purpose of protecting the inviolable blessings of a free and independent press. And so in the construction of this provision of our Constitution, it was ruled in Arnold v. Jewett, 125 Mo. 241, that the jury's right to judge of the law, as well as the fact, was confined to the sole question of whether the publication was in fact libelous. That on all other questions, the jury are as much bound by all the other instructions of the court in a libel suit as in any other case. In Sullivan v. Commission Company, 152 Mo. 268, it was ruled that the question of privilege was a question of law for the court, but that malice was a question of fact for the jury, if there was any evidence whatever of malice. In Heller v. Pulitzer Publishing Company, 153 Mo. 213, this court quoted from the opinion of Lord BLACKBURN in Bank v. Henty, L. R. 7 App. Cas. l. c. 775: "It certainly had always been my impression that

there was a difference between the position of the prosecutor, or plaintiff, and that of the defendant. The onus always was on the prosecutor or plaintiff to shew that the words conveyed the libelous imputation, and if he failed to satisfy that onus, whether he had done so or not being a question for the court, the defendant always was entitled to go free. Since Fox's Act at least, however the law may have been before, the prosecutor or plaintiff must also satisfy a jury that the words are such, and so published, as to convey the libelous imputation. If the defendant can get either the court or the jury to be in his favor, he succeeds. The prosecutor, or plaintiff cannot succeed unless he gets both the court and the jury to decide for him." Judge MARSHALL speaking for this court then said: "Our Constitution, in fewer words, is, substantially, the Fox Act, except that it has been extended to 'all suits and prosecutions for libel,' thus applying to civil as well as criminal cases. Otherwise the underlying principles are the same, as is shown by the adjudicated cases in this State. [State v. Armstrong, 106 Mo. 395; State v. Powell, 66 Mo. App. 598; McGinnis v. Knapp & Co., 109 Mo. 131; Arnold v. Jewett, 125 Mo. 241.] In all other respects pertaining to a trial, except as to a question of libel or no libel, the power of the court is the same in a libel suit as in any other kind of a case." Numerous other cases might be cited to show that this provision of the Fox Act and of our Bill of Rights, and the statute passed in pursuance thereof, have been interpreted to mean no more than that on the main issue of libel or no libel, the jury are the judges both of the law and the fact, and that in all other respects it was never the intention of the Parliament of England, nor of the people of this State in incorporating the Fox Act into our Constitution, to deprive the court, as such, of its powers in every other respect. Indeed, the language of our Constitution emphasizes that the court should assert its authority, as such, in directing the jury, and we have been

unable to find anywhere in the English cases, or in any court of last resort in this country, that the court has been deprived of its power to grant a new trial in a libel case any more than in any other character of suit, nor in our opinion is there any reason why the courts should be shorn of this great conservative principle and power in a libel suit any more than in any other sort of action. In the examination of libel cases many applications for new trials on the ground of excessive damages will be found collated by Odgers on Libel and Slander, page 656, in which the courts have considered whether the verdict was excessive or too small, and granted or refused the same upon well settled legal principles, without any suggestions whatever that the courts were without jurisdiction to grant the same in a proper case and on reasonable grounds. Our conclusion then is that the provision of our Constitution, that, in all suits and prosecutions for libel, the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact, does not deprive the courts of their power to grant new trials in a libel suit on the ground that the verdict is excessive or for any other recognized legal ground.

Proceeding then to the consideration of the contention of the defendant that the verdict in this case is so excessive and unreasonable that it should be set aside, it is to be remarked, first, that we are all of the opinion that there was no error in the instructions of the court or in any of its rulings in the admission or rejection of the testimony or upon its construction of the pleadings in the case; that the publication, which is a basis of the action, was libelous, we think there can be no doubt whatever, so that the sole question remaining is whether the verdict is so excessive as to indicate that it is the result of prejudice or passion. In our opinion the verdict is excessive and is unusually large,

but it does not follow that because the verdict is too large it is necessarily the result of prejudice or passion.

In Belt v. Lawes, 12 L. R. Q. B. D. 356, in an action for libel, the jury found a verdict for the plaintiff and assessed his damages at 5,000 pounds, and the defendant applied for a new trial on the ground that the verdict was excessive and the majority of the Queen's Bench Division refused a new trial on the plaintiff's consent to the damages being reduced to five hundred pounds, and defendant appealed. In the Court of Appeals, BRETT, the Master of the Rolls, said: "The first point in the case is a pure point of law, namely, whether the judgment of the majority of the Divisional Court can in law stand as it is, if the verdict cannot otherwise be impeached, it being founded on the consent of the plaintiff alone that the amount of the damages should be reduced from 5,000 pounds to 500 pounds. In my opinion such judgment can stand. Where the complaint is only that the damages are excessive, and the verdict cannot be otherwise impeached, and it is a case where the plaintiff is entitled to substantial damages, the court has power to refuse a new trial without the consent of the defendant, on the plaintiff's consenting to the amount of the damages being reduced to such an amount as, if it had been given by the jury, the court would not have considered excessive. It has been argued that this cannot be the right rule, because it is said that if the damages are excessive the court must come to the conclusion that the verdict is wrong, and the inevitable result of that must be a new trial. But the court is asked to exercise its discretionary power, and to say that the jury have given larger damages than they ought to have given. The court does not give damages, but it only says that if a jury had given a sum which was a part of what they have given, the court would not have been dissatisfied, but more than that, as the power of the court is discretionary, it seems to me it is competent to the court to exercise such power

in any way which is not unjust. Mr. Russell said then that if the court could reduce the damages without the consent of both parties, they could increase them also without such consent, which he said would be an absurd conclusion, because then the court would in that case be giving damages which a jury had not given. I am, however, by no means prepared to say that the court might not refuse a new trial if a defendant would agree that the damages should be larger. Suppose a case in which a new trial should be moved for in behalf of the plaintiff, on the ground that the amount of damages which the jury had given was obviously unreasonably too small, I am far from saying that the court would not have power in favor of the defendant, and in his interest, to say that the damages given are too small, but that if the defendant will agree to their being increased to such a sum as may be stated, a new trial shall be refused. But, however that may be, I have not the least doubt that where, as in the present case, the jury have given damages which are challenged only as being too large, the court has power to say that if the jury had given less, as 500 pounds and not 5000 pounds, the court would have considered such damages not excessive, and therefore to say if the plaintiff will consent to the verdict being for that amount, the defendant will really have no grievance." Lindley, L. J., concurring, said: "In fixing the damages instead of directing a new trial, the court does not usurp the province of a jury so much as when it sets aside a verdict and directs a new trial, which the court always has power to do upon proper grounds." As both parties appealed, the court upon the merits confirmed the original verdict for five thousand pounds.

In Baxter v. City of Cedar Rapids, 103 Iowa l. c. 607, it was insisted that the circuit court had erred in not granting a new trial because the damages were excessive and showed passion and prejudice, and it was said that the action of the court which caused the plain-

tiff to accept judgment for much less than the amount fixed for the verdict, showed that it found that the jury was influenced by passion and prejudice to fix an excessive amount in its verdict. In that case, which was for personal injuries, the verdict was for $5750, and the court gave the plaintiff the opportunity of remitting $2750, which the plaintiff accepted. The Supreme Court said: "That does not show that the court found that the verdict was for an excessive amount, but conceding that the effect and purpose of what was done were to overrule the motion for a new trial on condition that the plaintiff would accept judgment for the amount for which it was rendered, and if he would not, that the motion would be sustained, that does not show that the district court found that the jury was influenced by passion and prejudice in reaching its verdict. It merely shows that in the opinion of the court the evidence did not authorize a verdict for so large an amount as that fixed by the jury. Juries may, and frequently do, err in estimating the amount of a recovery, when there is no ground for claiming that they were influenced by passion or prejudice."

In Adcock v. Oregon R. R. Co., 45 Oregon 173, the action was for personal injuries, the verdict was for $1650, and a new trial was sought on the ground of the verdict being excessive. The court was of the opinion that the verdict was excessive and should not have been for a larger sum than $825, but upon a *remittitur* by plaintiff of one-half of the verdict, the motion was overruled. On appeal it was insisted that the court had no power to overrule defendant's motion for new trial on condition that plaintiff remit one-half of the damages assessed by the verdict. The court said: "The power of the court to require the entry of a *remittitur* in an action to recover damages for a tort, as a condition to overruling a motion for a new trial, has sometimes been denied, but according to the weight of authority the

227 Sup—35

power exists, unless it is apparent that the verdict was the result of passion and prejudice.'' Citing Blunt v. Little, 3 Mason 102; Doyle v. Dixon, 97 Mass. 208; Railroad v. Herbert, 116 U. S. 642. In which last mentioned case the plaintiff recovered a verdict for $25,000, and the court overruled a motion for a new trial on condition that the plaintiff should remit $15,-000· of the verdict, and that judgment was affirmed. In Arkansas Cattle Company v. Mann, 130 U. S. 69, the Supreme Court of the United States was asked to re-examine the question in the light of authorities, but adhered to the decision in the Herbert case, and held that it in no sense impaired the constitutional right of trial by jury. [18 Ency. Pl. and Pr., 125.]

In Chicago City Ry. Co. v. Gemmill, 209 Ill. 638, the action was for personal injuries and resulted in a verdict for $12,500; the trial court required the plaintiff to remit $6500, and then overruled the motion. It was assigned as error, that the court erred in entering a judgment on the verdict for $6000, the amount re-remaining after the *remittitur* was entered. The court said, in the case of Chicago Street Ry. Co. v. Wrixon, 150 Ill. 532, after an exhaustive examination of the authorities in this State: ''We are committed to the practice of allowing *remittiturs* in actions *ex delicto,* both in the trial and appellate courts, to such sums as shall to the court seem not excessive, and affirming as to the balance of the judgment.'' And the practice therein referred to is now too well established to be questioned. [Railroad v. Musa, 180 Ill. 130; Railroad v. Lewandowski, 190 Ill. 301.]

The decisions of this court as to the power of this court to require a *remittitur* in actions for unliquidated damages are not uniform. In Gurley v. Railroad, 104 Mo. l. c. 233-4, it was held by Divisional opinion that when it did not appear to be the result of passion or prejudice the verdict was wholly within the province of the jury, and when this court set aside any part of

the verdict it destroyed its integrity, and this court could not render another and different verdict. Thereafter in Burdict v. Ry. Co., 123 Mo. l. c. 242, 243, this court In Banc took a different view and held that where the only ground for reversal was the excessive verdict, it could and would require a *remittitur* as a condition of affirmance of the judgment. Afterwards in Rodney v. Ry. Co., 127 Mo. 676, the question again arose and a majority of the court In Banc held that this court had no power to require a *remittitur* of a part of a verdict for unliquidated damages as a condition of affirmance. Since that decision, in Chitty v. Ry. Co., 166 Mo. l. c. 445 and 446, Division Number One returned to the ruling in the Burdict case, supra, and the same ruling was continued in Reynolds v. Transit Co., 189 Mo. l. c. 423, and Devoy v. Transit Co., 192 Mo. l. c. 228, until in Phippin v. Ry. Co., 196 Mo. 321, Division Number Two concurred in holding that this court had the power to require a *remittitur* as a condition of affirmance, and since that case it is the recognized doctrine in this court. The rationale of these late cases is that the fact that a verdict is too large does not itself indicate that the jury were actuated by passion or prejudice, where there was no error in the admission or rejection of testimony or in the instructions of the court, and no misconduct on the part of the jury was shown, and the evidence established that the plaintiff was entitled to a substantial verdict, and that in such case if the plaintiff would consent to a *remittitur* of a part of his verdict, the defendant could not complain.

That the verdict is an unusually large one, must, we think, be conceded, but in considering whether it evinces prejudice or passion on the part of the jury the nature of the libel, the character and position of the plaintiff, the character and wealth of the newspaper and the extent of its circulation, the motive and malice of the publication, the mental anguish and suffering naturally and necessarily caused by it, together with

the mitigating circumstances, should all be taken into account, together with the defense interposed; indeed, so many considerations enter into the awarding of damages by a jury in a libel case that the courts approach the question of the excessiveness of a verdict in such case with great reluctance. As to the character and position of the plaintiff in this State we need go little further than the defendant's answer to ascertain what manner of man he was and is. It says he was a good sheriff of Warren county, he made a good Secretary of State, and administered that office and closed up his accounts without the loss of a dollar to the State; "once the most popular man in Missouri." Otherwise it appeared without contradiction that he had been twice elected sheriff of his county; that for four years he was Secretary of State; that he was secretary of the State Democratic Committee, and afterwards chairman of that committee in the campaigns of 1896 and 1898. Since his retirement from the office of Secretary of State, and at the time the libel was published, he was the president of the Central Missouri Trust Company, an important financial institution at the State capital. No attempt was made to show that plaintiff was unworthy of these important trusts, both public and private, and was otherwise than an honorable and upright citizen, widely known and esteemed. It was of this man this libel was published, charging him with having sworn to a lie; that he had sworn he had contributed $2500 to a campaign fund that was contributed by another whose name he desired to conceal; that "the people of Missouri are a God-fearing people and the man who will do what Sam [meaning plaintiff] done to serve his party or hisself, instead of the Lord, and will take the name of the Lord in vain, in swearing to an untruth, will never meet their approval. They'd be afraid to elect such a man. They'd be afraid of the vengeance of God fallin' upon them." In the same article is also the imputation that plaintiff sold out legislation in ad-

vance in exchange for campaign contributions. The entire article is couched in slang dialect and in the most objectionable style, calculated to bring contempt and ridicule on plaintiff, as well as to destroy his reputation as a truthful man by charging him with perjury and making false oaths and affidavits.

It is not necessary to reproduce the remainder of the charges made in the publication, as they are fully set forth in the petition. There is no pretence that these charges were true. The evidence not only showed that the plaintiff had never made the affidavit, nor was guilty of the false swearing attributed to him, but it went further and tended to establish that when a previous charge imputing to him embezzlement of this $2100 contribution had been made by this same defendant, he had, with two friends, gone to the office of the defendant and then and there stated to the editor-in-chief that the charge was false, and explained to him fully in regard to the manner of crediting this contribution to himself, and at the time showed to the editor that the treasurer of the committee alone had made affidavit to the accounts of the committee, including this item, and retraction had been made by the newspaper, so that when this libelous article was printed the defendant had full knowledge and notice of its falsity, and yet permitted it to be printed and published and sent broadcast all over the United States and into foreign countries in an edition which amounted to at least 160,000 copies. Indeed, the evidence went further and established that Fitzmaurice, the author of this article, knew that the plaintiff had not made said affidavit before he wrote the article. It is also to be remembered in this connection that this article was published in 1905, and the basis of the said charge was a transaction eight or ten years old, alleged to have transpired in 1896. As already said, no attempt whatever was made to justify this publication by alleging and proving its truth.

Perjury and false swearing are justly regarded as

among the most heinous offenses and it is difficult to conceive of a charge 'which, if false, could work more injury to a man's reputation and character and cause more mental anguish and suffering than an unfounded charge of this character, spread broadcast over the whole world. Reputation and honor are no less to good men than bodily safety and protection, indeed they are dearer than life itself. It is not necessary in order to recover general damages, for words which are actionable in themselves, that the plaintiff should have suffered an actual or constructive pecuniary loss. In such an action, the plaintiff is entitled to recover for the injury to his feelings which the libel has caused and the mental anguish and suffering which he has endured in consequence thereof.

When we come to consider the mitigating circumstances pleaded by the defendant, we find another article published in defendant's newspaper, which it pleads as an apology or retraction, but when we come to examine this article it is lacking in all the essentials of a manly and honest withdrawal of the infamous charge. In our opinion, instead of being a fair retraction, it was but an indirect repetition of the charge, because among other things, it says: "So far as Sam Cook was concerned, I tried to let him down easy, as my remarks showed." Thus insinuating at least that the real facts were more unfavorable to the plaintiff than had been set forth in the article sued on. In Hotchkiss v. Oliphant, 2 Hill (N. Y.) 510, Chief Justice NELSON said: "If the defendant had become satisfied that the charges which he had unwittingly copied were unfounded, common honesty and a decent respect for the rights of the injured party called for an unqualified withdrawal. Hesitation, lurking insinuation, an attempted perversion of the plain import of the language used in the libelous article, or the substitution of one calumny for another only aggravate the original offense and show a consciousness of the wrong done with-

out the manliness to repair it.'' This alleged mitigation, however, was all submitted to the jury in proper instructions.

When then it is considered that this libel was printed and published, not in an obscure newspaper of small circulation, but was published in a great metropolitan journal, whose circulation that day amounted to 160,000 copies of its paper, and that, according to its own business manager, was circulated in every State in the United States and in foreign countries, it must be evident, we think, that the measure of damages is not to be estimated as one of ordinary importance only, but that the power for evil and injury to the plaintiff could hardly be estimated. So that while the verdict is a large one and out of the ordinary, so also is the libel a large one. While the verdict is, in our opinion, too large, yet, we cannot say that we believe that it is the result of either passion or prejudice, and therefore we are of the opinion that it is a case in which a *remittitur* may properly be required of the plaintiff, and if he accedes to it that the judgment should be affirmed for the amount of the verdict less the *remittitur*. Accordingly it is ordered that if the plaintiff shall remit fifty thousand dollars of the amount assessed for actual damages, and shall also remit fifty thousand dollars from the amount of punitive damages assessed in the verdict, within twenty days, the judgment will be affirmed for twenty-five thousand dollars for actual damages and twenty-five thousand dollars for punitive damages, aggregating fifty thousand dollars. Otherwise, the judgment will be reversed and the cause remanded for a new trial.

*Valliant, C. J., Burgess, Fox* and *Woodson, JJ.,* concur; *Lamm* and *Graves, JJ.,* dissent in separate dissenting opinions

## SEPARATE CONCURRING OPINION.

WOODSON, J.—While concurring in the majority opinion filed herein, I wish to do so substantially in the language of the opinion written and filed by me in Division One of this court.

I will not undertake to make a full statement of all of the libelous charges published of and concerning the plaintiff, but sufficient only upon which to predicate the following observations.

The libelous article sued on is headed:

## "OLD POLITICIAN ON PARTY FUNDS.'

### "FIGHT OF THE PEOPLE.

*"Wrecks Through Covering Up And Fraud In Campaign Contributions.*

"The Present Investigation.

"The Thursday Conference. Why It Was Called. And What May Grow Out Of It."

This article in so far as relates to plaintiff, after stating he was the chairman of the Democratic State Central Committee in the years 1896 and 1898, and referring to the collection of big campaign funds from interested corporations, amounting in some instances to as much as $5000 or $6000, and turning them into the committee, and publishing them as coming from no one or from some one who never gave a cent, and that he had converted to his own use, or had failed to account for $2500 paid to him by Col. Phelps for campaign purposes, then states that the investigation of Niedringhaus was said to be to try to rub it in on the people; that the Republicans were trying to elect a man Senator who did the same thing Mr. Cook had done, and it was intended to not let the people forget it if it could be helped; that the people were "dead

sore'' on the question of campaign funds; that ''they 'er'' wide awake on this business of men who handled big money in the name of the party and who sell out legislation in advance in exchange for campaign contributions. ''The way Cook acted at the first session after the campaign of 1896, and the way him and Seibert both acted up there at the first session after the election of 1898 had put the people to thinkin' that its goin' to be that way all the time when chairmen of campaign committees get campaign contributions' they don't like to talk about.'' The article continues: ''The people wanted the investigation no matter 'who it hits or who it hurts.' '' That certain politicians knew how the people felt on that subject by seeing how they ''hacked'' Mr. Cook at the polls. The article used the foregoing statements of Mr. Cook's conduct as chairman of the Democratic State Central Committee, and his defeat at the polls for re-election as Secretary of State, at the previous November election, in order to emphasize its moral and political advice. Continuing, it stated in substance that Mr. Cook had defeated himself and had injured his party by his said conduct.

The article in speaking of the Cardwell case and Mr. Cook's testimony given therein, at Independence, Missouri, said of him, He is ''the man who swore to what wasn't so,'' and that, ''Thou shalt not bear false witness.'' . . . ''Now, Cook ain't the issue as a public officer, mind you. Sam was a good sheriff of Warren county. He made a good Secretary of State, and administered that office and closed up its accounts without the loss of a dollar to the State. Nothin' was ever proved against him but what he proved himself in the Independence story; but say, if you don't think that was enough, ask Sam. Here he comes, once the most popular man in Missouri, away back yonder behind the next lowest man on his ticket, and so far back of him that you've got to get a spyglass to see the dust

he's a-raisin'. Say, we were all against him—Republicans, Democrats and all of us. There's no such thing as party lines when it comes to dealin' with that there question. I tell you, Missourians is all alike. Give 'em a question that goes down to the bottom of their common nature and they'll answer it with almost one voice, and that voice'll be an echo of Mount Sinai a-sayin', 'Thou shalt not bear false witness.'"

It proceeds: "After Sam Cook had swore that he contributed $2500 to a campaign fund that was contributed by another man whose name Sam wanted to conceal." Then by way of comment on the foregoing, the article continues: "A man who'll do what Sam Cook done to serve his party or hisself instead of the Lord, an' will take the name of the Lord in vain, in swearin' to an untruth, will never meet their [the people's] approval."

After likening Mr. Cook and Senator Stone unto two boys who had stolen a pie, where one was flogged for lying, while the other ate the pie, it proceeds: "But Bill knows that Sam got a good deal of the pie before he was caught in the lie and licked. . . . Bill knows that Sam got licked as soon as he got caught lying, and that he'll keep on getting licked as often as he shows up on the ticket."

Said article contained several other charges of similar character to those before set forth, and in one of them Mr. Cook is accused of "perjury."

Later, the same author of the foregoing article, wrote another of and concerning Mr. Cook, and it was published in columns of the same paper, the defendant in this case, and among other things it said: "I've got myself into trouble with the people I've always liked and always got along well with, although we've pulled different ways in politics the last seven or eight years. Here not long ago, telling you'ns that what it was that knocked the old machine out and made Sam Cook, the most popular man in Missouri, run behind

his ticket, I pointed out that the thing that done the most of it was the makin' of a false affidavit to a statement of receipts of campaign funds. I wanted to point to you'ns the shortest road to ruin you could take, and one that'd get you there in a hurry if you didn't stop and read the signposts the Democratic party had put up all along the road on its trip to Independence, where Sam Cook said that Bill Phelps's contribution of $2500 had been credited to Sam himself in the official statement that was made under oath.

"Say, that thing got me in the worst cross fire I was ever in, and I've been under the real thing. Some of Niedringhaus's friends have jumped on me all spraddled out 'cause they say it was done against him, and friends of Sam Cook have jumped onto me all spraddled out 'cause they say it's doing Sam a injustice to say he's like Neidringhaus, for he didn't swear to it under oath as a true statement of the receipts and expenditures. The official statement under oath was made by the treasurer of the committee they say.

"An now I'm a-goin' to have my say. I don't give a cuss for either Niedringhaus or Sam Cook politically, but I like 'em both personally, and respect 'em both as gentlemen in all the dealin's I've had with 'em. What I said wan't done to hurt or harm either one of 'em, but a-showin' of the kind of thing that appeals most powerful to the people of Missouri when you put it before 'em in a right way. So far as Sam Cook was concerned I tried to let him down easy, as my remarks show. I took pains to say that his official record was a straight one, and I recollect sayin': 'All that's ever been proved against him he proved himself in his deposition at Independence.'

"Some of Sam's friends and I hear Sam himself says I accused him of perjury. Not on your life, I don't see how they make a charge of perjury out of that language, where it says that Sam couldn't a-been

Cook v. Globe Printing Co.

done up if he hadn't done hisself up by swearin' to the truth at Independence, where many a man would have sworn to a lie to saved hisself. It appears though that Sam swore to the resipt and disbursements of the Democratic State Committee in the campaign of 1896. If there's many that got that impression from anything I've said I'm sorry for it, and I'd better correct it, for it ain't so, and it's not what I meant to say.

"The official oath was made by the treasurer of the committee, a man for whom the figgers had been prepared, and who swore to a lie without knowing it, which makes it the same as not swearin' to a lie at all, they say.

"I don't know what to say about Niedringhaus, except that he says he swore to it and don't deny it, but it wasn't no lie. When put on his oath at Independence, Sam Cook didn't lie a little bit, but told the truth that done him up. What he's a kickin' about now is in bein' put in the same class with Niedringhaus in regard to official statements under oath made by chairman of State Committees."

By resolving these charges to their final analysis, they clearly accuse plaintiff of the following crimes:

First: Of embezzling the $2500 contributed by Col. Phelps.

Second: Of bribing legislators, by saying he sold legislation to corporations in advance in consideration of the large contributions made by them to the committee.

Third: Of perjury, in so many words.

Fourth: Of false swearing, in making an affidavit to a statement showing he had contributed the $2500 while in fact Phelps had contributed it.

There is no pretense that any of those four charges are true, yet three of them charge plaintiff with the commission of as many felonies which, if true, would subject him to imprisonment in the penitentiary, while

the other charged him with a misdemeanor, which, if true, would subject him to a fine or imprisonment in the county jail, or both said fine and imprisonment.

These libelous charges were published in the Sunday edition of defendant's paper, which had about one hundred and seventy-five thousand circulation, thereby carrying these inexcusable calumnies to the homes and firesides of probably that number of people, and there read probably by twice that number of people, and thereby falsely and maliciously whispered into their ears, that plaintiff was a three-fold felon, and that if he had his just deserts he would be behind the bars, wearing the stripes of a convict, and was unworthy to associate with decent and respectable people. It was written long ago that, "Slander is the vilest whelp of sin," and if there was any way to multiply the superlative degree, it might with great propriety be applied to libel, for the reason that a libeler as a rule speaks, as it were, in forked tongues to tens and hundreds of thousands of people in immutable language, where the slanderer speaks to only one in transient and fleeting words.

So, who can correctly estimate and definitely fix the amount of damages sustained by a person thus libeled? And who is it that can truthfully say that the libelous charges made in the case at bar have not greatly injured and damaged the plaintiff in his business, as well as socially and politically, to say nothing of the mental suffering and humiliation heaped upon him?

But few I dare say in this State can do so, who read the papers and who keep themselves posted upon ordinary public matters. And it is a physical impossibility for plaintiff to correct those great wrongs done unto him, and the only remedy afforded him was to submit his grievances to a jury of his peers as commanded by the organic laws of the State, and ask them to compensate him for the injuries thus sustained, and for

smart money against the libeler as a punishment for the malicious wrong done, as a warning to all such, for the protection of society at large.

Without any pretense of justification or excuse for its wrongs, defendant comes to this court and complains of the action of the jury in awarding so large a verdict against it, and asks mercy at our hands.

The enormity and irreparable character of the injury and wrong done plaintiff may best be illustrated by a story I once heard or read, which was substantially as follows: A penitent went to her priest and asked the forgiveness of her sins. Among others which were burdening her heart and tormenting her soul, was a slanderous charge she had falsely and maliciously made and put in circulation regarding one of her neighbor women. After repeating it to the priest, he hesitated, but finally said to her, ''You have committed a very grievous sin,'' and requested her to go away and return on the morrow, and he would then see what he could do for her. On the morrow she returned, and he met her at the church yard gate with a goose in his hands, and he commanded her to pluck the feathers therefrom and cast them to the winds. She obeyed, and, after doing so, she again prayed his forgiveness, but instead of doing so, he said to her, ''First go out into the highways and hedges and gather up all the feathers you plucked from the goose and cast to the winds, and bring them to me and replace them upon the goose, and when you have done so I will intercede for the remission of your sins.'' Upon hearing those words fall from his lips her heart was filled with sadness, and she said to him that it would be impossible for her to find or gather together all of the feathers, for the wind had scattered them to the four quarters of the earth, and that she could not replace them although found by her. He then said to her, ''My sister, so is it with your slanderous words, you plucked them from an evil heart and put them in circulation, and the wings

of gossip have carried them to the four quarters of my parish, and it is impossible for you to recall them, or to remove the stain you have placed upon the reputation and fair name of your neighbor.''

The same is true of the case at bar. The defendant cannot recall the hundreds of thousands of libelous words and articles it maliciously scattered throughout the State of Missouri, the United States and through foreign countries regarding the plaintiff; nor can it remove the blot it thereby painted upon the good name and reputation of the plaintiff. All it can do is to pay him in dollars and cents for the damages he has sustained in consequence thereof.

Counsel for defendant do not seem to realize the enormity of the wrong done by their client or the magnitude of the damages inflicted thereby upon plaintiff. Without profit, but with malice, it put in operation the powerful machinery by which its venomous words were sounded and echoed around the world, withering, blighting and blackening his good name and fame— the most valuable, yet the most vulnerable armor of man, when assailed by the public press. No man or woman is capable of withstanding its dreadful fire and onslaughts.

He who, perhaps, drank deeper and more copiously from the fountains of human nature, and who therefore better understood the weakness of man, in writing upon this subject, poured forth in immortal lines the value of a good name as compared to money. He said:

> Good name in man or woman, dear my lord,
> Is the immediate jewel of their souls.
> Who steals my purse steals trash; 'tis something—nothing;
> 'Twas mine, 'tis his, and has been slave to thousands;
> But he that filches from me my good name,
> Robs me of that which not enriches him
> And makes me poor indeed.

Realizing the truthfulness of the idea there expressed, and in order to protect their good name and

to remedy all injury done thereto by libelous publications, the people of this State reserved to themselves, by constitutional provision, the right to determine for themselves both the law and facts of all such cases under the direction of any court.

That constitutional provision is section 14 of the Bill of Rights, and reads: "That no law shall be passed impairing the freedom of speech; that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

By reading that provision it will be seen the extreme jealousy with which the people protected and guard the liberty of the press, and by the same act it will be observed that they reserved to themselves the right to determine and punish the press for any abuse of that liberty. The two are handmaids and must stand side by side, and neither must be violated. This extraordinary remedy was reserved to the people in express terms as a counterbalance for the extraordinary liberty granted to the press; this doubtless was for the purpose of preventing tribunals from assuming any power concerning a subject which was expressly reserved to the people.

No intelligent citizen will deny but what the press is one of the four great institutions of the country designed and laboring for the uplift and betterment of the human family. The family circle, the church, the public school and the public press do more good in instructing the mind and in purifying the heart and conscience of man than all other institutions and instrumentalities combined, and any unnecessary assault made upon any one of them is inexcusable. But notwithstanding the great good they are doing, and the jealousy with which they are protected, yet none of

them must be used as an engine for the oppression of the people who instituted and maintain them.

The Constitution even protects the press while publishing false and defamatory matter, and there is no remedy therefor except that stated in the same constitutional provision which guarantees to it that liberty. The same reasons which induced the people to grant that liberty and protection to the press, caused them to reserve to themselves the right to remedy the abuse of that liberty, and should cause the courts to hesitate about interfering with the verdict of juries in this class of cases.

It makes the jury in all such cases, under the direction of the court, the judges of the law and the triers of the facts; and in the case at bar, all members of the court agree that the trial court correctly directed the jury as to the law of the case, and that the article published is libelous; and under those facts and circumstances the jury should be granted a wide range in estimating and fixing the damages.

Clearly there is no reason why the verdict in this case should be set aside, even though it be conceded that it is excessive. The rule is, and the practice of this court has been, where a case has been well tried, and the only meritorious objection which can be used against the judgment is the excessiveness of the verdict, to reduce the verdict to a sum which in the judgment of the court would be reasonable and just. [Waldhier v. Railroad, 87 Mo. 37; Smith v. Railroad, 92 Mo. 374; Burdict v. Railroad, 123 Mo. 240-254; Loyd v. Railroad, 53 Mo. 514; Furnish v. Railroad, 102 Mo. 438; Chitty v. Railroad, 166 Mo. l. c. 444; Nicholds v. Crystal Glass Co., 126 Mo. 55; Rodney v. Railroad, 127 Mo. 676; Devoy v. Transit Co., 192 Mo. l. c. 226; Markey v. Railroad, 185 Mo. l. c. 365; Stolze v. Transit Co., 188 Mo. 581; Reynolds v. Transit Co., 189 Mo. 408; Hollenbeck v. Railroad, 141 Mo. 97; Chitty v.

227 Sup—36

Railroad, 148 Mo. 64; Phippin v. Railroad, 196 Mo. 321; Loftus v. Met. Street Ry. Co., 220 Mo. 470; Wellman v. Met. Street Ry. Co., 219 Mo. 126; Waddell v. Railroad, 213 Mo. 8; Brady v. Railroad, 206 Mo. 509.] See also Creve Coeur Ice Co. v. Tamm, 90 Mo. App. 189 and Arkansas Land Co. v. Mann, 130 U. S. 69.

But in a case where the facts are disputed and contested, and the evidence introduced tends to support both sides thereof, a verdict returned therein which is so excessively large as to be out of all reason so as to raise a presumption that it was the result of prejudice or passion, hatred or ill-will, then, clearly, it would be the imperative duty of the court in an ordinary action at law, to set the verdict aside and grant a new trial, for the reason that the verdict in such a case would also raise a presumption that the prejudice or passion, hatred or ill-will of the jury manifested in the size of the verdict also induced and controlled them in finding the facts to be as indicated by the verdict. In all such cases a *remittitur* would not reach or cure the error, for the reason that if said prejudice and ill-will had not existed, the jury might not have found the issues as they did; or in its absence, they might have found the issues for the other party.

In such a case the entire verdict would be infected with prejudice and be erroneous, and should be set aside; but upon the other hand, if the entire case, as here, was well tried and no error committed except in fixing the amount of the damages too high, then the entire error can be reached and completely cured by causing the plaintiff to remit a sum sufficiently large to reduce the verdict to what would be reasonable and just compensation for the injuries sustained. [Creve Coeur Ice Co. v. Tamm, supra; Koeltz v. Bleckman, 46 Mo. 320; Doty v. Steinberg, 25 Mo. App. 328; Sheedy v. Union Brick Works, 25 Mo. App. 527; Chitty v. Railroad, 148 Mo. 64.]

In passing upon this question, in the case of Broyhill v. Norton, 175 Mo. 1. c. 206, Judge VALLIANT, in speaking for the court, used this language: "A retrial of a case of this kind should not be ordered unless positively necessary; the good of the parties and the morals of the community are not promoted by it. In Chitty v. Railroad, 148 Mo. 64, and again in the same case in 166 Mo. 435, it was pointed out by MARSHALL, J., speaking for the court, that it is the right and duty of this court to affirm the judgment when the verdict is for the right party, and no fault with it can be found except that the award of damages is excessive, if the plaintiff will remit the amount that will bring the award down to a sum that this court deems reasonable and just. Considering the injury sustained by the plaintiff, and the condition and means of the parties, we are of the opinion that the damages assessed are twice what they should be, but we will not reverse the judgment if the plaintiff within ten days will remit $12,500 of the amount; if she will do so, the judgment will be affirmed, otherwise it will be reversed and the cause remanded for a new trial."

This rule as applied to ordinary cases is not only just and reasonable, but is supported by the great weight of authority; and if it is applicable to trials in libel suits, and we can see no reason why it should not be, then clearly the judgment in the case at bar should not be set aside for excessiveness, for the reason that the article complained of is clearly libelous upon its face, according to all the authorities. So holds the opinion of my learned associate who wrote the minority opinion. And since the case was well tried in so far as defendant was concerned, as we all agree, there is no reason left for the court to set aside the verdict or to grant a new trial.

I am, therefore, of the opinion even if the verdict in the case at bar is excessive, then the error complained of in that regard may be cured by the court

requiring the plaintiff to enter a *remittitur,* such as the court may deem just and proper.

For the reasons before stated, I concur in the majority opinion filed herein by my learned associate, but think the judgment should be for a larger sum.

### DISSENTING OPINION.

LAMM, J.—Coming to Banc from Division One on the dissent of two judges, this case on reargument was reassigned to my learned brother GANTT whose opinion has become that of a majority. In the divisional opinion it was held there were no reversible errors in rulings on testimony, instructions, the motion to elect or on jurisdiction. It was held, too, that the article complained of was libelous *per se* and need borrow no aid from the many innuendoes pleaded. On these phases of the case the majority opinion agrees with that in division, except in one particular presently pointed out.

In the divisional opinion it was ruled that the verdict was so enormous and out of proportion to all other verdicts in all other libel cases in every other civilized country and so out of proportion to the injury done plaintiff and took so little heed of the matters of mitigation established in the case that it bore on its face the unerring stamp of passion, prejudice, favor and a wild caprice abhorrent to a refined and exalted sense of justice between man and man; therefore, it could not stand at all. In the majority opinion in Banc the excessiveness of the verdict is conceded to the amount of two-thirds, *viz.,* $100,000; but my learned brethren are of the opinion that $100,000 of excess in a verdict does not indicate such lack of fair-mindedness in the jury as impeaches it for passion and prejudice. Being so minded, they put the alternative to the plaintiff to surrender two-thirds of his verdict or take a reversal and a new trial. To that result, namely, the sustaining of the verdict for any amount, I cannot agree

—the reasons for non-concurrence presently appearing.

Before formulating the grounds of this dissent two observations may be pardoned me as a foreword, *viz.*:

(a) In the first place, this plaintiff resided at Jefferson City in the county of Cole. The defendant was domiciled in the city of St. Louis. He left his home in Cole and brought his suit in Randolph on the theory that a cause of action arose to him in that county because a few of defendant's newspapers circulated there. In the Julian case, 209 Mo. 35, it was resolved by a majority of my brethren that such a course was within the statutory right of a person libeled by a corporate defendant. But the tremendous leverage put in the hands of a plaintiff libeled of allowing him to select any one county of the 114 in this State, where a given defendant, peradventure, may be hated by the mass of the people because of promulgating views locally deemed unsound on political questions, where jurors' minds necessarily take color from local bent and bias was considered by the majority opinion in the Julian case, by the minority opinion and in the Meriwether case, 211 Mo. 199. In the minority opinion such palpable and singular advantage was used, *arguendo,* against the construction put by the majority upon section 997, Revised Statutes 1899. But in the majority opinion it was said by our brother VALLIANT: "We appreciate the force of the argument of defendant's counsel wherein it is pointed out that under certain conditions an unfair advantage may be obtained by allowing the plaintiff to select the county in which he may bring his suit, *but that argument should be addressed to the legislative department of the State government.* The courts must take the law as they find it, whatever they may think of it." Fortunately, I think, for wholesomeness and evenhanded justice in our State, such arguments *were* addressed "to the legislative department of the State government," and resulted in an act

regulating libel suits (Laws of 1909, p. 347), *viz.*: "Suits for libel against corporations shall be brought in the county in which the defendant is located, or in the county in which the plaintiff resides; and when suit is instituted in the county in which the plaintiff resides, summons may be issued to and served by the sheriff of the county in which the defendant is located." The new act is just to both defendant and plaintiff. It does not compel plaintiff to go to a distant county where defendant is located to sue, it brings the corporate defendant to the home of the libeled party where naturally the humiliation suffered is the acutest, and the damage is the greatest. It permits plaintiff to beard the lion in his den by seeking the corporate defendant at its home, if he choose. But it denies to plaintiff the right to leave the homes of both and, as a *ruse de guerre,* search out a forum to try the case where prejudice may insidiously lurk or run rampant against defendant.

Surely it may not be assumed that a man leaves behind his good sense when he sits on the bench. He may not be blind to what everyone else must needs see. In State ex rel. v. Public Schools, 134 Mo. 296, this court was dealing with the administration of the school funds of the city of St. Louis and the right of taxpayers, parents and school children of that city to be freed from the evil clutch of partisan caucuses. In ruling that the hands of a band of politicians should be lifted from the administration of school funds and the management of the schools of that city, our brother GANTT used language in point here, *viz.*: "The stream cannot rise higher than its source, and we are dealing with *facts and men as they exist* and we are not justified in treating this matter from an Arcadian or Utopian standpoint." Attending to that bit of philosophy, does not a question spring spontaneously, *viz.*, may not the lump of leaven in it leaven the whole mass of meal in this case? For instance: Would it not be

Arcadian (and Utopian, too) to suppose that the venue of this case was cast by plaintiff in a distant county away from his business and chosen home for the purpose of even and exact justice? What was the guiding and natural reason of so singular a proceeding? Some things need no proclaiming on the house-tops. As some good old Methodist hymns sing themselves, so some things tell their own story—some questions are answered in the asking. We take it when the Legislature indirectly denounced that way of bringing libel suits by its said act denying the right of any other plaintiff to bring one hereafter in that way, the lawmaker indicated his well-grounded fear that justice might be scandalized and wounded by that course—nay more, *possibly had already been scandalized and wounded.* For is it not a cardinal canon of court construction in interpreting a law that the occasion and necessity of it, the mischief felt and the object and remedy in view, are to be taken into consideration?

In getting at the heart of the matter, *viz.,* whether this verdict is the product of prejudice or bias, favor or passion, we should consider what the Legislature considered and what (I submit) every just man must consider, *viz.,* the imminent danger of that very thing happening. I concede that under possible happy auspices and by great good luck the thing might not happen, but is it not "Arcadian" and "Utopian" to suppose it was likely not to happen? When the leopard changes his spots and the Ethiopian his skin then (and not till then) will it be permitted for any court to assume that a litigant is not putting his very best foot foremost in choosing his counsel or *place of trial* when he has the liberty of so large a choice in selecting the most promising spot to haul his enemy, the defendant, over the coals for punishment—for the hotter the coals and the more there are, the better his ends are subserved. For mark (to use the quoted language) "we are dealing with facts and men as they exist." Fore-

warned by the assurance of what might naturally be expected to happen, we are justified in scrutinizing the verdict jealously to protect the administration of the law from subtle influences doubtless calmly considered by plaintiff in selecting the region of his venire and venue.

(b)    The Julian case went to the Supreme Court of the United States. The principal opinion by VALLIANT, J., left a Federal question in that case. There was a majority concurring opinion dislodging that Federal question, so that that august tribunal declined jurisdiction and we may never know what its wisdom would say on the merits of questions most learnedly discussed by my brothers VALLIANT and GRAVES in the Julian case. For myself, I may be permitted a sigh of regret, for the sake of Jurisprudence, that those questions were not set at rest on their very merits by the highest court of the land, before the Legislature once for all wisely swept them aside by its new libel law.

I.    I dissent from the majority opinion in so far as it holds, according to my reading, that instruction 13 asked by defendant and modified by the court was error in favor of defendant. I do not think it error at all.

The petition charged directly that the publication pertained to the Corrupt Practices Act. The provisions of the act are set forth in that pleading. It is alleged that defendant wickedly, designedly and maliciously contriving and intending to injure plaintiff in his good name and credit and to bring him into public scandal, contempt, infamy and disgrace with the public generally and among all good and worthy people, and to make it appear that it was the duty of plaintiff to swear to and file a true and detailed account and statement of the receipts and expenditures of the Democratic State Committee, with the names of the persons from

whom received or to whom paid, with the object and purpose thereof, and that plaintiff in the discharge of that duty had willfully, corruptly and falsely made a false affidavit and falsely by swearing, etc., had been guilty of the abominable crime of perjury, did wrongfully, wickedly and designedly and with malice towards plaintiff, print and publish the following false, libelous, malicious, scandalous and defamatory words, article and matter, to-wit: (here follow those excerpts from the article alleged to be libelous in that regard). As said heretofore, the petition abounds in innuendoes. These innuendoes are interspersed from place to place *passim* in the article as pleaded, giving the pleader's interpretation of the words. When the jury came to be instructed the innuendoes were dropped—the plaintiff electing to proceed on the theory the article sufficiently explained itself without innuendoes and was libelous *per se*. The article, as said, was plainly prima-facie libelous and the mere innuendoes, therefore, filled no necessary technical office. But we do not understand that a plaintiff can submit to a jury a different libel than that charged in his petition with particularity any more than a plaintiff may sue in any other case on one cause of action and submit another to the jury and recover damages on the one substituted in the midst of the trial. For instance (in a purely hypothetical case), if A. is sued for printing of and concerning B. that B. is a thief, or a forger, or a perjurer, or a murderer, and if issues were framed on those charges and the truth thereof, or matter of privilege or of mitigation was pleaded by B. and threshed out at the trial, B. would not be allowed to recover damages of A. because the same article charged him with being a liar, a fornicator, a cuckold, a tippler or a gamester— no issue having been tendered or framed and no testimony having been introduced on any such behalf— or because he was merely held up to ridicule or provoked to wrath.

The plain libel sued on in this case was a false charge of doing one of two things, either of committing a perjury or of making a false voluntary affidavit. All the testimony was leveled at issues framed on such charges. Plaintiff by his instruction number one defines the main issue submitted to the jury to the effect that the petition charges that on a named date defendant, as owner and proprietor of the *Globe-Democrat,* "did wrongfully and with malice publish the following false and libelous words and matter, to-wit:" (here follow the excerpts from the article pleaded in the petition). None of plaintiff's instructions limit or define the issues as relating to perjury or a false voluntary affidavit. Plaintiff's third instruction contents itself with the statutory definition of libel reading as follows:

"3. The court instructs the jury that the statute of this State defines a libel to be the malicious defamation of a person made public by any writing, printing, sign, representation or effigy, tending to provoke him to wrath, or to expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse, and if therefore you believe and find from the evidence that the article admitted to have been published by the defendant corporation and complained of by plaintiff in this action was maliciously published and had a tendency to provoke him to wrath or to expose him to public hatred, contempt or ridicule or to deprive him of the benefits of public confidence and social intercourse, then the article in question is libelous and defamatory under the laws of this State."

By its instruction number four (given) defendant defines perjury. It followed that by asking number thirteen, reading:

"13. The jury are instructed that the plaintiff complains of the portion of said article set out in in-

struction number one, because he says they charge him with being guilty:

"(1)  Of voluntarily making a false affidavit; and

"(2)  Of falsely by swearing, taking an oath prescribed by the law of this State; and that

"(3)  By so doing plaintiff had then and there and thereby been guilty of the abominable crime of perjury.

"The jury are therefore instructed that unless it appears from all the facts and circumstances proven in evidence that the portions of the publications complained of do in fact charge that plaintiff had been and was guilty of the abominable crime of perjury, then the plaintiff cannot recover in any event."

It will be seen therefrom that defendant undertook to limit the alleged libel to the charge of perjury. The court refused the instruction and interpolated in the third paragraph, between the phrase "abominable crime of perjury" and the phrase "then the plaintiff cannot recover in any event," the phrase "or of making a voluntary false affidavit." Complaint is made of this amendment, but it is not sound. If the alleged libelous article was so cleverly written that it was fairly susceptible of one meaning or the other, then defendant cannot complain that the court put both propositions to the jury. In this case that course was warranted. It was defendant's right (under the particularity of the pleadings) to limit the character of the libel which would meet the statutory definition. The court so instructed, and we perceive no error. When read together, as they must be, the instructions mean no more than that if the jury believed that defendant by making false charges of perjury or of making a false voluntary affidavit against plaintiff, thereby used words having no tendency to provoke him to wrath or to expose him to public hatred, contempt or ridicule or deprive him of the benefits of public confidence or social intercourse,

they should find for defendant, but if they believed otherwise they should find for plaintiff.

The statute defines libel, hence plaintiff was entitled to define libel in statutory words (McCloskey v. Pulitzer, 152 Mo. 339; Julian case, supra), although it was once doubted whether that was so (McGinnis v. Geo. Knapp and Co., 109 Mo. l. c. 138 *et seq.*). So the common law defines negligence, *viz.*, the lack of care according to circumstance, and a plaintiff in a libel suit has no more right to allege the libel to consist of a false and malicious charge of perjury or of making a false and voluntary affidavit, and then turn round and recover because the alleged libelous screed merely had a tendency to provoke him to wrath or to deprive him of the benefits of public confidence or social intercourse or expose him to public hatred or contempt, than has a plaintiff the right in a negligence suit to particularize the elements of the alleged negligence, and then recover on a form of negligence not alleged.

II.   We come now to the very bone of contention— damages.   Whether $25,000 smart money and $25,000 compensation are too much depends on matter of mitigation.   Were there such environment and facts as, considering the personnel of the parties to this suit, dulled the edge of the libel, tended to ease or palliate the charge and thereby commanded a corresponding diminution in the quantum of damages?   I think so. Attending to this view of the case, a bird's-eye view of the record facts will assist to a just conclusion.

Defendant is a domestic corporation domiciled in the city of St. Louis, having a capital stock of $500,000 and real and personal property, including the good will of a large business and an Associated Press franchise, making its business and plant worth around $2,-000,000.   It has long owned and published in St. Louis a newspaper known as the *Globe-Democrat,* Republican in politics, of wide circulation and influence, circulating

by mail, express and carrier throughout Missouri and elsewhere in the United States and in foreign lands. The edition known as the Sunday *Globe-Democrat,* at the time in hand, averaged so many as 153,000 or 160,-000 copies.

Plaintiff in years gone was a newspaper man and had been sheriff of Warren county, making a good record. In 1896 and subsequent years he had been a member of the Democratic State Committee, acting as its secretary, and during the campaigns of 1896 and 1898 was the chairman of that committee, bearing the honor of leading and commanding with marked vigor and success his party forces in the elections of those years. Subsequently he had been an efficient Secretary of State, but was defeated as a candidate for that office in the fall of 1904. In February, 1905, he resided at Jefferson City and was connected with a financial institution, known as the Central Missouri Trust Company, as its president—holding no political place or office, but engrossed in private affairs.

While things were in this fix, on the twelfth of February, 1905, in the Sunday edition of the *Globe-Democrat,* defendant published an article purporting to be written by a correspondent using the pen name of "The Old Politician," and who, under that title, had been furnishing matter for the *Globe-Democrat.* "The Old Politician" was Donald C. Fitzmaurice. The record shows him to be a Democrat and the "Old Politician" articles were written in collaboration with two other Democrats whose identity remains to this day undisclosed, no attempt being made to establish it. Fitzmaurice was an experienced newspaper writer of good repute, residing in St. Louis, and before bringing his pen to the *Globe-Democrat,* had written political correspondence for the St. Louis Republic and other reputable newspapers.

It seems at that time there were two legislative investigations under way—one in the House, the other

in the Senate—the General Assembly then being in session and Republican on joint ballot—both authorized by resolution. The Republican caucus nominee for the Senate of the United States was Mr. Niedringhaus. These resolutions charged that he had collected from the brewing interests of the State for use in the Republican campaign in 1904, $21,000; that the names of those who contributed that sum were concealed in the report of the treasurer of the Republican State Committee of which he was the chairman and possibly treasurer, he putting the subscriptions down to himself. The testimony taken in those investigations tended, it is said, to give some color to the charge. His election was opposed by certain Republican members of the General Assembly. A movement, known in politics as a "bolt," had begun and was growing, a new caucus threatened, and the resolution in the House was apparently in aid of that movement, while that in the Senate may have been indirectly intended to aid neither faction of the Republican party, but to uncover conditions believed by those behind the resolution to show that the State had nothing good to hope from Republican ascendancy. Be that one way or the other, the facts disclosed and the discussion in and about these charges (and the counter charges made) caused a current of anxious and live political events, now passed into history. It was while the legislative situation was acute and while the public eye was riveted on that situation and while the public press was discussing with animation and solicitude the matter of concealing political contributions from brewing, liquor and corporate interests (contrary to the Corrupt Practices Act) and when a campaign was just over in which plaintiff was a candidate and in which the concealing of political contributions made by corporations had been an issue much discussed before the people, that Fitzmaurice prepared and defendant published the article in question, bringing under review plaintiff's alleged

conduct of the affairs of the Democratic State Committee and undertaking thereby to point a political moral on a live political situation.

The record shows (and it is a matter of history of which we may take judicial cognizance) that the public mind for a long time had been sharply engrossed with the question of the control, partial control or attempted control of political parties by special interests —e. g., corporations, liquor interests and others mentionable. Doubtless the fear that those who had axes to grind were only casting bread on political waters by laying heavy obligations on political committees by large contributions for campaign purposes, which contributions were sometimes disguised and concealed, and the grounded fear of defiling the honor and integrity of the ballot by the use of money, caused the passing of an act properly known as the Corrupt Practices Act—an act to accomplish publicity and sunlight in the political use of money. Public attention was called to lobbying and the danger, through lobbying, that the people's will would be thwarted by corrupt means or out of gratitude for large and secret contributions to committee expenses.

But before we speak farther of this article we must go back a little; for the history and record of this case cover several years, and it would be toying with the facts not to deal with the whole scope of the case in putting a financial estimate on plaintiff's damages. Plaintiff was not without the *furor scribendi*. It must not be overlooked that under this record he deliberately "threw the first stone" and thereby began the war of words culminating in the article complained of. That he who lives in a glass house should never throw stones is taught at the mother's knee and is a doctrine of use in libel suits. On November 3, 1901, this plaintiff published a signed article in the St. Louis *Republic*. It seems that Cardwell and Lyons, one or both, had been writing articles for the *Globe-Democrat*. Of the

character of these communications we may only judge
by the tenor of plaintiff's own article.  We infer that
Cardwell and Lyons were of the same politics as plain-
tiff and that plaintiff as a sometime editor and as a
political commander-in-chief felt a call to answer their
screeds.    To that end he published in the St. Louis
*Republic* of the date mentioned an article dealing out
censure freely and coarsely, charging that "but for the
practically unanimous co-operation of the Republican
members of the General Assembly—both House and
Senate—with the few dishonest members of the Demo-
cratic side, the lobby would have been powerless to
have accomplished anything in this State for years
past;" that this condition had existed for many years;
that "sandbagging" by laying the legitimate business
interests of the State under tribute was equally vicious
with "lobbying;" that the Republicans of the General
Assembly, at the time one Cardwell and Lyons were
members, "voted practically solid with the lobby and
the sandbaggers;" that Cardwell and Lyons made
records that were a disgrace to the party that sent
them to the Legislature and that the statement that
the Democratic State Committee received contributions
from corporations with the understanding that the cor-
porations should be protected against hostile legislation
"were absolutely and infamously false;" that these
men were but the tools "of the chief lobbyist of this
State" for the purpose of electing to the Senate of the
United States a named corporation candidate; that the
attack on the Democratic State Committee and the
Democratic State officers is a part of the scheme; that
before the campaign begins the real character of these
"pretended Democrats" will be understood; that they
were having ready access to the columns of the *Globe-
Democrat;* that the *Globe-Democrat* had "defamed its
own State" and naturally sheltered under its wing
"notorious boodlers and sandbaggers;" that the paper
had become "so disreputable in its libelous assaults"

as to become "powerless for either good or harm;" that it was a "guerilla newspaper," an "old whiskey ring organ," that there was "an affinity between it and boodlers and sandbaggers."

What may have led up to that publication this record does not disclose. We may assume that public discussion on at least some of the topics suggested was at full tide. At once Cardwell sued the publishers of the *Republic* for libel in the Jackson Circuit Court. Presently in that case depositions were taken at Independence, Missouri, and Mr. Cook and others testified. The record discloses that the testimony given by plaintiff and the other witnesses was scattered broadcast through the press and was a present and continuing topic of public discussion. In one of its defenses in the case at bar, defendant pleaded extracts from this testimony and its general dissemination and public discussion by way of mitigation. These extracts so pleaded were admitted by the reply as correct. The following appear among them (from Mr. Cook, plaintiff):

"Q. In the campaign of 1896, Mr. Cook, did you receive any money for the Democratic campaign fund from any corporation in this State? A. In 1896?

"Q. 1896, yes, sir? A. I think I did, yes, sir.

"Q. How much? A. I think Colonel Phelps made a personal subscription of one hundred dollars, and I raised some money around over the State; we had very little help, as I remember it, from any corporate interest. Afterwards, at the close of the campaign, I think he raised for the committee about two thousand dollars.

"Q. Colonel Phelps did? A. Yes, sir.

"Q. Did you put that in your report which was filed with the recorder of deeds? A. It was put in—the treasurer makes the report, not the chairman.

"Q. *Were you with him when he made his report?* A. *Yes, sir.*

227 Sup—37

"Q. Didn't you, Mr. Cook, keep a book in which you kept track of these contributions? A. Yes, sir. It is not absolutely accurate, but I kept it as near as I could.

"Q. As near to it as you could? A. I had absolute confidence in the treasurer.

"Q. This money went into the treasury of the committee? A. Yes, sir.

"Q. *How did you report it?* A. *It was reported in my name.*

"Q. *That it came from you instead of Colonel Phelps?* A. *Yes, sir.* . . . .

"Q. Now, in the campaign of 1898 did you collect any money from corporations of the State for the campaign fund? A. In 1898?

"Q. In 1898; yes, sir? A. I did not. Colonel Carroll gave me a thousand dollars for the campaign fund of 1898—I believe is the only man representing a corporation that contributed anything.

"Q. Did he tell you where he got the thousand dollars? A. He did not. I understood it was his own contribution.

"Q. You understood it was his own contribution— did you get six thousand dollars that came from the St. Louis Transit Company? A. I didn't know of any money that came from the St. Louis Transit Company.

"Q. At any time during that campaign did Mr. J. M. Seibert bring six thousand dollars to the headquarters, which he stated to you that he had gotten from the Transit Company or from the attorney for the Transit Company? A. Mr. Seibert collected some money for the committee. I don't know that it came from the Transit Company.

"Q. Did he tell you that it came from the Transit Company? A. No, sir; he did not.

"Q. Did he tell you whom he got it from? A. He told me that Mr. Priest raised the money for him.

"Q. Who is Mr. Priest? A. Sam Priest.

"Q. Yes. A. He is a lawyer of St. Louis.

"Q. Does he represent the St. Louis Transit Company? A. I think he does; yes, sir.

"Q. How much currency did he bring in from that source? A. I don't recall now.

"Q. Was it six thousand dollars? A. I don't know; possibly it might have been.

"Q. You don't swear that it was not six thousand dollars? A. No; my understanding was that Mr. Seibert had raised this fund for the use of the party. It never went into the hands of the committee.

"Q. Did he turn any part of it over to you? A. Part of it; yes, sir.

"Q. How much did he turn over to you? A. I couldn't tell without looking over the treasurer's books.

"Q. Of course you spent it for the committee? A. I turned it into the treasury of the committee.

"Q. And it was afterwards paid out on vouchers and so forth from you? A. Yes, sir.

"Q. Did Mr. Carroll subsequently raise another five thousand for the committee? A. I couldn't say; Mr. Seibert paid it out for the benefit of the committee, also.

"Q. How much did Colonel Carroll raise in this instance? A. I don't know.

"Q. Was it five thousand dollars? A. Might have been.

"Q. It was some thousands of dollars? A. I don't think it was five thousand dollars. I know he paid me a thousand dollars.

"Q. Who did? A. Colonel Carroll; and I paid it into the committee in my own name—to the treasurer of the committee.

"Q. Now, this money that was subsequently collected by Colonel Carroll and given to Mr. Seibert, do you know the amount of that? A. No, sir; I don't know how much it was.

"Q. Well, was it a thousand dollars? A. Why, I think it was three or four thousand dollars.

"Q. Three or four thousand dollars? A. Yes, sir.

"Q. And what part of that do you say, or did you say—or did Mr. Seibert give any part of that to you as chairman of the committee? A. He turned over—I don't remember how much; I could tell by looking at the treasurer's report. *Whatever he turned over to me I turned into the treasury, and it is reported as contributed by me;* and the balance of the money that Mr. Seibert received was disbursed by himself in the close counties of the State. . . . .

"Q. Do you know that it came from the Transit Company? A. I do not.

"Q. Evidently it came from some corporation? A. My understanding was that Judge Priest had raised the money for the conduct of the campaign.

"Q. From what? A. I never asked him. I suppose it was from the corporation interests, probably, that he was representing."

On cross-examination, plaintiff further testified as follows:

"Q. Do you know from what source Colonel Phelps raised the $2000? A. I do not.

"Q. That you regarded as his personal contribution at that time? A. No; that was the $2000 in 1896 —Colonel Phelps brought the check there to headquarters, and at the close of the campaign of 1896, a few days after it was over, it was entered upon my books to his credit, *later, when we went to make up the statement for publication—I mean the sworn statement of the treasurer, the personal representative of Gov. Stephens insisted—*

"Mr. Walsh: Who was it, just mention it.

"A. (Continuing): *The contribution ought not to go in Colonel Phelps' name, and it was at their request I went over and saw Colonel Phelps and told him the objection to it, and he wrote out an order to the treasurer to credit that in my name;* that is how it came

it was reported in my name instead of Colonel Phelps's on the sworn statement of the treasurer. I don't know how he raised it, anything about it.

"Q. That was done at the request of one of Gov. Stephens's personal representatives? A. One of Governor Stephens's personal representatives at that meeting. Col. Phelps knows all about that." . . .

On his re-direct examination plaintiff further testified as follows:

"Q. Who was the personal representative of Mr. Stephens that came and asked you to let the money of Mr. Phelps appear in your name? A. I am willing to state that if it is necessary.

"Q. It is necessary, I think; and I will ask you? A. Mr. E. T. Orear." . . .

And afterwards appeared E. T. Orear as a witness on behalf of the plaintiff, and being duly sworn, on his examination in chief, testified as follows:

"Q. Your name is Edward T. Orear. A. Yes, sir.

"Q. Where do you live? A. At Jefferson City. . . .

"Q. Just state what you know with respect to the contribution of $2000, whose name it should be put in, and who was present at the time the agreement was made, if you know? A. Shortly after the campaign, shortly after the election, Mr. Cook invited me to come to St. Louis, either by letter or telegram, I have forgotten now which; and up to that time I did not know that Colonel Phelps had contributed anything excepting $100. Mr. Cook wanted to confer with myself and some others in regard to closing up the work of the campaign. I met Mr. Cook and Gov. Stone, and I forget whether Mr. Seibert was present or not during the first part of the interview—he was during the day, but I am not clear whether he was there first or not. But Mr. Cook first informed me that the bills of the campaign had all been paid, and that in closing up the work they were

about $2000 short, and that Colonel Phelps had contributed that money and that he had discharged the indebtedness.

"Q.  That who had?  A.  That is, Mr. Cook had paid all the bills, and that they were then ready to make their report. My recollection is that Gov. Stone first suggested that the contribution of $2000 by Mr. Phelps ought not to appear as having come from him.

"Q.  From whom?  A.  From Mr. Phelps; because of the fact that he was the attorney of a corporation. The matter was discussed there between us for a short while, and I suggested that I could see no impropriety to its being credited to some one else provided Colonel Phelps made no objection to it; and it was then that Mr. Cook went up to see Mr. Phelps.

"Q.  Cook himself?  A.  Yes, sir; Mr. Cook; I think he probably went to see him twice—probably did not get to see him the first trip; but anyway, during the day he went to see him twice, and I don't think there was anything said in the conversation first, as to whom the contribution should be credited to; but finally I was informed that night that Mr. Phelps had given Mr. Cook an order—

"Q.  (Interrupting):  You were informed by whom?  A.  Well, I think Mr. Zeibig, or Mr. Cook; I don't know which.

"Q.  Who is Zeibig?  A.  Mr. Zeibig was the treasurer of the committee—that Mr. Phelps had given Mr. Cook an order on Mr. Zeibig to credit the deposit in Mr. Cook's name.

"Q.  When were you in this conference which you say took place between Mr. Cook and ex-Gov. Stone and yourself; were you there as a representative of Gov. Stephens?  A.  Well, I had been associated with Mr. Stephens, and I suppose I had been looked upon as his representative in the campaign to a degree. . . ."

On his cross-examination said Orear testified as follows:

"Q. And you say you first learned of this contribution after the election? A. Yes, sir.

"Q. *And when the accounts were being made up?* A. *Yes, sir.*

"Q. *For publication, I believe.* A. *Yes, sir.*

"Q. *It is the accounts that are required to be made up under the law that you refer to, I believe?* A. *Yes, sir.*

"Q. And there were present, you think, yourself, Mr. Cook and Mr. Zeibig and Mr. W. J. Stone? A. I am not very clear in my recollection whether Mr. Zeibig was present at the first part of the interview or not, but he was there during the day.

"Q. And it was you that made the suggestion that if Mr. Phelps would consent you saw no reason why the $2000 might not be shown in the name of Mr. Cook —as coming from him? A. Yes, sir; I don't remember the exact words, but that is about the substance of it.

"Q. And in fact, it was on your suggestion that Mr. Cook went up to see Mr. Phelps—or rather upon the suggestion— A. Well, that led to it; I don't remember just who said he had better go, or anything; but I remember I stated that Mr. Cook having received the contribution, it would be better for him to see Mr. Phelps. . . .

"Q. *Well, you knew all this had reference to so entering it?* A. *Yes, sir; I didn't see the order given by Mr. Phelps to Mr. Cook, but I was informed that he did give him a written order.*

"Q. Yes, sir; and it was agreed there that that should be done? A. Well, that is just exactly what happened there, Mr. Lehman; I have related it.

"Q. Yes, I would infer that it was agreed from that; now, Mr. Orear, did you have any idea that there was any impropriety in the receipt of the money from Mr. Phelps for the campaign funds? A. Well, I decline to answer." . . .

Prior to the Cardwell case, to-wit, on the 5th day of January, 1899, defendant's newspaper, under the head of "Democratic Campaign Mysteries," published an editorial to the effect that there were strange and well verified reports concerning the disappearance of contributions to the Democratic Committee fund; that Col. W. H. Phelps holds a receipt for $2100 given by him to that fund two years ago; that no report of the receipt or the expenditure of that money had been made by that committee; that the law required a sworn statement of such receipt; that the question was: what had become of Col. Phelps's $2100? It was suggested the "chairman" and others concerned would do well to furnish an explanation; that the matter was not a vague rumor but based on what Col. Phelps himself said, who had the receipt in his hands; that he and every citizen had the right to know how the money was spent; that a select and secret Democratic fund seemed to be well established in this State in defiance to the statute; that Col. Phelps's contribution could not be called an inconsiderable or trivial one and that it "had gone and left no sign;" that Gov. Stephens had fortified himself against occurrences of this kind last fall by making no campaign contributions; that his facilities for inside observation relieved him from much blame in that behalf, but that his course had "not stopped the remarkable leak in favor of others less favored." At once Mr. Cook went to the *Globe-Democrat* office with some friends. He and Mr. King, the editor of the *Globe-Democrat*, do not agree exactly as to what happened. In substance, Mr. King says that the question discussed was the acknowledgment of the receipt of the money and that Mr. Cook pointed out the item in the treasurer's report and that the money had been credited to him, Cook, and distributed in the campaign; that Mr. Cook produced Mr. Phelps's written order to change the credit from Phelps to Cook. Mr. Cook says that the question of who made the report was also up

for consideration, and that he pointed out the fact that Mr. Zeibig made the report. Mr. King does not recollect that phase of it, but the differences seem immaterial. The result of the interview was an editorial in the *Globe-Democrat* relieving Mr. Cook of any charge of misappropriating contributions.

Let the scene now shift to the winter of 1904-5. As already said, Mr. Cook had just before been a candidate for Secretary of State. The general public knew of his testimony in the Cardwell case by newspaper and oratorical discussion in that campaign. He had been defeated with his entire ticket except governor. The Legislature was Republican on joint ballot. Mr. Niedringhaus was the Republican caucus nominee for Senator. A bolt had been organized and a deadlock followed. He was charged with concealing a large contribution made by the brewing interests of this State to the Republican committee of which he was head and treasurer. Two legislative investigations were pending in which the facts were disclosed showing the report required by law from that committee did not disclose the source of that large contribution, but credited it to Mr. Niedringhaus. It was publicly asserted that a "mysterious stranger,"charged with a mission to break the deadlock and elect a Republican Senator, was on the ground from Washington. Be that as it may, on the twelfth of February, 1909, as said, the article of "The Old Politician" was published. The caption or head-notes in heavy type somewhat shadows forth the purpose of it and ran as follows:

"OLD POLITICIAN ON PARTY FUNDS.

"Fight of the People—Wrecks Through Covering Up and Fraud in Campaign Contributions—The present Investigation—The Thursday Conference, Why It Was Called and What May Grow Out of It."

The style is that of burlesque allegory. It is written purposely with bad spelling, possibly under the mistaken notion that the writer would gain credit by posing as a plain, illiterate man without Addisonian or drawing-room polish of phrase or manner, but an outspoken, rough, worldly-wise man who càlled a spade a spade, who had a shrewd and smartish gift of story-telling to illustrate his points, and a home-spun insight into men and things supposed to rivet the attention of the hearer and persuade belief. Undoubtedly it was libelous if false. Its broad *motif*, apparently, was the defeat of Mr. Niedringhaus. It speaks of this business of collecting big campaign funds out of interested contributors and turning them in and publishing them as from nobody, or from somebody that never gave a cent; that Republicans, Democrats and Populists felt alike on that question. The investigation of Niedringhaus was said to be to try to "rub it in" on the people that the Republicans were trying to elect a man Senator who did the same thing Mr. Cook had done and the article was intended to not let the people forget it if it could be helped; that the people were "dead sore" on the question of campaign funds; that (quoting) "they are wide awake on this business of men who handled big money in the name of the party an' who sell out legislation in advance in exchange for campaign contributions. The way Cook acted at the first session after the campaign of 1896 and the way him an' Seibert both acted up here at the first session after the election of 1898, had put the people to thinkin' that its goin' to be that way all the time when chairmen of campaign committees get campaign contributions they don't like to tell about." The writer says the people wanted the investigation no matter "who it hits or hurts" and that he was for it; that both parties in Missouri looked alike to him now; that he didn't want to go back to the time there was but one party in Missouri; that certain Politicians (naming them) knew how the people felt from seeing

the way Mr. Cook had been "hacked" at the polls; "an' (quoting) the big fight that was being made against the election of Niedringhaus after he got a caucus nomination, because it hadn't been found out on him before the caucus met."

But in leading up to his object, Fitzmaurice used the conduct of Mr. Cook as chairman of the Democratic State Committee and his defeat at the polls the preceding November to drive home and clinch his moralizing and political advice. He assumed that Cook had defeated himself by his admissions on the stand in the Cardwell case and had injured his party thereby. Under the allegory of a trip across the American desert on the Old Santa Fe trail to Independence, Missouri, he pictured Mr. Cook as bringing his party in the Cardwell case to the same town; the article spoke of him as "the man who swore to what wasn't so." It applied to him the injunction, "thou shalt not bear false witness," leading up to it in this way:

"That's when your Missourian gagged, an' bucked, an' kicked, till he knocked the dashboard out an' run away with the whole darned outfit. He'd stood Stone. He made a bad face over him, but swallowed him, alum an' all. That'll show you that he could stand anything but Cook.

"Now, Cook ain't the issue as a public officer, mind you. Sam was a good sheriff of Warren county. He made a good Secetary of State, an' administered that office an' closed up its accounts without the loss of a dollar to the State. Nothin' was ever proved against him but what he proved himself in that Independence story, but say, if you don't think that was enough, ask Sam. Here he comes, once the most popular man in Missouri, away back yonder behind the next lowest man on his ticket, an' so far back of him that you've got to get a spyglass to see the dust he's a-raisin'. Say, we were all against him. Republicans, Democrats an' all of us. There's no such thing as party lines when

it comes to dealin' with that there question. I tell you, Missourians is all alike. Give 'em a question that goes down to the bottom of their common nature an' they'll answer it with almost one voice, an' that voice'll be an echo of the one that came down from Mount Sinai a-sayin', 'Thou shalt not bear false witness.' "

It uses the expression, "After Sam Cook had swore that he contributed $2500 to a campaign fund that was contributed by another man whose name Sam wanted to conceal." It says, "A man who'll do what Sam Cook done, to serve his party or hisself instead of serving the Lord, an' will take the name of the Lord in vain in swearin' to an untruth will never meet their [the people's] approval." After telling a story of two boys who stole pie and how one got licked for lying while the other ate the pie, it states, "But Bill knows that Sam got a good deal of the pie before he got caught in the lie and licked . . . . and I guess Bill knows that Sam got licked as soon as he got caught lying, and that he'll keep on gettin' licked as often as he shows up on the ticket." Other statements of the same kind are made, in one the word "perjury" is used.

In explaining how these charges came to be made in that form, Fitzmaurice claims that although he knew at the time of the Cardwell depositions that Mr. Cook was chairman and not treasurer of the committee, and although he knew the law required the treasurer and not the chairman to make the affidavit, yet he got momentarily confused by the fact that Mr. Niedringhaus had acted in both capacities for the Republican committee and for the moment treated Mr. Cook as filling both places on the Democratic committee.

On February 26, 1905, Fitzmaurice returned to the matter of his prior article, in the *Globe-Democrat*. After dealing with the Republican senatorial situation at some length and pointing out that legislative pay would be cut down to a dollar a day at about that time in the spring called "groundhog's day," and that if a Senator

was not elected at that time none was likely to be elected at all, he appended a retraction and apology in the same vernacular and idiom. (See principal opinion for its terms.)

On the tenth of May following plaintiff sued for $100,000 actual, and $150,000 exemplary, damages, $250,000 in all. The verdict came in for $150,000—eleven jurors signing. That verdict was made up of a blending of actual and punitive damages, half and half. It is a coincidence of only possible value to Jurisprudence that while the jury cut away $100,000 from plaintiff's original estimate, my learned brethren have now cut away $100,000 from the jury's estimate—both reductions proceeding by equal leaps and bounds, turn about being fair play as the saying goes. Bearing in mind now that defendant pleaded the testimony of Mr. Cook and Mr. Orear taken in the Cardwell depositions and the broad dissemination of that testimony and a State-wide discussion in the press and on the "stump," continuing down during the campaign of 1904 as a live public question, by way of mitigation of damages, and bearing in mind that plaintiff went to trial solemnly admitting in his reply to defendant's answer that he and Orear gave that testimony in the Cardwell deposition, we come to the trial itself. At that trial Mr. Cook took the stand in his own behalf. The principal opinion sets out his testimony *in extenso*. We need only call attention to the fact that having admitted, for the purposes of the trial, that his former testimony was correct, he testified at the trial that it was poorly taken and poorly reported. Nevertheless, in substance, he admitted getting $2000 from Col. Phelps and giving Col. Phelps credit in his own book for that sum, Ziebig's books giving a like credit at the start; that a meeting was called shortly after the campaign was closed of parties interested in the accounts of the committee; that Mr. Cook attended that meeting and went to St. Louis for the very purpose of at-

tending it; that a controversy there arose over the Phelps contribution; that Gov. Stone was opposed to allowing the books to show a contribution from Phelps; that the representative of Gov. Stephens was also wrought up on that score. Mr. Cook desires us to understand "that it was a matter of indifference to him," but (observe) as the result of a consultation and for the very purpose of arranging the data in the treasurer's books so as to avoid the publicity of allowing the credit to appear in Col. Phelps's name, Mr. Cook went to see Col. Phelps to persuade him to consent to a substituted name. He says he did not suggest his own name to Col. Phelps, but it appears that after two interviews he bore back to Zeibig, the treasurer, an open order from Col. Phelps to allow the contribution to appear in Mr. Cook's own name. The evidence abundantly shows that the very purpose of this substitution was to conceal the matter from the public and that Mr. Cook was instrumental in doing that very thing. It was understood that if the substitution could be procured, Zeibig would be willing to make an affidavit that the contribution was made by a substituted party, the substitution being for the purpose of easing his conscience in that behalf. In cross-examination plaintiff described this meeting thus: "A meeting of Gov. Stone, Mr. Orear and those that would meet there for the purpose of closing up the campaign." It is shown further that when plaintiff entered the room those present were discussing the making of the affidavit under the Corrupt Practices Act. "They were discussing that matter when I entered the room," said he. Nothing else was discussed that witness could remember and when he heard the objections urged against the Phelps contribution he took the necessary steps to have it changed to himself—no one else lifting a finger to that end. He made two trips to see Col. Phelps, saw him both times and procured the written order and "handed it to Mr. Zeibig with the belief that

Mr. Zeibig would credit it to somebody else other than Col. Phelps . . . ." "And would swear to it?" was asked of the witness. His reply was: "Yes, sir; certainly." Returning to the campaign of 1898, being interrogated as to an item of $3500 credited to him as his personal contribution by the report of the treasurer, Mr. Cook again admitted that he had not contributed one cent of it, that he, as chairman, got $1000 from Col. Carroll, the general attorney of the Chicago, Burlington and Quincy Railroad, and had put it in as coming from himself because Col. Carroll had told him "he didn't want it credited in his name;" that $3500 had come from Mr. Seibert; that he, Seibert, got the money from Col. Carroll and Judge Priest and had turned it over to him and he, Cook, had taken the credit for it in his own name because Mr. Seibert "preferred that I would credit it to myself." He testified further that the treasurer "knew he," Cook, "didn't have any $3500," and that he told the treasurer that Mr. Seibert gave him the money; that he had "no secret from the treasurer;" and that he, the treasurer, "probably knew where it came from." "*I took the burden,*" said the witness, "*or whatever it was, in having it credited in my name.*" He says he expected that the treasurer's report would be sworn to and that the contribution would appear in his name in the sworn report.

The deposition of Col. John H. Carroll was read. He testified that when he gave $1000 to Mr. Cook he told him, Cook, "I don't want this matter *advertised.*"

The deposition of Col. William H. Phelps was also read. He testified that he gave Mr. Cook $2000 in person and got Zeibig's receipt for that sum; that Mr. Cook came to his office and personally solicited the contribution, stating that Gov. Stephens had been drawn upon for that sum but had declined to pay because he had contributed all the law would permit for campaign purposes; that subsequently Mr. Cook came to him and told him that the leaders of the party, because of wit-

ness's connection with a railroad, thought it best that his, Phelp's, contribution should not appear in the report required by law at the hands of the treasurer and wanted to know if he had any objection to its appearing in someone else's name. Witness told Mr. Cook that the contribution "was not made for *advertising* purposes and he had no objection." Accordingly witness gave an order on Mr. Zeibig, the treasurer, to have Cook substituted for Phelps. The recollection of the witness was that Cook suggested his own name.

The deposition of Mr. Seibert was also read. He testified that he got money from Priest and Carroll in currency and from the brewers and gave it to Mr. Cook. (Note—This is the money Mr. Cook caused to be credited to his own name in the treasurer's report of 1898.)

So that it is fair to say that the testimony at the trial substantially agrees with that given by Mr. Cook in the Cardwell depositions.

With the record in this fix defendant's learned counsel argue that, whether the charge is that of perjury (*i. e.*, a felony, R. S. 1899, sec. 2033) or that of making a false voluntary affidavit (*i. e.*, a misdemeanor, R. S. 1899, sec. 2036) a dilemma is sprung on plaintiff, impaling him on either horn. That is, in either event the charge is true, hence a demurrer lay and it was error to overrule it. This argument runs on the accepted doctrine that all who intentionally participate in or procure the commission of a misdemeanor are principals in the eye of the law, and every one who participates as an accessory before the fact in the commission of such a felony as perjury is himself (broadly speaking by including the idea of subornation) guilty of perjury. [State v. Wagster, 75 Mo. 107; State v. Fredericks, 85 Mo. 145; State v. Orrick, 106 Mo. l. c. 119 *et seq.*; State v. Edgen, 181 Mo. l. c. 590; R. S. 1899, sec. 2364.] The postulate assumed by counsel is sound as an abstract proposition in morals and law. In violations of law the hidden hand is as guilty as the open,

the man who holds the string that pulls the puppet is as guilty as the puppet himself, and either is subject to punishment by the law, or to just criticism and excoriation by the citizen or newspaper. But in this case defendant did not plead the truth by way of justification. Our code contemplates that such defense, if relied on, should be pleaded (R. S. 1899, sec. 636), that defendant may plead both matter in justification and mitigation so long as he states them separately. It is old doctrine, none the less sound because old, that justification by way of the truth is subject-matter of defendant's plea. This is so because defamatory matter is presumed to be false. That doctrine is based on those wise maxims which are of the very bones and framework of the body of our law and make its chief glory, *viz.*: In favor of innocence, all things are to be presumed; odious and dishonest things are not to be presumed in law. Therefore, in a libel suit the burden rests upon the defendant to show the truth of his charges and overcome the presumption of innocence. Thus, in McCloskey v. Pultizer Pub. Co., 152 Mo. l. c. 341, plaintiff introduced no evidence in chief except the alleged libelous publication.

True, in the case at bar, plaintiff alleged the publication was false, and defendant, with many specific denials, denied generally the allegations not admitted; but "no principle is better established than that the truth of slanderous words cannot be given in evidence under the general issue either as a defense or in mitigation of damages." And the plea of justification must with precision directly and distinctly allege the truth of the defamatory matter charged. We need not discuss the question whether a plaintiff should be nonsuited if, in making his case in court, he unequivocally admitted the truth of the charge as made, for that question is not in this case.

Defendant having deliberately elected not to justify by alleging the truth (thus withdrawing that issue of fact from the jury) may not raise it on demurrer and have us establish it as a matter of law. The principal opinion ruled with the divisional opinion on that point. But, as pointed out, all these phases of the case were pleaded as matter in diminution of damages and went to the jury on that issue. So that, on the *quantum* of damages, we have them presented legitimately to us for our consideration.

We take it as a sound proposition to be granted by all men as of course that if defendant, instead of charging Mr. Cook with actually swearing to a lie, had contented itself with publishing excerpts from his testimony given in the Cardwell case (and which testimony had become an established historical fact universally blazoned abroad in a matter affecting the public interests and involving the duties of officials or *quasi*-officials in their relations to the public) and had commented thereon to the effect that while Mr. Cook made no affidavit yet he intentionally and effectually made the path straight and plain for the treasurer to make a misleading and false one, that he had industriously caused the documentary data to be prepared and furnished whereby the public would be deceived and the good purposes of the law adroitly circumvented and struck down to the ground, it would have been guilty of no libel, although it had further charged that what Mr. Cook did was precisely as bad as what the treasurer did or Mr. Niedringhaus was charged with doing. Nor would it have been libel if the newspaper had drawn a political moral by pointing out that defeat was bound to follow the exposure of such violations of a good law, although persons guilty in that behalf were merely actuated by mistaken sentiments of party pride and fealty as contradistinguished from the general public weal.

The premises considered, the sum of the matter is

this: In so far as Mr. Cook was charged with violating the heart and intent of the Corrupt Practices Act by taking an active, chief and accommodating part in concealing the source of certain political contributions, he may not say he was not (in so far forth) so guilty as to be the fair subject of public criticism. In so far forth as he knowingly and accommodatingly furnished and arranged the data upon which the treasurer made a misleading sworn public statement, we cannot consent that the whole blame should be laid upon the treasurer of the committee as a scapegoat and Mr. Cook be acquit. The difference between what Mr. Cook actually did and what the "Old Politician" charged him with doing may not be the difference between tweedledee and tweedledum but it is not so manifest and great that in estimating his damages the difference between the true and the false can be judicially estimated at $50,000. What are $50,000 to be paid for except for the difference between *doing* the thing (of which he was not guilty) *and preparing the way and means for another to do it* (of which he was guilty)? Therefore, we humbly submit that even if we are to make the judicial attempt to squeeze and wring the prejudice and passion out of a jury's verdict, that commendable and baffling result has not been worked out in this case.

But this court has never yet ruled that it will allow to stand for any amount a verdict that is the evil product of passion, prejudice or favor. With all due deference the majority opinion plows around that proposition by holding that the verdict was not so enormous as to indicate the presence of those abhorrent influences. In Chitty v. Railroad, 148 Mo. 64, after a most exhaustive and learned review of the authorities upon the question we held by way of conclusion as follows (p. 82): "If this was a case where the judgment of the circuit court was otherwise errorless a *remittitur* would be proper under the old rule, but under the law as it is now interpreted,

it is a case where the verdict on its face appears to be the result of passion or prejudice (otherwise unjust), which the action of the circuit court has not cured, and the judgment should therefore be set aside.'' And in a very late case in Division Two, Partello v. Railroad, 217 Mo. 645 (l.·c. 661), it was said of a verdict in a case of tort: ''From a reading of the facts disclosed by the record in this case, it is apparent that the amount of the verdict is excessive and beyond reason, and so gross as to shock the sense of justice. It cannot be accounted for upon any theory other than prejudice or passion. That it was largely excessive was tacitly admitted by plaintiff when she remitted therefrom the large sum of $10,000, leaving the verdict yet remaining at an excessive amount. [Gibney v. Railroad, 204 Mo. 704.] We think the ends of justice will be subserved by a new trial.'' In Rodney v. Railroad, 127 Mo. l. c. 691, the argument turns on the presence or absence of passion and prejudice. Said BRACE, P. J.: ''The verdict is large, we think excessive, but not so excessive, under the circumstances of the case, as to induce the belief that it was the result of favor, passion or prejudice on the part of the jury. The appellant, therefore, is not entitled as of right to have the judgment reversed for this reason.''

Speaking of ''prejudice and passion,'' they may be traced in no other way except through their visible result in swollen and inflamed verdicts. Sometimes misconduct can be shown and a verdict arrested because of it. Sometimes the cause of the prejudice and inflammation may be traced to improper and bitter invective of counsel or a misstatement of facts. But courts would be powerless indeed if they could not reason from effect back to cause or if they had no way of discovering passion and prejudice except in palpable misconduct of some one or more jurors in the trial or of misconduct of counsel. In this case no such misconduct appears. Indeed eloquent counsel for respond-

ent (out of abundant caution) assured us *ore tenus,* that their conduct below was "calm," that calmness reigned throughout the trial, that calmness (like order at Warsaw, maybe) entered with the jury into their room and presided serenely over their deliberations. We have no disposition to doubt the utmost sincerity of counsel in giving us those assurances. Doubtless, too, counsel felt they were "calm" when they assured us at our bar that although there never had been such a verdict in any case before, yet there never had been in all the annals of time so wanton and wicked a libel, one so free from mitigating circumstances. We were assured, calmly, that if the columns of the *Globe-Democrat* containing the libel were put end to end they would reach from here to Kansas City—a living, scorching flame of slander one hundred and fifty miles long. It was argued that the verdict was about one dollar for each copy of its Sunday issue and that a dollar for each was little enough. We were urged, calmly, to sustain the entire verdict because the people demanded at our hands to make an example of the "yellow press." As if it was our judicial duty to smite defendant hip and thigh as a member of the yellow press (assuming calmly it was a member of it)—as if it was our judicial duty to turn a flexible and receptive ear to catch an assumed groundswell of popular or partisan clamor, or become a weather vane to point the way the wind sits—as if we sit to administer revenge and not justice. Though doubting much, we may assume that although such fervid appeals appear in the dry stick in the appellate court there was entire "calmness" in the green stick of the trial *nisi.* And yet in spite of assurances from distinguished counsel of the calmness below there was a verdict of such outrageous proportions in view of the matter of mitigation we have pointed out, as brings a blush spontaneously to the cheek. A $150,000 verdict in a suit for libel in a case where plaintiff is entitled to damages, but is

not shown to have lost a single friend or a single dollar by virtue of an excess of criticism beyond what was just and proper (and such excess plainly existed) is an anxious fact challenging sharp and instantaneous judicial solicitude. For be it always remembered that if a verdict of that size can stand then all those litigants who hitherto sailed on the frequented or unfrequented seas of Jurisprudence on voyages of quest for the land of the golden fleece of heavy damages quite missed the felicity of sighting it and came home poorer in pocket and consolation because of such failure. There is no such verdict can be found in the savage days of English libel law before the enactment of the Fox Libel Act. There is no such verdict can be found returned in any reported case in any court in any land since the dawn of civilization, so far as my research goes, and I have been persistent and diligent in search. Counsel point out no such verdict. *The same remarks are true of the amount allowed to stand by the judgment of my brethren.* There is no other record of a $50,000 libel verdict. If even the inventive imagination of Jonathan Swift conceived of such a verdict as possible in that land of gigantic growths, yclept Brobdingnag, he made no note of it in Gulliver's Travels. The verdict was spectacular, passionate, whimsical, and its grotesque amount earmarks it as springing from the hot bed of a welter of hatred and emotion. When the din and dust of this hour have passed away this verdict will stand as a blot on the jurisprudence of this State.

Let us examine the records of the appellate courts of Missouri in libel and slander suits. Those cases include libels and slanders by and of the high and the low, by and of the rich and the poor, the strong and the weak, women and men. Therein damages were assessed for libels and slanders running the whole gamut of possible defamation. The schedule is instructive and fully sustains our estimate of this verdict.

MISSOURI CASES ON LIBEL AND SLANDER, SHOWING CHARACTER OF CHARGE AND AMOUNT RECOVERED:

Estes v. Antrobus, 1 Mo. 197. Slander. "Thief." Judgment for plaintiff; no amount given. Affirmed.

Anthony v. Stephens, 1 Mo. 254. Slander. "Murderer." Judgment for plaintiff for one cent. Reversed and remanded on plaintiff's appeal.

Watson v. Musick, 2 Mo. 29. Slander. "Hog-stealer," etc. Judgment for defendant. Reversed.

Cooper v. Marlow, 3 Mo. 188. Slander. "Forgery." Judgment for plaintiff; no amount given. Reversed and remanded.

Adams v. Hannon, 3 Mo. 222. Slander (Plaintiff a woman.) "I [meaning defendant Hannon] stroked her [meaning plaintiff]." Judgment for plaintiff; no amount given. Reversed and remanded.

Williams v. Harrison, 3 Mo. 411. Slander. "You stole two of my hogs." Judgment for plaintiff; no amount given. Reversed and remanded.

Dyer v. Morris, 4 Mo. 214. Slander. "She has gone down the river with two whores to a goose-horn." Female plaintiff. Judgment for plaintiff; no amount given. Reversed and remanded.

Barnard v. Boulware, 5 Mo. 454. Slander. Words not given. Plaintiff nonsuited. Affirmed.

Hibler v. Servoss, 6 Mo. 24. Slander. "He had sworn a lie." Judgment for defendant. Affirmed.

Moberly v. Preston, 8 Mo. 462. Slander. "She had a child" (fornication). Female plaintiff. Judgment for plaintiff for $1300. Affirmed.

Palmer v. Hunter, 8 Mo. 512. Slander. "Perjury." Judgment for plaintiff for $946. Affirmed.

Harris v. Woody, 9 Mo. 112. Slander. "Swearing a lie." Judgment for defendant. Affirmed.

Edgar v. McCutchen, 9 Mo. 759. Slander. "Carnal knowledge of a mare;" using unprintable word. Judgment for plaintiff; no amount given. Affirmed.

Keemle v. Sass, 12 Mo. 499. Libel. "This impertinent fellow withheld from us . . . paper . . . intrusted to him for this office." Judgment for plaintiff for $100. Affirmed.

Sutton v. Smith, 13 Mo. 120. Slander. "Mrs. Sutton stole my corn." Judgment for defendant. Affirmed as to finding; reversed as to costs.

Fallenstein v. Booth, 13 Mo. 427. Slander. "Stole my note." Judgment for plaintiff for $1000. Affirmed.

Self v. Gardner, 15 Mo. 480. Slander. "Stealing a dollar." Judgment for plaintiff for $250. Affirmed.

Stieber v. Wensel, 19 Mo. 513. Slander. "Ye are whores." Female plaintiff. Judgment for plaintiff; no amount given. Affirmed.

Perselly v. Bacon, 20 Mo. 330. Slander. "Swore a lie before grand jury." Demurrer sustained. Reversed and remanded.

Dowd v. Winters, 20 Mo. 361. Slander. "False swearing." Plaintiff nonsuited. Reversed and remanded.

Pasley v. Kemp, 22 Mo. 409. Slander. "A rogue;" and "stealing," etc. Verdict for plaintiff for $750. Plaintiff remitted $250. Judgment for $500. Affirmed.

Hudson v. Garner, 22 Mo. 423. Slander. "Whore." "Whorish mother,"—adultery with a negro. Female plaintiff. Judgment for plaintiff for $3000. Affirmed.

Street v. Bushnell, 24 Mo. 328. Slander. "Theft." Plaintiff nonsuited. Affirmed.

Johnson v. Dicken, 25 Mo. 580. Slander. "Stealing corn." Judgment for plaintiff; no amount given. Reversed and remanded.

Birch v. Benton, 26 Mo. 153. Slander. "Whipping wife;" "D—d sheep-killing dog." Judgment for plaintiff; no amount given. Reversed and remanded.

Speaker v. McKenzie, 26 Mo. 255. Slander. "Whipped his mother." Demurrer to petition sustained. Affirmed.

Atteberry v. Powell, 29 Mo. 429. Slander. "Perjury." Judgment for plaintiff; no amount given. Reversed and remanded.

Weaver v. Hendrick, 30 Mo. 502. Slander. "Larceny." Judgment for plaintiff for $3000. Affirmed.

Coghill v. Chandler, 33 Mo. 115. Slander. "Larceny." Judgment for plaintiff; no amount given. Affirmed.

Curry v. Collins, 37 Mo. 324. Slander. "He is a bushwhacker." Demurrer to petition sustained. Affirmed.

Pennington v. Meeks, 46 Mo. 217. Slander. "Stole my hog." Judgment for plaintiff; no amount given. Affirmed.

Atwinger v. Fellner, 46 Mo. 276. Slander. Words not given. Judgment for plaintiff; no amount given. Affirmed.

Bundy v. Hart, 46 Mo. 460. Slander. "Burning a barn." Judgment for plaintiff; no amount given. Reversed and remanded.

Buckley v. Knapp, 48 Mo. 152. Libel. "Lack of chastity." Female plaintiff. Judgment for plaintiff for $5000. Affirmed.

Barbee v. Hereford, 48 Mo. 323. Slander. "Perjury." "Swore to a d—n lie." Judgment for plaintiff; no amount given. Affirmed.

Price v. Whitely, 50 Mo. 439. Libel. "An imp of the devil;" "Cowardly snail." Judgment for plaintiff; no amount given. Affirmed.

Elfrank v. Seiler, 54 Mo. 134. Slander. Words in Dutch, charging Elfranks (woman plaintiff) as follows: "Elfrank! that mean people; whoring folks!" Nonsuit. Reversed and remanded.

Polston v. See, 54 Mo. 291. Slander. "Stealing." Judgment for plaintiff for $500. Affirmed.

Clements v. Maloney, 55 Mo. 352. Slander. "Forgery." Judgment for plaintiff for $200. Affirmed.

Hall v. Adkins, 59 Mo. 144. Slander. "Larceny." Judgment for plaintiff; no amount given. Reversed and remanded.

Rammell v. Otis, 60 Mo. 365. Slander. "Larceny," and "keeping false books." Judgment for plaintiff; no amount given. Reversed and remanded.

Johnson v. St. Louis Dispatch Co., 65 Mo. 539. Libel. "Grand Larceny." Judgment for plaintiff; no amount given. Affirmed.

Boogher v. Knapp, 76 Mo. 457. Libel. "Convicted and sentence to prison." Judgment for plaintiff; no amount given. Affirmed.

Coe v. Griggs, 76 Mo. 619. Slander. "Stealing;" "D—d thieving scoundrel." Judgment for defendant. Affirmed.

Landis v. Campbell, 79 Mo. 433. Libel. "Excommunication;" "False and malicious statements." Judgment for plaintiff; no amount given. Reversed.

Christal v. Craig, 80 Mo. 367. Slander. "Perjury, larceny, adultery." Female plaintiff. Judgment for plaintiff for $500. Reversed and remanded.

Legg v. Dunleavy, 80 Mo. 558. Libel. "Dishonesty in business." Judgment for defendant. Affirmed.

Lewis v. McDaniel, 82 Mo. 577. Slander. "Biggest thief on this creek;" "hog stealing." Judgment for plaintiff for one cent. Affirmed.

Trimble v. Foster, 87 Mo. 49. Slander. "Thief . . . a d—n thief." Judgment for defendant. Reversed.

Noeninger v. Vogt, 88 Mo. 589. Slander. "Defrauder, incendiary and murderer." Judgment for defendant on demurrer. Reversed and remanded.

Caruth v. Richeson, 96 Mo. 186. Libel. "Corruption in office." Judgment for defendant. Affirmed.

Boogher v. Knapp, 97 Mo. 122. Libel. "Convicted of conspiracy and libel." Judgment for defendant. Affirmed.

Edwards v. Geo. Knapp & Co., 97 Mo. 432. Libel. "Sexual intercourse with her brother." Female plaintiff. Judgment for plaintiff for $5000. Reversed and remanded.

Hyde v. McCabe, 100 Mo. 412. Libel. "False swearing." Judgment for defendant on demurrer. Reversed and remanded.

Powell v. Crawford, 107 Mo. 595. Slander. "Larceny." Plaintiff nonsuited. Affirmed.

McGinnis v. Geo. Knapp & Co., 109 Mo. 131. Libel. "Bribery." Demurrer to petition sustained. Reversed and remanded.

Mitchell v. Bradstreet Co., 116 Mo. 226. Libel. "Assigned"—said of a commercial firm. Judgment for plaintiff for $5500. Affirmed.

Callahan v. Ingram, 122 Mo. 355. Slander. "Downright thief." Judgment for plaintiff for $5500. Reversed and remanded on instructions.

Fulkerson v. Murdock, 123 Mo. 292. Slander. Words not disclosed. Judgment for plaintiff for $1350. Affirmed.

Arnold v. Jewett, 125 Mo. 241. Libel. "Falsely representing defendants." Judgment for defendant. Affirmed.

St. James Military Academy v. Gaiser, 125 Mo. 517. Libel. "Teachers dancing," etc. Defendant's objection to the introduction of testimony sustained. Plaintiff nonsuited. Reversed and remanded.

Nicholson v. Rogers, 129 Mo. 136. Slander. "Keeping a whorehouse." Judgment for plaintiff; no amount given. Reversed and remanded on instructions.

Hancock v. Blackwell, 139 Mo. 440. Slander. "Larceny from a dwelling;" "adventuress and destined to become noted crook." Female plaintiff. Judgment for plaintiff for $3500. Reversed and remanded on improper evidence.

Sullivan v. Com. Co., 152 Mo. 268. Libel. "Afraid to deal with him," etc. Demurrer to evidence sustained —nonsuit. Reversed and remanded.

McCloskey v. Pulitzer Pub. Co., 152 Mo. 339. Libel. "Mistreatment of wife," etc. Judgment for defendant. Reversed and remanded on instructions.

Taylor v. Pullen, 152 Mo. 434. Slander. Words not given. Judgment for plaintiff for $801. Affirmed.

Heller v. Pulitzer Pub. Co., 153 Mo. 205. Libel. "Embezzler;" "Shipped out." Court instructed jury to find for plaintiff. Judgment for plaintiff; no amount given. Reversed and remanded.

Bray v. Callihan, 155 Mo. 43. Slander. "A villainous reptile"—"not fit to be in a decent community. He is not fit to go with decent girls," etc. Objection to introduction of evidence sustained; nonsuit. Reversed and remanded.

St. L. Clo. Co. v. Hail D. G. Co., 156 Mo. 393. Libel. "Fake advertisement." Judgment for defendant. Affirmed.

Finley v. Steele, 159 Mo. 299. Libel. "Tyrannical, abusive and indecent." Young lady school teacher, plaintiff. Judgment for defendant on mandatory instruction. Affirmed.

Stark v. Geo. Knapp & Co., 160 Mo. 529. Libel. "Lobbyist—corruption, etc." Judgment for defendant. Affirmed.

Jones v. Brownlee, 161 Mo. 258. Libel. "Adultery." Female plaintiff. Judgment for defendant. Affirmed.

McCloskey v. Pulitzer Pub. Co., 163 Mo. 22. Libel. Same as 152 Mo. 339, supra. Judgment for plaintiff for $6558. Motion for new trial sustained because of excessive verdict. Affirmed.

Wagner v. Scott, 164 Mo. 289. Libel. "Charges affecting plaintiff's professional and personal standing." Nonsuit on mandatory instruction. Reversed and remanded.

Jones v. Murray, 167 Mo. 25. Libel. "Murderer;" "Robber." Judgment for defendant. Reversed and remanded.

Weltmer v. Bishop, 171 Mo. 110. Libel. "Miserable charlatans," etc. Judgment for plaintiff for $750. Reversed.

Minter v. Bradstreet Co., 174 Mo. 444. Libel. "Attack on credit and responsibility." Judgment for plaintiff for $30,000. New trial granted, because excessive, etc. Judgment for plaintiff for $27,000 on second trial. Affirmed.

Carpenter v. Hamilton, 185 Mo. 603. Slander. "Stealing paint." Judgment for plaintiff for $800. Affirmed.

Ukman v. Daily Record Co., 189 Mo. 378. Libel. "Transfer of stock of cigars for $1." Plaintiff nonsuited. Affirmed.

Julian v. Kansas City Star, 209 Mo. 35. Libel. "Did well in a legislative way," etc. Affirmed for $15,000 damages.

Meriwether v. Knapp & Co., 211 Mo. 199. Libel. "Hypocrite, tricks, falsehood, political associate of boodlers," etc. Judgment for $10,000. Reversed and remanded.

Brown v. Globe Printing Co., 213 Mo. 611. Libel. "Perjury," etc. Judgment for $12,000. Affirmed.

Brown v. Knapp & Co., 213 Mo. 655. Libel. "Perjury," etc. Judgment for $10,000. Affirmed.

Flowers v. Smith, 214 Mo. 98. Libel. Many charges reflecting on official integrity. Judgment for $6000. Reversed and remanded.

Branch v. Knapp & Co., 222 Mo. 580. Libel. "Bribery," etc. Judgment for $10,000. Reversed.

Meriwether v. Knapp & Co., 224 Mo. 617, same as 211 Mo. 199. Libel. Judgment for plaintiff for $6000. Affirmed.

## MISSOURI APPEAL CASES ON LIBEL AND SLANDER.

Barber v. St. L. Dis. Co., 3 Mo. App. 377. Libel. "Adultery." Female plaintiff. Verdict for plaintiff for $3500. Remittitur for $1000. Judgment for plaintiff for $2500. Reversed and remanded for instructions.

Blackwell v. Smith, 8 Mo. App. 43. Slander. "Thief," etc. Judgment for defendant. Affirmed.

See: Memorandum cases in 8 Mo. App., pp. 561, 591.

Salvatelli v. Ghio, 9 Mo. App. 155. Libel. Attaching blame to Priest in stealing, etc. Judgment for defendant. Affirmed.

Hawkins v. Globe Printing Co., 10 Mo. App. 174. Libel. "Adultery." Female plaintiff. Judgment for plaintiff for $1000. Affirmed.

Meyrose v. Adams, 12 Mo. App. 329. Libel of title. Judgment for defendant. Reversed and remanded.

Hillebrand v. Dreinhoefer, 13 Mo. App. 586. (Appendix; Mem. Case, no amount given.) Affirmed. See also: Appendix, 14 Mo. App. 601.

Hermann v. Bradstreet Co., 19 Mo. App. 227. Libel. "In the hands of the sheriff." Judgment for plaintiff for $600. Reversed and remanded on pleadings.

Lanius v. Druggist Pub. Co., 20 Mo. App. 12. Libel. Charging plaintiff with traveling through country and representing defendant, etc. Judgment for plaintiff for $2000. Affirmed.

Mix v. McCoy, 22 Mo. App. 488. Slander. "Larceny of hogs." Judgment for plaintiff for $500. Affirmed.

Wood v. Hilbish, 23 Mo. App. 389. Slander. "Stealing." Judgment for plaintiff; no amount given. Reversed and remanded.

Casey v. Aubuchon, 25 Mo. App. 91. Slander. "Larceny." Judgment for plaintiff for $500. Affirmed.

McMurry v. Martin, 26 Mo. App. 437. Libel. (See letter on pp. 441-2 for grossly indecent and scandalous charges made.) Judgment for plaintiff; no amount given. Reversed and remanded on instructions.

Lally v. Cantwell, 30 Mo. App. 524. Slander. "False statements, causing a discharge from profitable employment." Demurrer to petition sustained. Reversed and remanded.

Elder v. Oliver, 30 Mo. App. 575. Slander. "Larceny." Judgment for plaintiff for $75. Affirmed.

Boyce v. Aubuchon, 34 Mo. App. 315. Slander. "Burglary and larceny." Judgment for plaintiff; no amount given. Reversed and remanded.

Morgan v. Rice, 35 Mo. App. 591. Slander. "Thief." Judgment for plaintiff for $500. Affirmed.

Houston v. Woolley, 37 Mo. App. 15. Libel (Attachment for). "Larceny," and other crimes. Special judgment of $500 against property. Special judgment made general and affirmed.

Baldwin v. Walser, 41 Mo. App. 243. Libel. "Notice of dissolution of partnership." Demurrer to petition sustained. Affirmed.

Wagner v. Printing Co., 45 Mo. App. 6. Libel. "Embezzlement." Judgment for plaintiff for $2000. Affirmed.

Baldwin v. Fries, 46 Mo. App. 288. Slander. "Thief." Judgment for plaintiff; no amount given. Affirmed.

Nelson v. Wallace, 48 Mo. App. 193. Slander. Husband and wife, plaintiffs. Charging wife with "Fornication, while single." Judgment for plaintiff for $1800. Reversed and remanded on instruction.

Manget v. O'Neill, 51 Mo. App. 35. Libel. "Fakir," "Confidence man," etc. Judgment for plaintiff for $600. Affirmed.

Walter v. Hoeffner, 51 Mo. App. 46. Slander. Female plaintiff. "Slut, bitch and whore." Judgment for plaintiff for $2500. Reversed and remanded on admission of evidence.

Unterberger v. Scharff, 51 Mo. App. 102. Slander. "Thief." Verdict for plaintiff for $1500. Remittitur, $750. Judgment for $750. Reversed and remanded on instructions.

Fulkerson v. Murdock, 53 Mo. App. 151. Slander. "Stealing." Judgment for plaintiff for $1350. Reversed and remanded on account of error in admission of evidence. Certified to the Supreme Court. Judgment of the circuit court affirmed in Supreme Court. (123 Mo. 292.)

Walker v. Hoeffner, 54 Mo. App. 554. Slander. Same as 51 Mo. App. 46. Judgment for plaintiff for $500 ($250 on each count). Affirmed as to first count. Remittitur ordered for $250.

Bridgman v. Armer, 57 Mo. App. 528. Slander. "Thief." Judgment for plaintiff for $400. Reversed and remanded on account of refused instructions.

Liske v. Stevenson, 58 Mo. App. 220. Slander. "Stealing." Demurrer to evidence sustained. Nonsuit. Reversed and remanded on plaintiff's appeal.

Spurlock v. Lombard Inv. Co., 59 Mo. App. 225. Libel. Advertising a "Trustee's Sale." Judgment for plaintiff for $700. Reversed.

Crecelius v. Bierman, 59 Mo. App. 513. Slander. "Forgery." Judgment for plaintiff for $500. Reversed and remanded.

Schmidt v. Bauer, 60 Mo. App. 212. Slander. "Defamation" of female plaintiff. Judgment for plaintiff for $1500. Reversed and remanded.

Lewis v. Humphries, 64 Mo. App. 466. Slander. "Larceny." Judgment for plaintiff; no amount given. Reversed and remanded.

Lamberson v. Long, 66 Mo. App. 253. Slander. "Larceny." Judgment for plaintiff for $100. Affirmed.

Crecelius v. Bierman, 68 Mo. App. 34. Slander. "Forgery." (Supra, 59 Mo. App. 521.) Judgment for plaintiff; no amount given. Affirmed.

Ferguson v. Chronicle Pub. Co., 72 Mo. App. 462. Libel. "Gambling," "Craps." Judgment for plaintiff for $300. Affirmed.

Linville v. Rhoades, 73 Mo. App. 217. Slander of title. Judgment for plaintiff; no amount given. Affirmed.

McAtee v. Valandingham, 75 Mo. App. 45. Slander. Female plaintiff charged with borrowing and keeping an obscene book for months. Judgment for plaintiff for $500. Reversed and remanded on instruction.

Arnold v. Sayings Co., 76 Mo. App. 159. Libel. "Larceny." Judgment for plaintiff for $1500. Affirmed.

Michael v. Matheis, 77 Mo. App. 556. Slander. Female plaintiff. "Common whore." Judgment for plaintiff for $325. Affirmed.

Baldwin v. Boulware, 79 Mo. App. 5. Slander. "Arson." Judgment for plaintiff; no amount given. Affirmed.

Alderson v. Auerswald, 80 Mo. App. 370. Slander. "Perjury." Judgment for plaintiff for $200. Reversed.

Hall v. Jennings, 87 Mo. App. 627. Slander. "Stealing." Judgment for plaintiff for $2000. Affirmed.

Hess v. Gansz, 90 Mo. App. 439. Libel. "Defamation of character." Judgment for plaintiff; no amount given. Reversed and remanded.

Butts v. Long, 94 Mo. App. 687. Slander. "Slander of title." Judgment for defendant on demurrer. Affirmed.

Krup v. Corley, 95 Mo. App. 640. Slander. "False swearing, thief, forger." Judgment for plaintiff for $500. Reversed and remanded on admission of testimony.

Weber v. Lane, 99 Mo. App. 69. Libel. "Disorderly house." Judgment for plaintiff for $500. Reversed.

Fish v. S. L. Ptg. & Pub. Co., 102 Mo. App. 6. Libel. "Bogus Reformer," etc. Judgment for plaintiff for $500. Reversed and remanded.

Friedman v. Pulitzer Co., 102 Mo. App. 683. Libel. "Forgery," etc. Verdict for plaintiff for $2800—new trial granted. Affirmed.

Dunlevy v. Wolferman, 106 Mo. App. 46. Slander. Female plaintiff accused of carrying meat out of store. Verdict for $875. Reduced, and judgment for plaintiff for $500. Affirmed.

Butts v. Long, 106 Mo. App. 313. Slander. "Slander of title." Judgment for defendants. Affirmed.

Kersting v. White, 107 Mo. App. 265. Slander. Female plaintiff. "Fornication." Judgment for plaintiff; no amount given. Reversed and remanded.

Duncan v. Williams, 107 Mo. App. 539. Libel. Female plaintiff. "Convicted and fined $1." Judgment for defendant. Affirmed.

Midland Pub. Co. v. Trade Journal Co., 108 Mo. App. 223. Libel. "Fake." Affirmed as to first count ($500); reversed as to second.

Israel v. Israel, 109 Mo. App. 366. Slander. Female plaintiff. "Whore and s—n of a b—h." Judgment for plaintiff for $1270. Affirmed.

Brown v. Wintsch, 110 Mo. App. 264. Slander. Female plaintiff. "Fornication," etc. Judgment for plaintiff; no amount given. Affirmed.

Farley v. Pub. Co., 113 Mo. App. 216. Libel. "Dishonest conduct." Judgment for plaintiff for $400. Affirmed.

Grimes v. Thorp, 113 Mo. App. 652. Slander. "Stealing corn." Judgment for plaintiff for $2000. Reversed and remanded on instructions.

Yager v. Bruce, 116 Mo. App. 473. Slander. "Thief." Judgment for plaintiff for $1000. Reversed and remanded. Improper evidence. Kenworthy v. Journal Co., 117 Mo. App. 327. Libel. "Perjury." Judgment for plaintiff; no amount given. Reversed and remanded.

Overton v. White, 117 Mo. App. 576. Slander. "Fornication." (2d appeal of 107 Mo. App. 265.) Judgment for plaintiff for $2000. Affirmed.

Meriwether v. Knapp & Co., 120 Mo. App. 354. Libel. "Denouncing a politician as a criminal; connected with Ed. Butler." Verdict for plaintiff for $5000. Remittitur. Judgment for $4500. Affirmed.

Dust Sprayer Mfg. Co. v. Western Fruit Grower, 126 Mo. App. 139. Libel. (Tendency of whole article libelous—false representation.) Demurrer sustained. Affirmed.

Maginn v. Schmick, 127 Mo. App. 411. Libel of title. Judgment for plaintiff; no amount. Affirmed.

Payton v. Clothing Co., 136 Mo. App. 577. Slander. "Dirty thief." Judgment for plaintiff; no amount given. Affirmed.

If my figures are correct the total amount of damages assessed in libel and slander suits in this State in the ninety years of its existence, in cases that were affirmed as well as those reversed, ascertainable from the printed volumes of appellate courts, is $184,576.02. Mr. Cook recovered within $34,578.02 of as much as all the others put together. Are we to be told that such a verdict does not irresistibly bespeak passion and prejudice? The amount of damages left standing is less than one-third and more than one-fourth of the total damages assessed in all cases of libel or slander that ever reached an appellate court in Missouri. Doubtless the defendant can suffer the loss and still

print its newspaper. But I most respectfully doubt whether the cause of Jurisprudence can well suffer the loss of judicially estimating the damages of this plaintiff at the sum of $50,000—of *judicially* determining that $100,000 of excess in a verdict does not show prejudice and passion and of *judicially* cutting away two-thirds of a verdict and leaving one-third standing, with no rule to guide the court but a guess, and power to enforce the guess.

It was said of Mr. Justice BULLER that in writing down the reasons of the judgments he delivered he looked as well before as behind in order to keep within reasoned precedents and avoid making bad ones. I have been told that it was once said of soothsayers in very olden times that two of them could not meet in the highway without smiling at each other. If $100,000 of excess in a verdict be not indubitable evidence of prejudice and passion how can we hereafter (without smiling at each other) ever hold in any case of tort that any amount of excess in any verdict indicates prejudice and passion? Nay more, as rules of law are not established for one case or for one day but for all time and all cases of like character, therefore it seems to me that in this case we have struck down the recognized rule of reason and law hitherto guiding us in deducing prejudice and passion from such an inflamed excess of damages as makes a just man instinctively cry out against it. Sure am I that no exigency of the law either requires this verdict to stand or a new and anxious precedent to be established. Therefore, I respectfully dissent from the conclusions reached by my esteemed brethren.

*Graves, J.*, concurs in these views and files a concurring opinion.

### SEPARATE DISSENTING OPINION.

GRAVES, J.—Concurring fully in what is said by LAMM, J., in his dissenting opinion, I wish by way of emphasis to add a few thoughts upon the results of this case upon future jurisprudence in this State. The opinion, after reviewing several late cases, in my judgment foreign to the real issues in this case, says:

"The rationale of these late cases is that the fact that a verdict is too large does not itself indicate that the jury was actuated by passion or prejudice *where there was no error in the admission or rejection of testimony or in the instructions of the court and no misconduct on the part of the jury was shown and the evidence established that the plaintiff was entitled to a substantial verdict, and that in such case if the plaintiff would consent to a remittitur of a part of his verdict, the defendant could not complain.*"

If this be the law, then this court has erred a great many times in reversing and remanding cases on the ground that the verdict indicated passion and prejudice upon the part of the jury. The most recent instance is that of Partello v. Railroad, 217 Mo. 645. This case, which in my judgment announces the rule of law in this State from the earliest date up to the present case, comes from our learned brothers of Division Two, all of whom concur in the present opinion. In the Partello case, there was no error in the admission or rejection of evidence; there was no error in the giving or refusing of instructions; there was no proof of the misconduct of the jury. In other words, every element of the new doctrine announced in the present case, was open and obvious in the Partello case, yet our learned brethren in that case said that the verdict itself was evidence of passion and prejudice and reversed and remanded the cause without a suggestion of *remittitur*. In so doing, they followed every prior precedent in this State, and were right, but the announced doctrine hereinabove

quoted from the present opinion neither comports with the Partello case nor any of its predecessors. The rulings in the two cases are diametrically opposed to each other, yet we find no word overruling the Partello case. Why, when there was no error as to the evidence, no error as to instructions, no evidence as to misconduct of the jury, and evidence that plaintiff was entitled to a verdict in some substantial sum, was Mrs. Partello remitted to another trial of her cause, without privilege of consenting to a *remittitur,* as given in the case at bar?

But to the real issue in the present case. There is, as in the Partello case, often no means of detecting the passion and prejudice of a trial jury, except by the amount of the verdict. It is no evidence that there was no passion and prejudice on the part of the jury because the record discloses that the trial court did its duty with reference to the admission of the testimony and the giving of the law. To my mind, if a painstaking trial judge has excluded from the jury all improper evidence and then given to them proper instructions, and yet an unconscionable verdict is returned, that fact alone is the strongest evidence of passion and prejudice. If the court admitted improper evidence and an excessive verdict resulted we might attribute this to error of the court, but if the court did its duty, then we can trace a grossly excessive verdict to no other source than to the passion and prejudice of the jury. Generally speaking passion and prejudice of a jury cannot be shown other than through the verdict. Jurors imbued with passion and prejudice, do not proclaim that fact from the house-tops, but it is locked up within their breasts, until it is brought to the public gaze through the verdict. So that instead of urging that there is absence of passion and prejudice by reason of absence of error in the course of the trial, the exact opposite should be said. In other words a grossly excessive verdict based upon a record without

error upon the part of the trial court is the strongest evidence of passion and prejudice upon the part of the jury. That the verdict in this case was grossly excessive, my brothers by their conclusions have announced. That it shocked their conscience is bespoken by their opinion—not in words, but in the minimized judgment.

I repeat, what I have said before, that when the judges of a court are so shocked by the enormity of a verdict, that they feel that they should not permit it to stand, without cutting it down one-half, or in this instance cutting it down two-thirds, such verdicts should be declared to be the result of passion and prejudice and a new trial unconditionally awarded.

Passion and prejudice, if such exists, vitiates the whole verdict, and not a part of it. This doctrine has so often been announced by the courts that citation of authority is useless. In fact, my brothers in effect concede this in the opinion, by announcing the new rule, quoted supra, for ascertaining whether or not there was passion or prejudice.

Under the holding in the present case and others to be mentioned, reversing and remanding a cause for passion and prejudice is a lost doctrine in Missouri. Whilst in the present case it is urged that the absence of error in the admission of testimony is evidence of no passion and prejudice, yet we have met all situations in tort cases in this and the case of Moore v. Transit Company, 226 Mo. 689 (handed down at this sitting), should there be error in the admission of evidence. In the Moore case it is conceded that evidence was improperly admitted, and further conceded that the verdict was so grossly excessive as to require a *remittitur* of one-half of the amount. In other words, where we find that there is no error upon the part of the trial court, there is no sufficient evidence of passion and prejudice to disturb the whole verdict, but if on the other hand we chance to find that the court did commit

error in the admission of evidence, we will say that such evidence, improperly admitted, will be weighed by the court, its effect on the jury analyzed, and an allowance will be made to defendant for the excess of such verdict superinduced by the improper evidence. Taking the two cases, reversing and remanding a cause on account of passion and prejudice is a lost art in Missouri.

Personally, I think that the doctrine of *remittitur* in tort cases is without foundation in law or logic, but being the established doctrine of the court, I bow to it, but in so doing I think it well to take our bearings upon the vital question as to what shall be sufficient evidence of passion and prejudice to demand at our hands the reversal of a case for retrial before an impartial jury.

To my mind the verdict in this case is so grossly excessive as to indicate passion and prejudice upon the part of the jury. If not in this case, I can hardly conceive of one wherein the doctrine would obtain. The action of my associates in reducing a $150,000 verdict to $50,000, proclaims the grossness of the verdict. Even-handed justice demands a new trial in this case. The passion wrapped up in the excessiveness of this verdict cannot be eradicated by the paring knife of a *remittitur*. It permeates the whole verdict and the whole judgment should be set aside and the cause retried.